**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| KATHLEEN LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-01716 |
| | ) | (LMB/LRV) |
| | ) | |
| INOVA HEALTH CARE SERVICES, | ) | |
| d/b/a INOVA HEALTHPLEX, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Date: July 15, 2024

Laurie L. Kirkland, VSB No. 75320
Ian J. McElhaney, VSB No. 94888
BLANKINGSHIP & KEITH, P.C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
(703) 691-1235 (telephone)
(703) 691-3913 (facsimile)
lkirkland@bklawva.com
imcelhaney@bklawva.com

*Counsel for Defendant Inova Health Care Services,*
*d/b/a Inova HealthPlex*

**Table of Contents**

Preliminary Statement..................................................................................................... 1

Statement of Undisputed Material Facts ........................................................................ 2

    Ms. Slattery Places Ms. Lewis on a Performance Improvement Plan in 2018.................. 2

    Ms. Lewis Receives a Final Memorandum of Expectations in 2019 ................................. 4

    Colleagues Complain About Ms. Lewis's Workplace Conduct,  Prompting Karen
    Wastler to Call for a Cultural Assessment of Ms. Lewis's Department ........................... 7

    Ms. Lewis Submits a Formal Grievance about Ms. North-Giles...................................... 10

    The Cultural Assessment Substantiates Concerns About Ms. Lewis's  Workplace
    Conduct, and Sean McCleary Makes the Decision to Terminate Ms. Lewis ................... 12

    Inova Also Considered Ms. Lewis's Request for a Raise................................................. 15

Argument ....................................................................................................................... 17

    I.   Ms. Lewis Cannot Prove a Prima Facie Case of Discrimination or Retaliation.............. 18

        A.  Ms. Lewis Cannot Establish a Prima Facie Case of Wrongful Discharge Based on
            Race (Counts I & II). ........................................................................................... 18

        B.  Ms. Lewis Cannot Establish a Prima Facie Case of Retaliation................................ 20

        C.  To the Extent Ms. Lewis's Claims Also Are Based on a Denial of a Requested Raise,
            Such Denial Does Not Satisfy the Element of Adverse Action Necessary to Prove a
            Prima Facie Case of Discrimination or Retaliation. ................................................. 23

    II. Inova Had Legitimate, Non-Discriminatory and Non-Retaliatory Reasons for the
        Adverse Actions about which Ms. Lewis Complains. ...................................................... 25

        A.  Inova Did Not Conduct a Cultural Assessment or Terminate Ms. Lewis's
            Employment because of Her Race or Any Alleged Protected Activity....................... 25

        B.  Inova Did Not Deny Ms. Lewis Her Request for a Raise because of Her Race or
            Any Alleged Protected Activity.............................................................................. 26

    III. Ms. Lewis Cannot Establish that Inova's Legitimate Reasons for Its Actions Were a
        Pretext for Discrimination or Retaliation......................................................................... 27

        A.  Ms. Lewis Has No Evidence that the Feedback Received from Multiple Different
            Persons Is Unworthy of Credence and a Pretext for Racial Discrimination.............. 27

        B.  Ms. Lewis Cannot Establish Pretext Because She Cannot Prove that the Real
            Reason for the Denial of Her Raise or Her Termination was Retaliation. ................. 29

    IV. As to Counts II and IV, Ms. Lewis Also Cannot Satisfy the Additional Element of
        "But-For Causation" as Requested to Prove a Claim under Section 1981. ...................... 30

Conclusion .................................................................................................................... 30

i

**Preliminary Statement**

In her Complaint, Plaintiff Kathleen Lewis ("Ms. Lewis") alleges that her former employer, Inova Health Care Services ("Inova"), discriminated against her on the basis of race and retaliated against her after she claimed to have engaged in protected activity. Ms. Lewis alleges that the primary perpetrator of these acts was one of her immediate supervisors, Shannon North-Giles ("Ms. North-Giles"), and that the actions taken against her culminated in the denial of a requested raise and ultimately in the termination of Ms. Lewis's employment in July 2020.

The undisputed record developed through discovery, however, paints a very different picture. For one, Ms. North-Giles, who was not discriminating retaliating against Ms. Lewis, had nothing whatsoever to do with any denial of a requested raise nor Ms. Lewis' termination. Instead, a newly hired Vice President of Imaging and Laboratory Services, Sean McCleary ("Mr. McCleary"), for the department made the decision to terminate Ms. Lewis's employment—not because of her race or any protected activity—but because she, as a leader, repeatedly failed to collaborate well with others and had fostered an environment of fear for those working with her, notwithstanding that Inova previously had warned her on two occasions to correct such behavior lest she be terminated. Likewise, it was not Ms. North-Giles, but Mr. McCleary, who denied Ms. Lewis's request for a raise—again, not because of her race or because of protected activity—but because he found her present level of compensation to be equitable based on her duties and tenure at Inova. These non-discriminatory and non-retaliatory reasons are enough to defeat Ms. Lewis's action, but, additionally, there is *no evidence* that the decisionmaker, Mr. McCleary (not even mentioned in the Complaint), considered Ms. Lewis's race, and there is *no evidence* that he was even aware of any activity by Ms. Lewis protected by law. Indeed, even Ms. Lewis does not consider him among the myriad individuals she believed to harbor racial animus against her.

1

The record is clear: Inova provided Ms. Lewis, a director-level leader, with multiple opportunities to improve her performance, but she failed to show sustained improvement, leading Inova, as any employer would, to terminate her for not meeting its expectations and not for any discriminatory or retaliatory reason. For these reasons and those that follow, Inova is entitled to summary judgment in its favor as to all claims.

## Statement of Undisputed Material Facts

1.      Ms. Lewis began working at Inova in July 2016 as the Director of Laboratory Services, which position she held during her entire employment with Inova. (Dep. of Kathleen Lewis, attached as Def. Ex. 1, at 10:7-14.)

2.      When Ms. Lewis joined Inova, her immediate supervisor was Katherine "Katie" Slattery, the Senior Director of Ambulatory Services. (Def. Ex. 1 at 13:18-23.)

### Ms. Slattery Places Ms. Lewis on a Performance Improvement Plan in 2018

3.      In early 2018, Ms. Slattery completed an annual evaluation of Ms. Lewis's performance for the 2017 calendar year ("2017 Evaluation"). (Def. Ex. 1 at 16:1-18.) The 2017 Evaluation identified that Ms. Lewis did "not meet expectations" in two categories: "Lives our 'Stronger Together' Cultural Belief," and "Lives our 'Tell Me' Cultural Belief." (Def. Ex. 2.[1])

4.      The 2017 Evaluation stated with respect to the former category, "[t]he belief shared was that [Ms. Lewis] was not a role model for collaboration and often suggestions for compromise were met with defensiveness or negativity. Kathleen needs to continue working on creating experiences that will change these beliefs and position her as a leader who models

---

[1] Def. Ex. 2 is Inova's Trial Exhibit 1, to which Ms. Lewis did not object, and thus which stands admitted into evidence. (2/15/24 Order (Doc. No. 8).) Likewise, all other exhibits cited in this brief, other than deposition transcripts, are to Inova's Trial Exhibits, to which Ms. Lewis filed no objections and thus which also stand admitted. (*Id.*) For ease of reference, the trial exhibit number also is indicated when each new exhibit is introduced.

effective and positive partnership with all constituents." With respect to the latter category, the 2017 Evaluation stated, among other things, that Ms. Lewis "needs to better demonstrate that she absorbs the feedback that she receives from others by acting on it and thus changing others' experiences and beliefs as a result." (Def. Ex. 2.)

