IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

| | |
|---|---|
| KATHLEEN LEWIS, | ) |
| Plaintiff, | ) |
| vs. | ) Case 1:23-cv-01716 (LMB/LRV) |
| INOVA HEALTH CARE SERVICES, d/b/a INOVA HEALTHPLEX, | ) |
| Defendant. | ) |

# MEMORANDUM IN OPPOSITION TO
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Kathlynne Ramirez, Esquire (*pro hac vice*)
kramirez@kramirezlaw.com
Kathlynne Ramirez, Esq. LLC
31 Walker Avenue
Gaithersburg, MD 20877
240-372-1832 (p)

Sarah M. Mugmon (VA Bar No. 96690)
sarah@lipplawwfirm.com
THE LIPP LAW FIRM, P.C.,
4000 Legato Road, Suite 1100,
Fairfax, Virginia 22033
703-869-7704 (p)
*Counsel for Plaintiff, Kathleen Lewis*

Dated: July 29, 2024

Inova's Motion for Summary Judgment rests entirely upon disputed issues of material fact. Inova cannot prevail on a motion for summary judgment by ignoring the record evidence.

## I. INOVA'S MOTION RESTS ON HOTLY DISPUTED ISSUES OF MATERIAL FACT

Inova's Motion for Summary Judgment relies on a series of critical disputed facts:

1. Paragraph 5 of Inova's Statement of Undisputed Material Facts states:

> 5. Following the 2017 Evaluation, Ms. Slattery placed Ms. Lewis on a Performance Improvement Plan ("PIP") issued February 15, 2018. The PIP stated that Ms. Lewis was "perceived by some leaders as difficult to work with because of her unwillingness to partner or compromise in finding a resolution[,]" that Ms. Lewis "sometimes responds to leaders in a defensive manner," and that "[s]ometimes her response has been perceived as negative or delivered in a negative tone." The PIP also documented instances where Ms. Lewis's superiors had "received information about areas of concern involving the lab from other leaders rather than receiving the information directly from Kathleen. This is partly due to leaders' prior interactions with Kathleen or her lack of proactively escalating the matter to senior leadership for guidance." (Def. Ex. 1 at 45:16-20; see PIP, attached as Def. Ex. 3 (also Inova Trial Ex. 3).)

(Dkt. 27, at p. 5). Plaintiff disputes this as misleadingly omitting that the PIP was "successfully closed after being extended several times for no reason." (Dkt. 27-1, at p. 6, also known as Def. Ex. 1 at Dep 45:11-12) The PIP was dishonest, unfair and unjustified. The parties underwent mediation and the mediator stated he did not understand why Plaintiff was on a PIP to begin with. Tonia Suber, with HR forced Inova to remove Plaintiff from the PIP, because management kept extending it with no justification. (Pl. Ex. 1 at KL0057)

2. Paragraph 6 of Inova's Statement of Undisputed Material Facts states:

> 6. The PIP tasked Ms. Lewis with developing an action plan to correct the deficiencies identified in the PIP and further provided for a "360 performance feedback review" ("360 Assessment") to be completed by Ms. Lewis's direct reports, colleagues, and supervisors. The PIP further advised that Ms. Lewis "must show immediate improvement and sustain improved performance on an on-going basis beyond the assessment period of this Plan. Recurring or additional performance

issues will result in action up to and including termination of employment without further coaching or notice." (Def. Ex. 3.)

(Dkt. 27, at p. 5). While it is undisputed that Plaintiff was subject to a "360 Assessment," the results produced favorable results. A total of 16 respondents, to include her direct reports, peers and managers all gave feedback. Out of a possible score of 5, the lowest single score she received was 3.58, and the majority of her scores ranged between at 3.8 and 4.2, indicating "Agree." (Dkt. 27-5 at p. 12-13)

    3.      Paragraph 8 of Inova's Statement of Undisputed Material Facts states:

> 8. The 360 Assessment, conducted by Partners in Leadership, was completed in May 2018. Ms. Lewis received high scoring in keeping "the 'Key Results' front and center" in her daily work, but she received lower scores in areas such as championing culture change, partnership, and finding/acting on solutions. (See Def. Ex. 5 (Inova Trial Exs. 9-10).)