5.      Following the 2017 Evaluation, Ms. Slattery placed Ms. Lewis on a Performance Improvement Plan ("PIP") issued February 15, 2018. The PIP stated that Ms. Lewis was "perceived by some leaders as difficult to work with because of her unwillingness to partner or compromise in finding a resolution[,]" that Ms. Lewis "sometimes responds to leaders in a defensive manner," and that "[s]ometimes her response has been perceived as negative or delivered in a negative tone." The PIP also documented instances where Ms. Lewis's superiors had "received information about areas of concern involving the lab from other leaders rather than receiving the information directly from Kathleen. This is partly due to leaders' prior interactions with Kathleen or her lack of proactively escalating the matter to senior leadership for guidance." (Def. Ex. 1 at 45:16-20; *see* PIP, attached as Def. Ex. 3 (also Inova Trial Ex. 3).)

6.      The PIP tasked Ms. Lewis with developing an action plan to correct the deficiencies identified in the PIP and further provided for a "360 performance feedback review" ("360 Assessment") to be completed by Ms. Lewis's direct reports, colleagues, and supervisors. The PIP further advised that Ms. Lewis "must show immediate improvement and sustain improved performance on an on-going basis beyond the assessment period of this Plan. Recurring or additional performance issues will result in action up to and including termination of employment without further coaching or notice." (Def. Ex. 3.)

7.      The 60-day PIP ended in April 2018. In an email to Ms. Lewis confirming completion of the PIP, Ms. Slattery noted areas of improvement, but explained that "[t]here

remain outstanding concerns regarding the relationship with the perioperative leadership team. The expectation is that you continue to focus on creating strong partnerships with them." Ms. Slattery also advised Ms. Lewis that the 360 Assessment would run from late April to early May, and that following the assessment, Ms. Lewis would receive coaching, with the expectation that Ms. Lewis would incorporate feedback from the 360 Assessment and her coaching sessions "into [her] interactions with others and continue to improve their experiences and beliefs about you as a leader." (Def. Ex. 4 (Inova Trial Ex. 8).)

8.      The 360 Assessment, conducted by Partners in Leadership, was completed in May 2018. Ms. Lewis received high scoring in keeping "the 'Key Results' front and center" in her daily work, but she received lower scores in areas such as championing culture change, partnership, and finding/acting on solutions. (*See* Def. Ex. 5 (Inova Trial Exs. 9-10).)

9.      Inova also paid Partners in Leadership for a coach for Ms. Lewis to review her results and provide further coaching in the upcoming months. (Def. Ex. 6 (Inova Trial Ex. 11).)

**Ms. Lewis Receives a Final Memorandum of Expectations in 2019**

10.      By the time of Ms. Lewis's next annual evaluation for the 2018 calendar year, Inova had hired Shannon North-Giles, who had replaced Ms. Slattery as the Senior Director and as Ms. Lewis's immediate supervisor. (Dep. of S. North-Giles, attached as Def. Ex. 7, at 13:22-15:10; 84:19-85:8.)

11.      In the 2018 Evaluation, Ms. North-Giles observed that there were "still some gaps in legacy perceptions and opportunities for relationship building," but she rated Ms. Lewis overall as "meets expectations" for the 2018 calendar year. (Def. Ex. 8 (Inova Trial Ex. 13).)

12.      By June 2019, however, Ms. North-Giles felt that Ms. Lewis had begun exhibiting behaviors similar to those that had been the subject of Ms. Lewis's PIP the prior year. Through

4

discussions with Robyn Harding née Walden ("Ms. Walden"), then Acting Director of Inova Human Resources, as well as Lanai Jackson, Inova HR Business Partner, Ms. North-Giles determined that, in lieu of a second PIP, Ms. North-Giles would issue a Memorandum of Expectations to Ms. Lewis to alert Ms. Lewis to the recurring pattern of behaviors observed by Inova that needed to change in order for Ms. Lewis to continue in Inova's work environment. (Dep. of R. Harding née Walden, attached as Def. Ex. 9, at 54:10-57:15; Def. Ex. 7 at 34:18-35:8; *see also* June 2019 Emails, attached as Def. Ex. 10 (Inova Trial Exs. 15-17).)

13.     It is not uncommon at Inova for an employee to improve enough to close out a PIP, but then to return to the same behaviors demonstrated prior to the PIP and be terminated for those recurring behaviors. (Dep. of R. Hawkins, attached as Def. Ex. 11, at 32:5-9.) The Memorandum of Expectations is another tool that Inova's leaders may use to provide feedback and give clear expectations going forward. (Def. Ex. 11 at 35:6-19.)

14.     Ms. Walden understood that the concerns regarding Ms. Lewis related to Ms. Lewis's ability to "engage effectively with others on her team and with peers" and to "get along effectively with others that she needed to work with," rather than concerns about Ms. Lewis's work product or accuracy. (Def. Ex. 9 at 15:18-17:6.)

15.     Ms. Walden recommended the approach of issuing a Memorandum of Expectations along with a meeting in which Ms. North-Giles and Ms. Jackson would counsel Ms. Lewis regarding her communications and how they failed to embody Inova's values. (Def. Ex. 9 at 55:10-14; 59:9-21; R. Walden's June 25, 2019 Email and attachments, attached as Def. Ex. 12 (Inova Trial Ex. 18); *see also* 6/17/19 Email from Ms. Walden recommending a counseling session, included in Def. Ex. 10.)

16.     On or about June 20, 2019, Ms. North-Giles and Ms. Jackson met with Ms. Lewis to provide the counseling recommended by Ms. Walden. Following this meeting, Inova intended to proceed with issuing the previously prepared Memorandum of Expectations. (*See* 6/26/19 Email, attached as Def. Ex. 13 (Inova Trial Ex. 19); 6/28/19 Email, attached as Def. Ex. 14 (Inova Trial Ex. 22).)

17.     Inova issued the Memorandum of Expectations to Ms. Lewis on July 2, 2019. (*See* 7/2/19 Email from L. Jackson, attached as Def. Ex. 15 (Inova Trial. Ex. 23); Memorandum of Expectations, attached as Def. Ex. 16 (Inova Trial Ex. 24); Def. Ex. 1 at 73:3-12.)

18.     The Memorandum of Expectations identified concerns regarding behaviors similar in nature to the concerns raised in the 2018 PIP and for which Ms. Lewis had received coaching from Partners in Leadership. (Def. Ex. 16.)

19.     The Memorandum of Expectations also set forth Inova's expectations for Ms. Lewis to make herself available to her colleagues for collaboration and partnership, halt reflexive email push back, participate in cross-functional projects as requested, and act such that her colleagues no longer need to escalate to senior leadership for Ms. Lewis's non-participation in operational changes and improvements. (Def. Ex. 7 at 35:12-19; Def. Ex. 16.)

20.     Finally, the Memorandum of Expectations, like the PIP the prior year, warned Ms. Lewis that "[s]imilarly to the Performance Improvement Plan you completed on April 19, 2018, the expectations outlined above will need to be demonstrated immediately and sustained on a continuous basis. Recurring or additional performance issues may result in action up to and including termination of employment without further coaching or notice." (Def. Exs. 3, 16; *see also* Def. Ex. 7 at 37:13-39:7; Def. Ex. 9 at 57:16-12.)

6

21.     Ms. Lewis did not agree that a Memorandum of Expectations should have been issued after the counseling session. (Def. Ex. 1 at 75:1-5.)

22.     In response to her concerns, Ms. Walden met with her and reported that she felt they had had a "positive and productive meeting." (*See* Def. Ex. 17 (Inova Trial Ex. 26).)

23.     On October 2, 2019, Ms. Lewis emailed Ms. Walden with concerns about Ms. North-Giles, and expressed that she "feel[s] as though I am being harassed . . . and treated badly." (*See* 10/2/19 Complaint, included in Def. Ex. 18 (Inova Trial Ex. 29).)

24.     In response, Ms. Walden advised Ms. Lewis that she and Karen Wastler, who served as the AVP of Ambulatory Services and as Ms. North-Giles's supervisor at the time, would address Ms. Lewis's working relationship with Ms. North-Giles and "determine what needs to happen to ensure [Ms. Lewis] feel[s] [she is] being treated fairly and respected as a leader, and, Shannon is able to obtain information from [Ms. Lewis] to be effective and accountable in her role." (Def. Ex. 18; Def. Ex. 9 at 59:22-60:15; Def. Ex. 11 at 99.)