(Dkt. 27, at p. 6). This statement is immaterial. The scores Inova omitted to mention establish Plaintiff's success rate.

    4.      Inova also claims, in Paragraph 13 of its Statement of Undisputed Material Facts, that:

> 13. It is not uncommon at Inova for an employee to improve enough to close out a PIP, but then to return to the same behaviors demonstrated prior to the PIP and be terminated for those recurring behaviors. (Dep. of R. Hawkins, attached as Def. Ex. 11, at 32:5-9.) The Memorandum of Expectations is another tool that Inova's leaders may use to provide feedback and give clear expectations going forward. (Def. Ex. 11 at 35:6-19.)

(Dkt. 27, at p. 7) This is hotly disputed. Mr. Hawkins did not testify to this document as a "Memorandum of Expectations," neither does the document indicate it is a Memorandum of Expectations. (Pl. Ex. 2, KL00415) He testified he didn't have a name for this tool. (Dkt. 27-11, at p. 6, also known as Def. Ex. 11 at Dep 35:22) This was new to Mr. Hawkins, and that it "became another tool in a leader's toolkit to give them expectations so that it was not put into a formal

discipline by giving a leader or team member a chance to improve without going down a formal discipline path, which is then moving you more towards the ability to be terminated." (Dkt. 27-11, at p. 6, also known as Def. Ex. 11 at Dep 35: 2-22). Inova's progressive discipline procedure allows for this softer approach, prior to issuing a PIP. Mr. Harding testified the document may have been Tonia Suber's idea. (Pl. Ex. 3 Harding Dep 57:5) Ms. Harding added, "the memo of expectations was a "softer approach than a performance improvement plan. Typically, when a leader at Inova Health System was not successful with a performance improvement plan, the next step was separation, demotion, reassignment." After reviewing the language in Ms. Ms. North-Giles' memo indicating that the Plaintiff could be terminated without further coaching or notice, Ms. Harding's testified being "alarmed" because "it doesn't kind of match the intent of the memorandum." (Pl. Ex. 3 Harding Dep 63:1-8; 11-14; 17-22; 64:1; 65:4-6) Plaintiff disagreed with the memo of expectations because it was dated July 2, 2019, served as a retroactive documented counseling, which referenced the meeting on June 20, 2019. As Plaintiff informed Ms. Harding (née Walden) by email dated July 1, 2019, she had never heard of retroactive documented counseling. The meeting was described by Ms. Jackson as merely a "discussion to provide feedback." Neither Ms. Jackson nor Ms. North-Giles mentioned the meeting was being tied back to the 2018 PIP issued 17 months prior. Both Ms. North-Giles and Plaintiff provided feedback to each other. Upon prompting, Ms. North-Giles could give no examples, while Plaintiff raised specific issues about Ms. North-Giles' unproductive management style. (Pl. Ex. 4 KL123-124)

5. Paragraphs 23-25 of Inova's Statement of Undisputed Material Facts underline that Inova failed to conduct an EEO investigation into Plaintiff's claims of feeling harassed and treated badly raised by email to Ms. Harding dated October 2, 2019:

23. On October 2, 2019, Ms. Lewis emailed Ms. Walden with concerns about Ms. North-Giles, and expressed that she "feel[s] as though I am being harassed . . . and treated badly." (*See* 10/2/19 Complaint, included in Def. Ex. 18 (Inova Trial Ex. 29).)

24. In response, Ms. Walden advised Ms. Lewis that she and Karen Wastler, who served as the AVP of Ambulatory Services and as Ms. North-Giles's supervisor at the time, would address Ms. Lewis's working relationship with Ms. North-Giles and "determine what needs to happen to ensure [Ms. Lewis] feel[s] [she is] being treated fairly and respected as a leader, and, Shannon is able to obtain information from [Ms. Lewis] to be effective and accountable in her role." (Def. Ex. 18; Def. Ex. 9 at 59:22-60:15; Def. Ex. 11 at 99.)

25. In her meetings with Ms. Lewis before and after Ms. Lewis's October 2, 2019 email, Ms. Walden absolutely does not recall Ms. Lewis attributing any perceived harassment that she felt to her race. (Def. Ex. 9 at 60:11-61:3.)