25.     In her meetings with Ms. Lewis before and after Ms. Lewis's October 2, 2019 email, Ms. Walden absolutely does not recall Ms. Lewis attributing any perceived harassment that she felt to her race. (Def. Ex. 9 at 60:11-61:3.)

### Colleagues Complain About Ms. Lewis's Workplace Conduct, Prompting Karen Wastler to Call for a Cultural Assessment of Ms. Lewis's Department

26.     In February and March 2020, then-Chairman and Medical Director of Pathology and Laboratory Medicine, Dr. Yan Liu, expressed concerns to Ms. Wastler about Ms. Lewis's workplace conduct. At that time, Dr. Liu's concerns included nervousness regarding her own ability to navigate interactions with Ms. Lewis and her perception that other team members may be unwilling to speak up to candidly share concerns about their work environment. In addition, Dr. Liu expressed concern that Ms. Lewis was not supportive of a compensation increase for one

of the pathology assistants, Emily L., in order to retain the pathology assistant at Inova. (*See* 2/26/20 and 3/4/20 Emails from K. Wastler, included in Def. Ex. 19 (Inova Trial Exs. 34-35.))

27.     In response to these initial concerns in the spring of 2020 by Dr. Liu, Human Resources ("HR") arranged a mediation session between Ms. Lewis and Dr. Liu to talk about being collaborative and working together as a team. (Def. Ex. 11 at 99:13-100:1.)

28.     Shortly thereafter, on March 10, 2020, Inova approved a 5.63% increase in Emily L.'s compensation based on a system equity review and in an effort to retain her as a pathology assistant, a position for which Inova had difficulty filling at that time. (*See* Def. Ex. 102:13-20; *see also* Def. Ex. 20 (Inova Trial Ex. 33).) Notwithstanding the raise, however, Emily L. resigned from Inova a little over a month later. (Def. Ex. 21 (Inova Trial Ex. 38).)

29.     In Emily L.'s exit interview with HR,[2] among the reasons she gave for resigning her position included working with Ms. Lewis, who Emily L. described as "extremely difficult to work with . . . and . . . made it a hostile environment." In Emily L.'s view, Ms. Lewis did not listen to feedback or the concerns of team members well, was not receptive to their ideas, concerns or feedback, and is not supportive of team members. (Def. Ex. 22 (Inova Trial Ex. 41).)

30.     Due to continued concerns expressed by Dr. Liu as well as Emily L.'s exit interview comments, Ms. Wastler determined that a cultural assessment of Inova's Lab Services Department was appropriate to determine if Ms. Lewis was the right leader in her role at Inova. (Def. Ex. 11 at 52:2-20; 70:4-12; 99:2-100:12.) Mr. McCleary, the then-Vice President of Imaging and Laboratory Services, supported Ms. Wastler's decision to request a cultural

---

[2] Subsequently, in late June 2020, Emily L. also participated in an exit interview with a third-party vendor, in which she again reported a lack of support from Ms. Lewis, whom she described as not understanding or appreciating her experience or value despite Emily L.'s best efforts to collaborate and whom she described as having a hostile attitude toward high level lab employees and pathologists alike. (Def. Ex. 23 at Inova 1700 (Inova Tr. Ex. 46).)

assessment. (Decl. of S. McCleary, attached as Def. Ex. 24, at ¶¶ 2, 5-6.) Ms. Lewis has admitted

that she does not know the reasoning for the cultural assessment. (Def. Ex. 1 at 197:10-15.)

31.     Ms. North-Giles was not involved in the decision to conduct a cultural assessment

of Ms. Lewis's department, nor did she conduct it. (Def. Ex. 11 at 52:2-20; 58:1-3.)

32.     Cultural assessments are not targeted at a specific leader—rather, they determine

engagement and morale within the assessed unit or department in an effort to ascertain how to

better retain employees, reduce turnover, and repair anything leading to employee dissatisfaction.

(Def. Ex. 9 at 38:15-39:13.) In other words, a cultural assessment is an opportunity for the HR

department to speak with team members and leaders within a department to get a general feel for

the culture within a department. (Def. Ex. 11 at 49:2-7.)

33.     The results of a cultural assessment may be used as a basis for termination if, for

example, it is determined that a leader is leading in a way that is not within Inova's mission,

vision, and values. A culture of retaliation or facilitating an environment where team members

are fearful of their leader are examples of leadership not within Inova's mission, vision, and

values. (Def. Ex. 11 at 49:8-50:5.) In such cases, a leader may be terminated without the

opportunity to respond to the actual cultural assessment. (Def. Ex. 11 at 55:21-56:21.)

34.     To perform a cultural assessment, HR develops questions based on the feedback

that prompted the need for the assessment. Leaders review the questions to ensure they are not

leading questions and that they seek the correct information, and then HR interviews individuals

in the department to ask the prepared questions. (Def. Ex. 11 at 54:16-55:16.)

35.     HR tasked Lanai Jackson, who, like Ms. Lewis, is an African American female

over the age of 40, as the HR Business Partner responsible for performing the cultural

assessment of Ms. Lewis's department because the only other HR Business Partner, Marianne

Castillo, already was performing a cultural assessment of a different department and she did not have the ability to do both in a timely manner. (Def. Ex. 11 at 58:1-3; 84:9-20; 124:1-4.)

36.     Due to Ms. Jackson's involvement in the issuance of the Memorandum of Expectations the prior summer in 2019, Ms. Lewis expressed concerns regarding her participation. In response to her concerns and to eliminate any bias perceived by Ms. Lewis in the process, Inova instituted measures to ensure that no individual would be interviewed by Ms. Jackson alone and that all individuals interviewed in person would verify that their recorded answers were true and accurate by reviewing and signing all notes from their interviews. (Def. Ex. 11 at 91:2-92:16.) At no time did Mr. Hawkins observe Ms. Jackson engage in any behavior that seemed discriminatory or retaliatory toward Ms. Lewis. (Def. Ex. 11 at 123:2-124:4.)

### Ms. Lewis Submits a Formal Grievance about Ms. North-Giles

37.     During the pendency of the cultural assessment, on or about June 29, 2020, Ms. Lewis submitted a formal grievance against Ms. North-Giles to Terri Feely, Kelly Armstrong, MaryBeth Ireland, and Mr. Hawkins (the "Grievance"). (*See* 6/29/20 Grievance, included in Def. Ex. 25 (Inova Tr. Ex. 46).)

38.     In the Grievance, Ms. Lewis posed the following series of rhetorical questions regarding her perception that Ms. North-Giles treated her differently: "I have no clue why my Senior Director targets and treats me differently. When she is present the work environment feels like that of a drama filled reality tv show. Is it because I am younger than her? Is it because I look different than her? Is it because I have a different skin hue than her? Is it because I am taller than her? Is it because my knowledge base and experiences are different from hers?" (Def. Ex. 25.) Ms. Lewis has testified that she did not know why any alleged discrimination was occurring, and she felt it had to do with "some of these things." (Def. Ex. 1 at 124:1-7.)

10

39.     Mr. Hawkins shared the Grievance with Ms. Wastler and their own supervisors, but not with Mr. McCleary, who was not Ms. North-Giles's leader at Inova. (*See* Def. Ex. 25.)

40.     Inova investigated Ms. Lewis's allegations. First, Mr. Hawkins met with Ms. Lewis to discuss the Grievance and, when asked, she did not provide examples of any treatment related to skin color. Rather, Mr. Hawkins understood from the meeting that Ms. Lewis was complaining not about skin color, height, or age, but about Ms. North-Giles's disruption to Ms. Lewis's ability to do her job without regard to protected class. (Def. Ex. 11 at 110:18-111:8.)