These statements are immaterial. What is crucial and material is that Ms. Harding did not even ask Plaintiff if she believed the harassment was based on her race and failed to conduct an investigation. (Pl. Ex. 3 Harding Dep. At 61:20-22; 62:1-6)

6. Paragraphs 26 and 27 of Inova's Statement of Undisputed Material Facts state:

26. In February and March 2020, then-Chairman and Medical Director of Pathology and Laboratory Medicine, Dr. Yan Liu, expressed concerns to Ms. Wastler about Ms. Lewis's workplace conduct. At that time, Dr. Liu's concerns included nervousness regarding her own ability to navigate interactions with Ms. Lewis and her perception that other team members may be unwilling to speak up to candidly share concerns about their work environment. In addition, Dr. Liu expressed concern that Ms. Lewis was not supportive of a compensation increase for one of the pathology assistants, Emily L., in order to retain the pathology assistant at Inova. (*See* 2/26/20 and 3/4/20 Emails from K. Wastler, included in Def. Ex. 19 (Inova Trial Exs. 34-35.))

27. In response to these initial concerns in the spring of 2020 by Dr. Liu, Human Resources ("HR") arranged a mediation session between Ms. Lewis and Dr. Liu to talk about being collaborative and working together as a team. (Def. Ex. 11 at 99:13-100:1.)

This is strongly contested. Mr. Hawkins testified that end of the mediation, he concluded that Plaintiff was not at fault. "There was no fault, and that meeting was a -- I think it was more of an alignment type of conversation." There was no firm conclusion from that mediation, only the

"takeaway was to try to get the PAs underneath Dr. Liu. (Pl. Ex. 5 Hawkins Dep 100:16-22; 102:10-12)

> 7. Paragraph 30 of Inova's Statement of Undisputed Material Facts states:
>
>> 30. Due to continued concerns expressed by Dr. Liu as well as Emily L.'s exit interview comments, Ms. Wastler determined that a cultural assessment of Inova's Lab Services Department was appropriate to determine if Ms. Lewis was the right leader in her role at Inova. (Def. Ex. 11 at 52:2-20; 70:4-12; 99:2-100:12.) Mr. McCleary, the then-Vice President of Imaging and Laboratory Services, supported Ms. Wastler's decision to request a cultural assessment. (Decl. of S. McCleary, attached as Def. Ex. 24, at ¶¶ 2, 5-6.) Ms. Lewis has admitted that she does not know the reasoning for the cultural assessment. (Def. Ex. 1 at 197:10-15.)

As Mr. Hawkins testified, these "continued concerns" are non-existent. Furthermore, Plaintiff testified that the first time she received the document was when she was terminated. She was not given an opportunity to review, the claims went uninvestigated, and Plaintiff was not given an opportunity to provide a rebuttal. (Pl. Ex. 6 at Lewis Dep 198:16-20)

> 8. Paragraph 32 of Inova's Statement of Undisputed Material Facts states:
>
>> 32. Cultural assessments are not targeted at a specific leader—rather, they determine engagement and morale within the assessed unit or department in an effort to ascertain how to better retain employees, reduce turnover, and repair anything leading to employee dissatisfaction. (Def. Ex. 9 at 38:15-39:13.) In other words, a cultural assessment is an opportunity for the HR department to speak with team members and leaders within a department to get a general feel for the culture within a department. (Def. Ex. 11 at 49:2-7.)

This flies against Mr. Hawkins' testimony that "A Cultural assessments -- the culture is created by leaders, so cultural assessments are always aimed at understanding the leadership style and the culture the leader is creating." (Pl. Ex. 5 at Hawkins Dep 51:20-22; 52:1)

> 9. Paragraph 33 of Inova's Statement of Undisputed Material Facts states:
>
>> 33. The results of a cultural assessment may be used as a basis for termination if, for example, it is determined that a leader is leading in a way that is not within Inova's mission, vision, and values. A culture of

retaliation or facilitating an environment where team members are fearful of their leader are examples of leadership not within Inova's mission, vision, and values. (Def. Ex. 11 at 49:8-50:5.) In such cases, a leader may be terminated without the opportunity to respond to the actual cultural assessment. (Def. Ex. 11 at 55:21-56:21.)