41.     Next, Mr. Hawkins interviewed each of the other four leaders who reported to Ms. North-Giles, asking each of them the same questions in an effort to determine whether Ms. North-Giles displayed disruptive behavior, treated Ms. Lewis differently than others reporting to her, brought down morale, constituted a micromanager, or failed to display Inova's Values & Behaviors. (Inova Def. Ex. 11 at 111:9-112:21; Def. Ex. 26 (Inova Trial Exs. 51-52).)

42.     Two of the leaders, one of whom, like Ms. Lewis, is black, spoke positively about Ms. North-Giles, perceiving her management style as valuable. Two other leaders, neither of whom is black, substantiated some claims in that they too perceived Ms. North-Giles to display disruptive behavior, to bring down morale with negativity, to prevent operations from going smoothly, and to act as a micromanager. The difference, however, was not based on race; rather, more tenured leaders perceived her style as micromanaging and disruptive, while less tenured managers perceived it as valuable. (Def. Ex. 11 at 111:16-112:8, 124:16-126:5; Def. Ex. 26.)

43.     None of the four leaders substantiated Ms. Lewis's claims that Ms. North-Giles treated Ms. Lewis differently; instead, her style was consistent across every single leader. Additionally, none of the other leaders substantiated Ms. Lewis's claim that Ms. North-Giles did not display Inova's Values and Behaviors. (Def. Ex. 11 at 111: 4-8, 112:4-8; Def. Ex. 26.)

44.     Based on the substantiated portion of Ms. Lewis's claims, Inova decided to honor Ms. Lewis's request to report directly to a member of the executive team rather than to Ms. North-Giles to be more aligned with Inova's organizational structure, and Inova provided coaching to Ms. North-Giles regarding her management style. Inova advised Ms. Lewis of the results of the investigation and this outcome on July 24, 2020. (Def. Ex. 27 (Inova Trial Ex. 53).)

**The Cultural Assessment Substantiates Concerns About Ms. Lewis's
Workplace Conduct, and Sean McCleary Makes the Decision to Terminate Ms. Lewis**

45.     On July 6, 2020, HR completed the Cultural Assessment of the Laboratory Services department. While many respondents provided positive feedback, 8 of the 39 team members interviewed expressed that they did not feel comfortable speaking with the laboratory leadership team, which included Ms. Lewis. For those team members who had had negative encounters with Ms. Lewis, the cultural assessment found "a fear of retaliation or that there will be harsh consequences for questioning decisions made by leadership." Team members also reported that they did "not feel that Kathleen will listen to suggestions and will proceed with doing what she wants to do," that they believe "there will be retaliation from Kathleen or that the issues that are brought to her attention will be ignored," and that they do not always feel comfortable speaking up right away about concerns. (Def. Ex. 11 at 58:17-61:13; *see also* PowerPoint Presentation of Cultural Assessment, included in Def. Ex. 28 (Inova Trial Ex. 54).)

46.     On July 7, 2020, Mr. McCleary (as Vice President of the laboratory service line and because he was becoming Ms. Lewis's direct supervisor), Ms. Wastler, and Mr. Hawkins met to review the results of the cultural assessment and to consider whether or not to terminate Ms. Lewis's employment. Although they recognized Ms. Lewis as "a talent when it comes [to] the lab and it's [sic] outcomes," they discussed that "she has always had challenges with her behavior and aligning with Inova's cultural values." Accordingly, based on Ms. Lewis's

demonstrated history of behavior that did not align with Inova's values and behaviors, which behavior already had been addressed in 2018 via a PIP and formal coaching and in 2019 with a final Memorandum of Expectations, and based on Dr. Liu's and Emily L.'s recent complaints about Ms. Lewis creating a hostile culture of a fear of retaliation and a lack of collaboration, which complaints were substantiated by the Cultural Assessment, Mr. McCleary decided to terminate Ms. Lewis's employment with Inova. (Def. Ex. 24 at ¶¶ 7-10; Def. Ex. 11 at 44:16-45:3; 54:8-12; 96:16-97:13; Def. Ex. 27; 7/7/20 Emails, at Def. Ex. 29 (Inova Trial Ex. 55).)

47.     In addition to receiving feedback regarding Ms. Lewis, the Cultural Assessment also reflected negative feedback regarding two other leaders who reported to Ms. Lewis: Nicolas Centeno and Maria Bond. Unlike Ms. Lewis, neither Mr. Centeno nor Ms. Bond had received any PIP, Memoranda of Expectations, coaching, or counseling in the past. As this was the first negative feedback Inova ever had received about either of them, Inova decided not to terminate their employment, but instead Ms. Wastler and HR provided documented coaching to each of them (as it had to Ms. Lewis already). (Def. Ex. 11 at 63:18-64:16; *see also* Def. Exs. 3, 6, 16.)

48.     With respect to Ms. Lewis, the feedback received during the Cultural Assessment also was not the sole reason for Mr. McCleary's decision to terminate her employment. (Def. Ex. 11 at 58:11-16; 65:10-66:2; 73:11-74:8.) For example, the Cultural Assessment expressly did not include the feedback from Emily L.'s exit interview. (Def. Ex. 28; *see also* Def. Ex. 22.)

49.     Additionally, Mr. McCleary's own interactions with Ms. Lewis had indicated to him that she did not prioritize how the lab fit into the larger structure of the organization and that she did not work to collaborate with leaders in other departments. (Def. Ex. 24 at ¶ 8.)

50.     Although Ms. Wastler and Mr. Hawkins agreed, Mr. McCleary was the ultimate decisionmaker as to the termination of Ms. Lewis. (Def. Ex. 11 at 54:8-12; Def. Ex. 24 at ¶ 10.)

51.      In the same way that Ms. North-Giles had played no role in the decision to conduct the Cultural Assessment, Ms. North-Giles similarly did not participate in the July 7, 2020 meeting to discuss the termination of Ms. Lewis's employment, nor was she involved in any way in the decision to terminate Ms. Lewis's employment. (Def. Ex. 24 at ¶ 11.) Ms. North-Giles did not assist in preparing the Notice of Termination, nor was she even made aware of the reasons for Ms. Lewis's termination. (Def. Ex. 7 at 18:10-19:4.)

52.      In making the decision to terminate Ms. Lewis's employment, Mr. McCleary did not consider Ms. Lewis's race. (Def. Ex. 24 at ¶ 13; Def. Ex. 11 at 126:6-10.) Notably, even Ms. Lewis has not claimed in her sworn deposition testimony that Mr. McCleary is among the myriad individuals at Inova whom she believes to have discriminated against her based on her race. (Def. Ex. 1 at 210:8-211:5.)

53.      In addition, in making his decision to terminate Ms. Lewis's employment, Mr. McCleary did not consider the fact that Ms. Lewis had filed the Grievance against Ms. North-Giles. (Def. Ex. 24 at ¶ 13-15; Def. Ex. 11 at 126:6-15.) In fact, although Mr. McCleary became generally aware that Ms. Lewis had filed a grievance, he was not aware that she had raised any claim of discrimination based on race in it, or at any prior time. (Def. Ex. 24 at ¶¶ 13-15.)

54.      On July 27, 2020, Mr. McCleary provided Ms. Lewis with a Notice of Termination, stating the reasons for his decision. (Def. Ex. 24 at ¶ 12; *see also* Notice of Termination, attached as Def. Ex. 30 (Inova Trial Ex. 57).)

55.      The next day, Inova advised Ms. Lewis that her termination date would be effective August 1, 2020 to allow her benefits to conclude on August 31, 2020, and it provided her additional time to seek alternative benefit options. Ms. Lewis was placed on administrative leave until her termination date of August 1, 2020. (Def. Ex. 31 (Inova Trial Ex. 58).)

**Inova Also Considered Ms. Lewis's Request for a Raise**

56.     Prior to Ms. Lewis's termination, Ms. Lewis had requested that her compensation be reviewed because she recently had undertaken additional duties when a blood gasses project transitioned from Respiratory Therapy to Laboratory Services and thus began to fall under Ms. Lewis's purview, "going live" in December 2019. (Def. Ex. 24 at ¶ 16.)