This too is contested. Mr. Hawkins testified that the cultural assessment can be used as a basis of termination "if a leader has team members, overwhelmingly, saying that they fear this leader then it can be used ." (Pl. Ex. 5 at Hawkins Dep. 50:2-4) Plaintiff's cultural assessment came back, overwhelmingly positive. "31 out of the 39 team members interviewed feel comfortable speaking with the laboratory leadership team (supervisors and/or director)." (Ex. 6 at KL183) Furthermore, Mr. Hawkins testified that other leaders have been given an opportunity to provide a response to the feedback from cultural assessments. "A It depends -- so I will say, yes. In those cultural assessments, they were given a chance to respond because -- I will say, the reason why, in those situations, it wasn't a -- there wasn't a history of performance, and, I guess, not living within the mission, vision, and values, in which that they were out of the bubble, in terms of if they are the right fit for the role." (Pl. Ex. 5 at Hawkins Dep. 56:1-9)

10. Paragraph 36 of Inova's Statement of Undisputed Material Facts states:

> 36. Due to Ms. Jackson's involvement in the issuance of the Memorandum of Expectations the prior summer in 2019, Ms. Lewis expressed concerns regarding her participation. In response to her concerns and to eliminate any bias perceived by Ms. Lewis in the process, Inova instituted measures to ensure that no individual would be interviewed by Ms. Jackson alone and that all individuals interviewed in person would verify that their recorded answers were true and accurate by reviewing and signing all notes from their interviews. (Def. Ex. 11 at 91:2-92:16.) At no time did Mr. Hawkins observe Ms. Jackson engage in any behavior that seemed discriminatory or retaliatory toward Ms. Lewis. (Def. Ex. 11 at 123:2-124:4.)

This is contested. Deborah Sexton and Bixbie Rivales were both reporting to Plaintiff at the time. They each provided statements attesting they did not get the feeling of fairness, neutrality or

objectivity in the line of questioning. Ms. Sexton verbalized that she felt the climate assessment was a witch hunt against the Plaintiff. She added that it appeared that Ms. North-Giles was harassing Plaintiff and HR was letting it happen. Ms. Jackson then confirmed that the assessment was not about Ms. North-Giles. Ms. Sexton stated, "confirmed my suspicion that the assessment was directed specifically at Kathleen. Lanai wrote something down on the back of the interview form, so I felt like she was hiding my comments and probably did not share them." (Pl. Ex. 7 Sexton and Rivales Affidavit)

11. Paragraph 40 of Inova's Statement of Undisputed Material Facts states:

> 40. Inova investigated Ms. Lewis's allegations. First, Mr. Hawkins met with Ms. Lewis to discuss the Grievance and, when asked, she did not provide examples of any treatment related to skin color. Rather, Mr. Hawkins understood from the meeting that Ms. Lewis was complaining not about skin color, height, or age, but about Ms. North-Giles's disruption to Ms. Lewis's ability to do her job without regard to protected class. (Def. Ex. 11 at 110:18-111:8.)

Mr. Hawkins testified that all discrimination complaints are investigated, but he chose to handle Plaintiff's allegations in a grievance meeting rather than an investigation, and with that, they found that tenured leaders reporting to Ms. North-Giles thought of her as a micro-manager and disruptive. (Pl. Ex. 5 at Hawkins Dep 40:14; 111:9-10; 16-19) Rather than continue an investigation into race, however, Mr. Hawkins concluded that "So what we found is that there wasn't anything specific to Shannon's leadership style that was direct to an ethnicity, but more of that her leadership style, whether it's effective or not, was consistent across every single leader." (Pl. Ex. 5 at Hawkins Dep 112:4-8) Mr. Hawkins does not recall receiving EEO training in the "burden shifting analysis." (Pl. Ex. 5 at Hawkins Dep 117:13-16) Inova's own exhibit shows that a leader bearing the initials S.P. reported that Ms. North-Giles told her that S.P. does not articulate information well. When S.P. questioned if it was due to her accent, Ms. North-Giles did not respond." (Dkt. 27-26)