57.     When Ms. Lewis had requested the raise in August of 2019, prior to blood gasses "going live," Ms. Lewis had explained that her then-immediate supervisor, Ms. North-Giles, had said "that maybe she could possibly justify a discretionary bonus," though Ms. Lewis admits that she did not know what Ms. North-Giles was offering her.[3] (Def. Ex. 1 at 163:2-7; *see also* Def. Ex. 32 (Inova Trial Ex. 59).)

58.     Likewise, Ms. Lewis had admitted that Ms. Wastler never promised her a raise. (Def. Ex. 1 at 97:13.)

59.     In April 2020, when Ms. Lewis followed up on her Compensation Action ***Request*** Form, or CARF, she explained that she had been told that "something could happen after annual evaluations ***possibly***." (Def. Ex. 33 (Inova Trial Ex. 61) (emphasis added).) In response, Mr. Hawkins had advised Ms. Lewis that all CARF requests had been put on hold indefinitely," due to the Covid-19 pandemic's resulting in layoffs in April of 2020. (*Id.*; Def. Ex. 11 at 103:13-104:3.) Ms. Lewis replied, "I figured, but it never hurts to ask. Thanks!" (Def. Ex. 33.)

---

[3] In her Complaint, Ms. Lewis had claimed that Ms. North-Giles offered her a $20,000 raise for managing additional duties for Blood Gasses. (Compl. ¶ 41.) When asked if anyone promised her a $20,000 raise during her deposition, Ms. Lewis testified, "They supported and approved the action for review. And that's implied in that when you're taking over a whole new service line and doing a [Compensation Action Request Form], you know, when you have the justification, it's in line with that." (Def. Ex. 1 at 165:1-8.) Given Ms. Lewis's inability to identify anyone who promised her a $20,000 raise under oath, it is not clear whether she has abandoned such claim or not. Nonetheless, Inova addresses this claim herein out of an abundance of caution.

60.     By June 22, 2020, Inova had advised Ms. Lewis that her CARF would be reviewed by Mr. McCleary for sign off, and then, if approved, sent to finance and Dr. Bansal, President of Inova Alexandria Hospital, for final sign off at the local level before Inova's compensation department could review it. (*See* Def. Ex. 33 (Inova Trial Ex. 62); *see also* Def. Ex. 9 at 45:8-22; Def. Ex. at 107:22-108:9.)

61.     Upon receiving Ms. Lewis's request, Mr. McCleary consulted with others and reviewed Ms. Lewis's position, scope of duties, and tenure with Inova in comparison with the four other directors of laboratory services at other Inova locations to determine whether a compensation increase for Ms. Lewis was appropriate or equitable. (Def. Ex. 24 at ¶¶ 17-19; *see also* Def. Ex. 34 (Inova Trial Exs. 63-64).)

62.     Mr. McCleary's review revealed that the director receiving the highest base salary oversaw a much larger scope of work at Inova Fairfax Medical Campus and that she had been working for Inova for nearly 40 years longer than Ms. Lewis. And notwithstanding that Ms. Lewis had been the director hired by Inova most recently, her compensation was equivalent to the compensation earned by the director at Inova Fair Oaks Hospital, who also was responsible for blood gasses in her laboratory, and who had been working for Inova for approximately 9 years longer than Ms. Lewis. (Def. Ex. 24 at ¶ 18.)

63.     All of the directors also were eligible for Management Incentive Plan bonuses, or "MIP bonuses," with the same target percentages (Def. Ex. 24 at ¶ 18), which bonuses are based on Inova's overall performance and could be awarded even if Inova had issues with the team member's individual performance. (Dep. Ex. 11 at 29:17-30:2; Def. Ex. 7 at 31:8-20.)

64.     After reviewing the compensation earned by other laboratory directors, all of whom already had blood gas projects under their purview (or, in the case of Inova Loudoun

Hospital, would the following year as well), their tenure, and their scope of duties, Mr. McCleary determined that Ms. Lewis already was equitably compensated in line with her scope of duties and tenure at Inova. Accordingly, he denied her request for these reasons. (Def. Ex. 24 at ¶ 19.)

65.     In denying Ms. Lewis's request for a raise, Mr. McCleary did not take into consideration her race, nor was he aware at that time that Ms. Lewis had complained of any discrimination based on her race by anyone at Inova. (Def. Ex. 24 at ¶¶ 20-21.)

### Argument

To survive summary judgment in this case, Ms. Lewis must prove that Inova unlawfully denied her request for a raise and terminated her employment because of her African-American race (Counts I & II) or in retaliation for her allegedly engaging in activity protected by Title VII or Section 1981 (i.e., complaints of discrimination based on race) (Counts III & IV). Lacking any direct evidence that Inova's alleged adverse actions resulted from unlawful discrimination or retaliation, Ms. Lewis must prove that her termination or the denial of her requested raise were motivated by unlawful discrimination or retaliation under the burden-shifting framework established by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).

Under the first step of the *McDonnell Douglas* framework, Ms. Lewis must prove a prima facie case of employment discrimination or retaliation. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Only if she satisfies this burden does the burden of production shift to Inova, as the employer, to articulate a non-discriminatory and non-retaliatory reason for the adverse action. *Id.*; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (confirming that an employer's burden is one of production, not persuasion). Upon Inova's production of such evidence, the burden shifts back to Ms. Lewis to "prove by a preponderance of the evidence that the stated reason for the adverse employment action is a

17

pretext and that the true reason is discriminatory or retaliatory." *Id.* Thus, in this third step, Ms. Lewis's "burden to show pretext 'merges with her ultimate burden of persuading the court that she was the victim of intentional discrimination [or retaliation].'" *Id.* at 217.

Finally, with respect to her claims of discrimination and retaliation under Section 1981, Ms. Lewis not only must prove discrimination or retaliation under the above burden-shifting framework, but, as to Count II, she also "bears the burden of showing that race was a 'but-for cause' of [her] injury," *Comcast Corp. v. Nat'l Ass'n of Afr. Am-Owned Media*, 589 U.S. 327, 333 (2020), and as to Count IV, she must prove that "but for her participation in protected activity, she would not have suffered a materially adverse action," *Ali v. BC Architects Eng'rs, PLC*, 832 F. App'x 167, 172-73 (4th Cir. 2020), *as amended* (Oct. 16, 2020). As set forth fully below, Ms. Lewis cannot meet any of her burdens, and Inova is entitled to summary judgment in its favor as to all counts in the Complaint.

I.   **Ms. Lewis Cannot Prove a Prima Facie Case of Discrimination or Retaliation.**

   A.  **Ms. Lewis Cannot Establish a Prima Facie Case of Wrongful Discharge Based on Race (Counts I & II).**

To establish a prima facie case of discriminatory discharge, Ms. Lewis must establish "(1) that she is a member of a protected class, (2) that she suffered from an adverse employment action, (3) that she was performing at a level that met her employer's legitimate expectations, and (4) that the position as filled by a similarly situated qualified applicant outside of the protected class." *Guessous,* 828 F.3d at 216 (cleaned up). Although Ms. Lewis can satisfy the first, second, and fourth elements, she has no evidence sufficient to prove that, at the time of her discharge, she was performing at a level that met her employer's legitimate expectations. The record developed through discovery in this case establishes just the opposite: Ms. Lewis was performing below Inova's legitimate expectations at the time of her termination.

Specifically, in the spring of 2020, Dr. Liu and a pathology assistant expressed concerns about Ms. Lewis's creating an environment of retaliation and bullying, which concerns were substantiated through a leadership-approved cultural assessment of Ms. Lewis's department in June 2020 to determine if Ms. Lewis was an appropriate leader in her role at Inova. (SUMF 26-36, 45-46.) The results of the cultural assessment revealed that several team members did not feel comfortable speaking with laboratory leadership, including Ms. Lewis, and their negative interactions with Ms. Lewis fostered fear of retaliation for speaking up about concerns. (SUMF 45.) In light of the recent complaints, which were substantiated by the results of the cultural assessment and by Mr. McCleary's own observations of Ms. Lewis, as well as the fact that Ms. Lewis twice failed to improve her leadership notwithstanding receipt of a PIP, coaching, and a Memorandum of Expectations addressing similar concerns, Mr. McCleary made the decision to terminate Ms. Lewis for her failure to meet Inova's expectations at that time. (SUMF 46-50.)