12. Paragraph 45 of Inova's Statement of Undisputed Material Facts states:

> 45. On July 6, 2020, HR completed the Cultural Assessment of the Laboratory Services department. While many respondents provided positive feedback, 8 of the 39 team members interviewed expressed that they did not feel comfortable speaking with the laboratory leadership team, which included Ms. Lewis. For those team members who had had negative encounters with Ms. Lewis, the cultural assessment found "a fear of retaliation or that there will be harsh consequences for questioning decisions made by leadership." Team members also reported that they did "not feel that Kathleen will listen to suggestions and will proceed with doing what she wants to do," that they believe "there will be retaliation from Kathleen or that the issues that are brought to her attention will be ignored," and that they do not always feel comfortable speaking up right away about concerns. (Def. Ex. 11 at 58:17-61:13; see also PowerPoint Presentation of Cultural Assessment, included in Def. Ex. 28 (Inova Trial Ex. 54).)

This is hotly contested. Mr. Hawkins testified that no independent investigation to substantiate whether the alleged "fear of retaliation" was credible. HR did not look into whether Plaintiff was actually engaged in retaliatory conduct. When he was asked what an example is of a "harsh consequence(s) for questioning decisions made by leadership" he could not give an example. (Pl. Ex. 5 at Hawkins Dep 72:13-16; 73:6-7; 74:9-15) Even Ms. North-Giles could not point to any documentary support to substantiate these alleged fears of retaliation. (Pl. Ex. 8 at North-Giles Dep 67:14-15)

13. Paragraphs 50 and 51 of Inova's Statement of Undisputed Material Facts states:

> 50. Although Ms. Wastler and Mr. Hawkins agreed, Mr. McCleary was the ultimate decisionmaker as to the termination of Ms. Lewis. (Def. Ex. 11 at 54:8-12; Def. Ex. 24 at ¶ 10.)
>
> 51. In the same way that Ms. North-Giles had played no role in the decision to conduct the Cultural Assessment, Ms. North-Giles similarly did not participate in the July 7, 2020 meeting to discuss the termination of Ms. Lewis's employment, nor was she involved in any way in the decision to terminate Ms. Lewis's employment. (Def. Ex. 24 at ¶ 11.) Ms. North-Giles did not assist in preparing the Notice of Termination, nor was she even made aware of the reasons for Ms. Lewis's termination. (Def. Ex. 7 at 18:10-19:4.)

Mr. McCleary admitted that he spoke with Ms. North-Giles and Ms. Wastler about Plaintiff, and that "he had heard" about Plaintiff. As Plaintiff's Affidavit states, "Sean never got to know me for

the short time he was working while I was there. He never asked how he could support me, if I had concerns, or how he could better assist me/my team." Plaintiff shared her request for additional compensation with him. (Pl. Ex. 9 KL Affidavit)

    14.    Paragraph 62 of Inova's Statement of Undisputed Material Facts states:

> 62. Mr. McCleary's review revealed that the director receiving the highest base salary oversaw a much larger scope of work at Inova Fairfax Medical Campus and that she had been working for Inova for nearly 40 years longer than Ms. Lewis. And notwithstanding that Ms. Lewis had been the director hired by Inova most recently, her compensation was equivalent to the compensation earned by the director at Inova Fair Oaks Hospital, who also was responsible for blood gasses in her laboratory, and who had been working for Inova for approximately 9 years longer than Ms. Lewis. (Def. Ex. 24 at ¶ 18.)

According to the Plaintiff's affidavit, Cornwall, Ashburn, Inova Fair Oaks Hospital are much smaller hospitals. Alexandria, the Plaintiff's campus, was only second to Fairfax in terms of volume. These Directors had a smaller scope of work. (Pl. Ex. 9 Lewis Affidavit) Inova has admitted that it approved the additional compensation for Emily Loter, who was a Caucasian employee. (Dkt. 27 at ¶28). Plaintiff waited for Inova to approve her pay increase for a period of one year, from July 2, 2019 through her termination on July 27, 2020 (Ex. 10 KL0031). Mr. McCleary never informed Plaintiff of his decision not to grant her pay increase, nor does he indicate in his affidavit when he determined Plaintiff was "equitably compensated in line with her scope of duties and tenure at Inova."