Ms. Lewis's documented performance issues are akin to the circumstances at issue in *King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003). In that case, a probationary teacher was terminated after multiple instances of behavioral deficiencies at work. *Id.* at 148. After bringing a wrongful discharge claim, the district court granted summary judgment in favor of the employer because the teacher failed to proffer evidence that his job performance was satisfactory at the time he was terminated, and therefore failed to establish a prima facie case. *Id.* On appeal, the Fourth Circuit affirmed, observing that,

> Appellee offered substantial evidence that King was not in fact meeting legitimate job performance expectations, chronicling in detail King's poor performance and his supervisors' numerous concerns. King's response to appellee's evidence is limited to his own claim of satisfactory job performance and to testimony he elicited from his fellow teachers to the effect that his lesson plans were substantially comparable to their own. Neither testimony can sustain a challenge to appellee's proffer that King was not in fact meeting *appellee's* legitimate performance expectations.

19

*Id.* at 149 (emphasis added). So too here. The record is replete with Ms. Lewis's record of poor behavioral performance as a leader and with various different supervisors' concerns about the same. Those performance deficiencies and concerns persisted at the time of her termination. Consequently, it is indisputable that Ms. Lewis failed to meet *Inova's expectations*, and Ms. Lewis cannot substitute her own opinion about her job performance for Inova's to create a dispute of material fact. Because Ms. Lewis cannot establish that she was meeting Inova's legitimate expectations at the time of her discharge, Ms. Lewis cannot prove even a prima facie case of discriminatory discharge based on her race as to Counts I and II.

**B.  Ms. Lewis Cannot Establish a Prima Facie Case of Retaliation.**

To establish a prima facie case of retaliation under Title VII or Section 1981, Ms. Lewis must show that (1) she engaged in protected activity, (2) that Inova took a materially adverse action against her, and (3) that a causal relationship existed between the protected activity and adverse action. *See Guessous*, 828 F.3d at 217. In this case, Ms. Lewis alleges that she engaged in activity protected by Title VII and Section 1981 on two occasions: when she reported Ms. North-Giles' "conduct" to Ms. Wastler in the spring of 2020, and when she submitted her June 29, 2020 Grievance. (Compl. ¶¶ 17, 19, 96-97, 101-102.)

**1.  Ms. Lewis Cannot Prove Her Engagement in Protected Activity in Communications to Ms. Wastler in the Spring of 2020.**

The first instance of so-called "protected activity" fails to establish a prima facie case for two reasons. First, Ms. Lewis does not allege that any report about Ms. North-Giles' "conduct" to Ms. Wastler in the spring of 2020 made any allegation of racial discrimination against Ms. North-Giles or against anyone else at Inova. (Compl. ¶ 17.) When asked about this complaint to Ms. Wastler during her deposition, Ms. Lewis testified that she had no specific information about

20

when she made the complaint or what specifically she reported to Ms. Wastler,[4] and she did not

testify that she reported racial discrimination. (*See* Def. Ex. 1 at 88:3-92:6.)

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to

discriminate against any of his employees . . . because he has opposed any practice made an

unlawful employment practice ***by this subchapter*. . . .**" 42 U.S.C. § 2000e-3(a) (emphasis

added). Similarly, "[p]rotected activity under § 1981 includes opposing 'policies or practices that

discriminated against any person on the basis of race.'" *Cepada v. Bd. of Educ. Of Baltimore

Cnty.*, 974 F.Supp.2d 722, 788 (D. Md. 2013). Thus, to the extent any complaint was made to

Ms. Wastler at all in the spring of 2020, Ms. Lewis cannot prove it constituted a complaint of a

practice made unlawful under Title VII or Section 1981 so as to qualify as a protected activity

under these statutes.

Second, if Ms. Lewis did not complain of racial discrimination to Ms. Wastler in the

spring of 2020, then Inova could not have understood Ms. Lewis to be engaging in protected

activity at that time. Consequently, it also could not retaliate against her for doing so. Discussing

causation in the context of Title VII, the Fourth Circuit explained the obvious point that,

> An employee's belief that a Title VII violation has occurred may be completely
> reasonable, but if she fails to tie complaints about workplace conduct to her
> protected status, the employer could not have retaliated for engaging in a
> protected activity. Without notice that an employee is complaining about
> discrimination based on their protected status, an employer has no means to
> distinguish between protected conduct and frivolous complaints about workplace
> disagreements unprotected by law.

*McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 412 (4th Cir. 2022). Here, even assuming

Ms. Lewis believed she was complaining about racial discrimination to Ms. Wastler in the spring

---

[4] Ms. Wastler no longer works for Inova. (Def. Ex. 11 at 65:4-6.)

of 2020, she cannot prove that she expressed that belief to Inova, meaning she also cannot prove that Inova retaliated against her for engaging in any alleged protected activity in spring 2020.

### 2. As to All Alleged Protected Activity, including the Grievance, Ms. Lewis Cannot Satisfy the Element of Causation as to Any Protected Activity.

Unlike the vague complaint allegedly made to Ms. Wastler in the spring of 2020, Ms. Lewis has produced the content of her June 29, 2020 Grievance. In the Grievance, Ms. Lewis stated, "I have no clue why my Senior Director targets and treats me differently. When she is present the work environment feels like that of a drama filled reality tv show." (SUMF 38.) She then asked a series of rhetorical questions: "Is it because I am younger than her? Is it because I look different than her? Is it because I have a different skin hue than her? Is it because I am taller than her? Is it because my knowledge base and experiences are different from hers?" (*Id*.)

Even assuming that Ms. Lewis' varied and rhetorical questions constituted activity protected by Title VII or Section 1981, Ms. Lewis cannot prove the third element of a causal relationship because she has no evidence whatsoever to rebut Mr. McCleary's sworn testimony that he—the decisionmaker responsible for terminating her employment and for denying her request for a raise—was unaware that Ms. Lewis had complained to Inova about discrimination based on race in the Grievance (or at any other time elsewhere). (SUMF 53.)

"Decisionmakers can hardly be accused of harboring a retaliatory animus when they were unaware of the actions that allegedly led to the retaliation." *Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 177 (4th Cir. 2023) (discussing retaliation under, inter alia, Title IX using Title VII framework); *see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case."). As Ms.

Lewis cannot establish that Mr. McCleary had knowledge of any activity by Ms. Lewis that is protected by Title VII or Section 1981 when he made the decisions to deny her request for a raise and to terminate her employment, Ms. Lewis cannot prove even a prima facie case of retaliation in Counts III or IV.

    **C.  To the Extent Ms. Lewis's Claims Also Are Based on a Denial of a Requested Raise, Such Denial Also Does Not Satisfy the Element of Adverse Action Necessary to Prove a Prima Facie Case of Discrimination or Retaliation.**

In addition to the termination of her employment, Ms. Lewis also has complained that Inova denied her request for an alleged $20,000 raise in June 2020 after her role as the Director of Laboratory Services expanded to include oversight of a blood gasses project. (Compl. ¶¶ 41-42, 44.) Not only do the undisputed facts demonstrate that (i) Ms. Lewis never requested, much less was promised, offered, or denied, a raise of this specific amount (SUMF 56-65) and (ii) that Mr. McCleary remained unaware of Ms. Lewis's alleged protected activity when he denied her request for a raise (SUMF 65) discussed *supra*., the denial of a requested raise also does not constitute the type of adverse employment action or materially adverse action required to state a prima facie claim of discrimination or retaliation. *See, e.g.*, *Noonan v. Consolidated Shoe Co., Inc.*, 84 F.4th 566, 572-74 (4th Cir. 2023) (discussing Title VII discrimination's adverse employment action and Title VII retaliation's materially adverse action elements).