## II.    ARGUMENT

### A.    Lewis' Complaints are Protected Activity

    1.    <u>Lewis was Performing in a Satisfactory Manner</u>

Inova attempts to argue that Ms. Lewis was performing below Inova's legitimate expectations at the time of her termination. This is simply not true. Plaintiff received an overall rating of Meets Expectations in her Performance Assessment in 2018 and a rating of Successful in

her Yearly Performance Check-In for 2019. (Pl. Ex. 11 KL 1035, Pl. Ex. 12 KL1037) Inova did not issue a PIP in 2019 or 2020. To argue that the culture or climate assessment substantiated the environment of retaliation and bullying, yet, have not one *scintilla* of evidence of the retaliation or bullying is absurd.

As for Emily L.'s exit interview comments and Dr. Liu's complaint serving as the catalyst for a Climate Assessment, this is inconsistent and pretext should be inferred. Ms. North-Giles was not subject to a Climate Assessment after Plaintiff's numerous complaints against her, even after Inova confirmed from the other leaders that Plaintiff's allegations were substantiated, and that Ms. North-Giles was a micromanager and being disruptive. Mr. Hawkins determined that Plaintiff was not at fault after Dr. Liu complained in the first instance. The Climate Assessment was overwhelmingly positive and yet, used to terminate Plaintiff.

Plaintiff's Performance Appraisals.

2. <u>Lewis Engaged in Protected Opposition Activity when she Complained on July 1, 2019, October 2, 2019 and June 29, 2020</u>

Lewis opposed what she believed to be intentional discrimination by making a clear and unequivocal harassment internal report. Inova, however, twists the applicable legal standards beyond recognition to create false hurdles for retaliation plaintiffs that would severely undermine the anti-retaliation protections available to Ms. Lewis. Inova argues that because Mr. McCleary was the ultimate decision maker in terminating the Plaintiff, and because he had no knowledge of her complaints, Inova is in the clear. It was Mr. Hawkins and Ms. Wastler's responsibility to ensure that Plaintiff was not retaliated against based on her complaints of discrimination. They failed to provide this information to Mr. McCleary and instead laid the groundwork for a botched Climate Assessment to be used for Plaintiff's termination. Mr. McCleary admitted that he spoke with Ms. North-Giles and Ms. Wastler about Plaintiff, and that "he had heard" about Plaintiff.

B.     **Lewis Can Prove Causation**

Inova's argument that Lewis cannot prove causation because Mr. McCleary did not know about her complaints falls flat. This is a "cat's paw" case, meaning that Inova should be held liable for the animus of a supervisor who was not charged with making the ultimate employment decision. *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011).

For all the disputed facts laid out above, it is clear that Inova's reasons for failing to conduct an investigation into Plaintiff's discrimination complaints, conducting a "grievance meeting" and dismissing her complaints, followed by a Climate Assessment directed against the Plaintiff, instead of Ms. North-Giles was the one documented as being disruptive in the workplace, and when HR new that Plaintiff was not at fault for Dr. Liu's complaints, all prove pretext.

Dated: July 29, 2024

KATHLYNNE RAMIREZ, ESQ. LLC
31 Walker Avenue, Gaithersburg, MD
Tel: (240) 372-1832

By: /s/ Kathlynne Ramirez
Kathlynne Ramirez, *Pro Hac Vice*
kramirez@kramirezlaw.com
*Counsel for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of July 2024, the following was filed and served through ECF, to:

>Laurie L. Kirkland, VSB No. 75320
>BLANKINGSHIP & KEITH, P.C.
>4020 University Drive, Suite 300
>Fairfax, Virginia 22030
>Phone: 703-691-1235
>Fax: 703-691-3913
>lkirkland@bklawva.com
>*Counsel for Defendant Inova Health Care Services,*
>*d/b/a Inova HealthPlex*

>　　　　　/s/ Kathlynne Ramirez
>Kathlynne Ramirez, Pro Hac Vice
>kramirez@kramirezlaw.com
>*Counsel for Plaintiff*