While there could be a situation where denial of a merit or routine pay increase could constitute an adverse employment action, *see e.g., Crawford v. Newport News Indus. Corp.*, 2018 WL 4561671, at *24 (E.D. Va. Mar. 2, 2018), *report and recommendation adopted in part*, 2018 WL 2943445 (E.D. Va. June 11, 2018) (citing *Flateau v. South Carolina Comm'n for the Blind*, 50 F. App'x 653, 654 (4th Cir. 2002)), that is not the case here. Unless an employee is entitled to a particular raise, an employer denying an employee's request for additional money is

not a material adverse job action. *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1006 (7th Cir. 2000). Concluding otherwise would allow employees to request raises whenever they pleased, and when they are denied by the employer, "require courts to become involved in the messy business of evaluating employees and making finely-tuned raise determinations." *Lovell v. BBNT Sols., LLC*, 295 F. Supp. 2d 611, 627 (E.D. Va. 2003) (finding that an employee receiving a lower raise than she believed she was entitled to was not an adverse employment action).

When considering whether the plaintiff established a prima facie case of discriminatory denial of a pay raise where the plaintiff alleged that his employer failed to give him a ten percent increase, the court in *McMillan v. S.C. Dep't of Corr.* applied the framework for discriminatory failure to promote. 16 F.Supp.2d 635, 640 (D.S.C. 1997), *aff'd,* 153 F.3d 721 (4th Cir. 1998). Accordingly, a plaintiff is required to prove that:

1. he is a member of a protected group;
2. he applied for the position [or raise] in question;
3. **he was qualified for the position [or raise]**; and
4. he was rejected for the position [or raise] in favor of someone not a member of a protected group under circumstances giving rise to an inference of unlawful discrimination.

*Id*. (emphasis added.) The record here does not show that Ms. Lewis qualified for the raise she requested; rather, the record demonstrates that she was not so qualified because she already was being equitably compensated based on her duties and tenure. (SUMF 56-65.)

In the retaliation context, denial of a pay increase could also constitute adverse action, but not when the employee had no "expectation or entitlement to a salary increase." *Maher v. Univ. of S.C.*, 2013 WL 394149, at *4 (D.S.C. Jan. 10, 2013), *report and recommendation adopted*, 2013 WL 416216 (D.S.C. Jan. 31, 2013). Here, Ms. Lewis had no expectation or entitlement to a pay increase; hers was a *request* that Inova consider granting her additional compensation for

taking on an additional project, which request Inova considered and denied as inequitable. (SUMF 56-65.) This decision was neither the type of adverse employment action nor materially adverse action sufficient to support a prima facie case of discrimination or retaliation.

## II.    Inova Had Legitimate, Non-Discriminatory and Non-Retaliatory Reasons for the Adverse Actions about which Ms. Lewis Complains.

Even assuming that Ms. Lewis could establish a prima facie case, which she cannot, Inova has produced ample evidence of its legitimate, non-discriminatory and non-retaliatory reasons for its decisions to deny Ms. Lewis's requested raise and to terminate her employment.

### A.  Inova Did Not Conduct a Cultural Assessment or Terminate Ms. Lewis's Employment because of Her Race or Any Alleged Protected Activity.

As stated in the Notice of Termination, Inova received a complaint in June 2020 regarding Ms. Lewis's workplace conduct, including that she was displaying retaliatory behavior and that laboratory team members were afraid to speak out against her. (SUMF 54; Def. Ex. 57.) In addition, Inova received negative feedback from an exit interview of Emily L., from laboratory leadership, and from other team members, including through a cultural assessment of the department conducted to determine whether Ms. Lewis was the right leader in her role at Inova, which feedback substantiated the June 2020 complaint made by Dr. Liu. (SUMF 29-30, 45, 54; *see also* Def. Exs. 22, 54, 57.) Inova terminated Ms. Lewis—not because of her race or any alleged protected activity—but, as stated, "due to multiple violations of Inova's 'Standards of Behavior,' demonstrating acts and behaviors that reflect unfavorably upon the reputation of Inova, and failing to meet Inova's expectations for a Director." (SUMF 54; Def. Ex. 57.)

Indeed, as reflected in the Notice of Termination, this was not the first time that Inova had had to address Ms. Lewis's workplace behavior. Just two years after Inova hired her to fulfill a leadership role—Director of Laboratory Services—Ms. Lewis's first supervisor, Ms. Slattery,

placed her on a PIP in 2018 because of her difficulties working with others, including her lack of collaboration with others and failure to absorb and act on feedback received. (SUMF 3-5; *see also* Def. Exs. 2-3.) Inova counseled Ms. Lewis that she needed to show immediate and sustained improvement in these areas subject to the PIP. (SUMF 6; Def. Ex. 3.) Inova then had sought to facilitate Ms. Lewis's improved performance through a 360 assessment that identified areas for improvement and by paying for a private coach to help Ms. Lewis understand the results of her evaluation and provide ongoing coaching. (SUMF 7-9; Def. Exs. 8-11.)

While Ms. Lewis's behavior improved for a short time, by 2019, her next supervisor, Ms. North-Giles, felt that Ms. Lewis was displaying similar behaviors to those that were the subject of the prior PIP issued by her predecessor, Ms. Slattery. (SUMF 11-12.) After consulting with HR and with its guidance, Ms. North-Giles issued Ms. Lewis a Memorandum of Expectations to outline Inova's view that Ms. Lewis needed to show immediate and sustained improvement, with the consequences for failing to do so including termination. (SUMF 12, 15-20; Def. Ex. 16.)

But despite Inova's repeated and annual interventions with Ms. Lewis regarding her behaviors that did not meet Inova's expectations of its leaders, such behaviors manifested a third time in 2020, warranting her termination. (SUMF 29-30, 45-46, 48-50; Def. Exs. 22, 23, 28, 30.) Though the point is obvious such that it hardly needs making, Ms. Lewis's repeated failure to meet Inova's performance expectations was a legitimate, non-discriminatory and non-retaliatory reason for her dismissal. *See, e.g.*, *King*, 328 F.3d at 151.

### B.  Inova Did Not Deny Ms. Lewis Her Request for a Raise because of Her Race or Any Alleged Protected Activity.

Likewise, Inova's reason for denying Ms. Lewis's request for additional compensation— because she already was being appropriately and equitably compensated—is a non-discriminatory, non-retaliatory reason for that denial. Upon receiving Ms. Lewis's request, Mr.

McCleary reviewed Ms. Lewis's position, scope of her duties, and tenure as compared to the directors in similar positions at Inova's other locations. (SUMF 60-64.) In doing so, Mr. McCleary found that Ms. Lewis already was being equitably compensated, particularly in light of the fact that most directors already had the blood gasses project within their purview and in light of the fact that Ms. Lewis was the director with the shortest tenure at Inova. (SUMF 61-65; Def. Exs. 24, 31-32.) It was for these non-discriminatory and non-retaliatory reasons—not because of any racial or retaliatory animus—that Ms. Lewis did not obtain the additional compensation she sought. (SUMF 64-65.)

### III.   Ms. Lewis Cannot Establish that Inova's Legitimate Reasons for Its Actions Were a Pretext for Discrimination or Retaliation.

As Inova has set forth non-discriminatory and non-retaliatory reasons for its decisions to terminate Ms. Lewis's employment and to deny her request for additional compensation, Ms. Lewis bears the burden of proving that Inova's stated reasons are pretextual. To meet this burden, it is not enough for Ms. Lewis to state her own belief that she was discriminated against because of her race or retaliated against for engaging in protected activity, *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000); instead, to survive summary judgment, Ms. Lewis must produce evidence to "cast sufficient doubt upon the genuineness of the explanation [for the denial of her request for a requested raise and for her termination] to warrant a jury's consideration of possible alternative and discriminatory motivations," *Guessous*, 328 F.3d at 217-18 (citing *King*, 328 F.3d at 154 (Gregory, J., dissenting)). Ms. Lewis has no such evidence.

### A.   Ms. Lewis Has No Evidence that the Feedback Received from *Multiple* Different Persons Is Unworthy of Credence and a Pretext for Racial Discrimination.

Ms. Lewis's Complaint rests upon the implicit premise that the negative feedback Inova received about her was unworthy of credence, and thus she assumes multiple Inova employees

27

must have discriminated against her based on race. Not only does Ms. Lewis have no evidence to support the unfounded allegations of discrimination that she has leveled against her immediate supervisor, Ms. North-Giles (SUMF 37-43) or anyone else, but her unfounded allegations are irrelevant because neither Ms. North-Giles nor anyone else identified in her Complaint were the ultimate decisionmakers with respect to her termination or denial of her request for a raise. Instead, Mr. McCleary (whom Ms. Lewis accuses of no wrongdoing) made these decisions.

There is no evidence whatsoever to suggest that Mr. McCleary understood any of the following bases for his decision to terminate Ms. Lewis to be untrue: (a) the reports he received about Ms. Lewis's prior disciplinary warnings documented in her personnel file; (b) the documented complaints of Dr. Liu and Emily L. in May and June 2020, and (c) the results of the cultural assessment, including negative feedback from 8 team members, which he and HR found to substantiate Dr. Liu's and Emily L.'s concerns. "[N]othing in the record . . . reasonably calls into question the honesty of [Mr. McCleary's] professed belief" that Ms. Lewis had continued to act contrary to Inova's expectations despite Inova's prior warnings. *Giannopoulous v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997); (*see also* SUMF 46-50).

The same is true for Mr. McCleary's understanding that Ms. Lewis already was equitably compensated, leading to his decision to deny her the additional compensation she requested. (SUMF 56-65.) And even if Mr. McCleary's honest beliefs had been incorrect—and there is no evidence that they were—an "employee must present evidence reasonably calling into question the honesty of his employer's belief; [an] employee's mere demonstration that his employer's belief may be incorrect is not sufficient to prove discrimination." *Dejarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citing *Giannopoulous*, 109 F.3d at 411). Ms. Lewis has no evidence to question the honesty of Mr. McCleary's beliefs—indeed, of all the individuals she

believes discriminated against her at Inova, *Mr. McCleary is not among them*. (SUMF 52.) Thus, Ms. Lewis cannot prove Mr. McCleary's stated reasons were a pretext for racial discrimination, and Inova is entitled to summary judgment as to Counts I and II.

### B. Ms. Lewis Cannot Establish Pretext Because She Cannot Prove that the Real Reason for the Denial of Her Raise or Her Termination was Retaliation.

In order to carry her burden of showing that Inova's real reason for terminating Ms. Lewis was a pretext for retaliation, Ms. Lewis must establish "both that the employer's real reason was false ***and*** that retaliation was the real reason for the challenged conduct." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (quoting *Jiminez v. Mary Washington College*, 57 F.3d 369, 378 (4th Cir. 1995) (cleaned up, emphasis added)). Thus, unlike discrimination claims under Title VII, retaliation claims under Title VII (and Section 1981, as stated below) "require the employer to show 'that retaliation was a but-for cause of a challenged adverse employment action.'" *Guessous*, 828 F.3d at 217 (quoting *Foster*, 787 F.3d at 252). Put differently, Ms. Lewis must show that Mr. McCleary would not have denied her requested raise or terminated her employment but for her prior complaint of discrimination based on her race.

For the same reasons that Ms. Lewis cannot satisfy the causal element of a prima facie case of retaliation; namely, that Mr. McCleary—the decision maker—was wholly unaware that Ms. Lewis had engaged in any activity protected by Title VII or Section 1981, Ms. Lewis also cannot prove that her engagement in protected activity was a "but-for cause" of Mr. McCleary's actions. *See Lashley,* 66 F.4th at 177 (holding that where a plaintiff has no "evidence on this score, the chain of causation is broken and the plaintiff cannot show that retaliation was 'a but-for cause'" of her termination). Having no evidence that Mr. McCleary was even aware of her protected activity—much less that it was the sole reason for his decisions—Inova is entitled to summary judgment as to Counts III and IV.

**IV.     As to Counts II and IV, Ms. Lewis Also Cannot Satisfy the Additional Element of "But-For Causation" as Requested to Prove a Claim under Section 1981.**

While the same elements are required to establish a case of racial discrimination in employment under both Section 1981 and Title VII, see *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004), a Section 1981 plaintiff also "bears the burden of showing that race was a but-for cause of its injury." *Comcast Corp.*, 589 U.S. at 333. It is not sufficient "to show that race played some role in the defendant's decisionmaking process." *Jones v. Lowe's Companies, Inc.*, 845 F. App'x 205, 215 (4th Cir. 2021) (quoting *Comcast Corp.*, 589 U.S. at 329) (internal quotation marks omitted). The burden is on Ms. Lewis to connect her claimed adverse action with racial discrimination and "to show that racial considerations *caused* the adverse decision." *Jones*, 845 F. App'x at 215. As noted above, the same "but-for" causation standard applies to retaliation claims under Section 1981. *Ali,* 832 F. App'x at 172–73 (4th Cir. 2020) (unpublished).

As discussed fully above, Ms. Lewis cannot establish even a prima facie case of racial discrimination or retaliation, much less produce evidence to satisfy the "but for" causation standard under Section 1981. Instead, the evidence reflects that she was terminated for documented performance deficiencies, and her requested raise was denied because she already was compensated equitably. The ultimate decision-maker, Mr. McCleary, did not consider her race in making these decisions, nor was he aware of any claimed protected activity asserting racial discrimination. (SUMF 45-65.) For those same reasons discussed *supra*, Ms. Lewis cannot establish that Inova's reasons were pretextual, much less satisfy Section 1981's "but-for" causation standard, meaning Inova is entitled to summary judgment in its favor.

## <u>Conclusion</u>

For all these reasons, Inova respectfully requests that this Court grant its motion for summary judgment and enter judgment in its favor as to all Counts of the Complaint.

Respectfully submitted,

INOVA HEALTH CARE SERVICES,
 d/b/a INOVA HEALTHPLEX
By Counsel

Dated: July 15, 2024

BLANKINGSHIP & KEITH, P. C.
4020 University Drive, Suite 300
Fairfax, Virginia 22030
Telephone:  (703) 691-1235
Facsimile:  (703) 691-3913

By:    /s/ Laurie L. Kirkland
        Laurie L. Kirkland, VSB No. 75320
         lkirkland@bklawva.com
        Ian J. McElhaney, VSB No. 94888
         imcelhaney@bklawva.com
        *Counsel for Defendant Inova Health Care Services,*
         *d/b/a Inova HealthPlex*

**<u>Certificate of Service</u>**

I hereby certify that on this 15th day of July 2024, I will electronically file the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to the following:

        Sarah Mugmon, Esq.
        **The Lipp Law Firm, P.C.**
        4000 Legato Road
        Suite 1100
        Fairfax, Virginia 22033
        Tel: (703) 896-7704
        Email: sarah@lipplawfirm.com

        Kathlynne Ramirez, Esq.
        **KATHLYNNE RAMIREZ, ESQ., LLC**
        31 Walker Avenue
        Gaithersburg, Maryland 20877
        kramirez@kramirezlaw.com
        Tel: (240) 372-1832

        *Counsel for Plaintiff*

          /s/  Laurie L. Kirkland
        Laurie L. Kirkland, VSB No. 75320
        BLANKINGSHIP & KEITH, P.C.
        4020 University Drive, Suite 300
        Fairfax, Virginia 22030
        Phone: 703-691-1235
        Fax: 703-691-3913
        lkirkland@bklawva.com
        *Counsel for Defendant Inova Health Care*
        *Services, d/b/a Inova HealthPlex*