U.S. EEOC
Lewis v. INOVA
Rebuttal to Position Statement
February 25, 2022
Page 7

disgruntled worker.  For Respondent to take her feedback from an exit interview, having received information from Ms. Lewis to disprove the allegations, and still accept Ms. Loter's version is absurd.  The evidence Ms. Lewis submitted to HR to disprove Ms. Loter's accusations are found in (*Id.,* pp. 198-280)

The 6/4/2020 complaint by a physician was Dr. Liu, again.  That was the second time she lied about Ms. Lewis anonymously.  Dr. Liu said she didn't want to be cited.  She was allegedly reporting retaliation.  Those allegations against Ms. Lewis were never clearly identified, because they were never investigated.  Ms. Lewis was not given an opportunity to defend herself.

As further evidence of the harassment from Shannon, note that the Respondent's Exhibit A, is missing page 1.  Please request the rest of the email from the Respondent.  Shannon accused Ms. Lewis of time & attendance concerns.  She actually made it a point to call opposite locations (where Ms. Lewis was going to be) to email Ms. Lewis later that she couldn't locate Ms. Lewis.  That's why Ms. Lewis told her to call Ms. Lewis' cell.  Ms. Lewis was sitting at her office at SHP and she was blowing up Ms. Lewis' phone at the hospital knowing Ms. Lewis was at the Healthplex.  Robyn Walden of HR found those claims by Shannon to be untruthful.

Ms. Lewis couldn't and wasn't late as a salaried employee.  Ms. Lewis was at work before Shannon and after her on a regular basis.  Ms. Lewis didn't have to clock in.  Ms. Lewis worked more hours than she was compensated to.  No other Director was asked to supply their weekly schedule.  She was trying to deny Ms. Lewis' vacation when Ms. Lewis had requested it and had the PTO hours.  She claimed Ms. Lewis didn't have PTO, another fabrication.  Ms. Lewis never had any counseling for time and attedance.  She was not only punctual, but always early.

Shannon deliberately tried to undermine Ms. Lewis by ordering instruments for the lab without Ms. Lewis' knowledge.  Ms. Lewis had to get the order stopped before we were charged.  She ordered instruments with Lisa and Yvonne from and didn't include Ms. Lewis, Ms. Lewis' supervisor, or Dr. Liu in the decision, even though Ms. Lewis was the one instructed to order the instruments.

Finally, Respondent argues that it "attempted" to assist Ms. Lewis in improving Ms. Lewis' performance for over two years.  Nothing is further from the truth.  The PIP in 2018 was dishonest, unfair and unjustified.  The parties underwent mediation and the mediator even stated he didn't understand why Ms. Lewis was on a PIP to begin with.  Tonia Suber from HR forced Respondent to remove Ms. Lewis from the PIP, since management kept extending it with no justification.



Inova Alexandria Medical Campus

To: Kathleen Lewis, Laboratory Services Director

From: Shannon North-Giles, Sr. Director

Date: July 2, 2019

Subject: Performance Expectations

On June 20, 2019 I met with you regarding your performance as the Director of Laboratory Services. Specifically, I shared feedback received from leaders you support from various departments. The feedback included your inconsistencies in demonstrating the Inova "One Team" value as it relates to collaborating with your colleagues to move operations and patient safety solutions forward. These behaviors are similar in nature to concerns addressed with you in a documented Performance Improvement Plan, initiated on February 15 and completed on April 19, 2018. These behaviors were also focused on in collaboration with your coach from Partners in Leadership.

Based upon continued observations and feedback received from various stakeholders and in follow-up to our June 20 conversation, I am outlining performance expectations which require immediate attention in order to be met:

- Kathleen will make herself available to her colleagues for collaboration and partnership.
- Kathleen will halt reflexive email push back.
- Kathleen will participate in cross-functional projects as requested.
- Kathleen's colleagues will no longer need to escalate to senior leadership for her non-participation in operational changes and improvements.

Similarly to the Performance Improvement Plan you completed on April 19, 2018, the expectations outlined above will need to be demonstrated immediately and sustained on a continuous basis. Recurring or additional performance issues may result in action up to and including termination of employment without further coaching or notice.

I am available to help you ensure you successfully meet these expectations.

Thank you,

Shannon North-Giles,
Senior Director
Ambulatory Services

**KL0415**

57

1    A    So I'm trying to think of -- of who
2  Lanai could have talked with or consulted with to
3  get this softer approach.  And it -- I don't
4  believe it was me.  I believe she may have spoken
5  to Tonia Suber, who had, you know, more of a
6  history with this.  So I'm not certain where Lanai
7  Jackson got the idea for this softer approach.
8    Q    Going to scroll up just a little bit
9  more.  Do you recall or does this refresh your
10  memory that on June 14th, 2019, Ms. North-Giles
11  agreed with Ms. Jackson's approach?
12    A    After writing this out, I think the
13  below outlined suggestion probably makes the most
14  sense.  I have -- okay.  So I recall her being in
15  agreement.
16    Q    Now, I'm going to scroll up and see you
17  also received an e-mail June 17th, 2019, from Ms.
18  Wastler, and I'll let you take a minute to read
19  that, and then let me know what you recall her
20  position being at that time.
21    A    Okay.  All right.  She will be
22  successful.  However, considering the gravity of

58

1  the step after this, I do want to be sure that the
2  highest level of leadership are in agreement.  So
3  that's her style.  That is Ms. Wastler style.  And
4  notice that she has copied Dr. Bansal.  And -- and
5  so what I'm drawing between -- reading between the
6  lines, she wanted to make sure that whatever
7  approach we were going to use was going to work
8  and produce results.
9    Q    And when she mentions the gravity of the
10  step after this, what would you understand that
11  step to be?
12    A    That would be separation or termination.
13    Q    And I'm going to scroll up to the very
14  top of where we started.  We're still on Inova
15  601, and it's your response on June 17th, 2019.
16  Take a minute, if you want to read it and see if
17  (crosstalk) --
18    A    Sure, sure.
19    Q    -- as to your recommendation at that
20  point.
21    A    Okay.
22    Q    So at this point, what were you

59

1  recommending next steps to be with respect to Ms.
2  Lewis?
3    A    I don't recall.  I -- I seriously doubt
4  that my guidance for next steps would've been
5  separation at that point.  It's either next steps
6  that we'll go to a memo of expectations and -- or
7  we'll go to a performance improvement plan, but it
8  would have not been separation.
9    Q    And with respect to a meeting, would
10  that have been a counseling session between Ms.
11  North-Giles and Ms. Lewis?
12    A    Yes.  Because I -- I referred to that at
13  thee -- in the first paragraph, and -- and I
14  wanted to ensure she had adequate support to
15  prepare and conduct the conversation.  So it was
16  intended to be a counseling session.
17    Q    And with respect to her support, who did
18  you recommend be present with Ms. North-Giles
19  during that session?
20    A    It -- it looks like Lanai at the bottom,
21  Lanai to be present.
22    Q    Now, I'm going to skip forward in time,

60

1  so bear with me.  Next, you were asked about an
2  October 2nd, 2019, e-mail from Ms. Lewis, which
3  I'm showing you included in what's been marked as
4  Inova 801 to Inova 802.  Do you see that e-mail,
5  the same e-mail you were showed before, which I
6  think was Exhibit 4?
7    A    Uh-huh.
8    Q    If I scroll to the top, you'll see --
9  does this refresh your memory as to whether you
10  did reply to Ms. Lewis?
11    A    I'm pleased with my reply to her.  I
12  don't recall having a meeting with her and Karen
13  Wastler, though.  This was October 2nd.  So I --
14  but I'm pleased that it was moving along the --
15  this -- this path.
16    Q    Do you -- when you say you don't recall
17  the meeting, do you think you didn't have it, or
18  you just don't recall one way or the other?
19    A    I -- I don't recall being in a -- in a
20  room, in an office, with Karen and Kathleen.
21    Q    In any follow up conversations or
22  meetings with Ms. Lewis, either before or after

**61**

1 this time, do you recall her attributing the
2 harassment she felt to her race?
3    **A  No, no.  Absolutely not.  No.**
4       MS. KIRKLAND:  Okay.  I have no further
5 questions.  Thank you, Ms. Harding.
6    Ms. Ramirez?
7       MS. RAMIREZ:  Yeah.  I just have a few
8 follow-up.  Did you ask -- the question that was
9 just posed was whether I'm sorry, I didn't write
10 it down.  Can -- can we have that read back to us?
11 The question, please?
12       THE REPORTER:  Yeah.  Just one moment.
13       Question: And there before or after this
14 time, do you recall her attributing the harassment
15 she felt to her race?
16    RE-EXAMINATION BY COUNSEL FOR THE PLAINTIFF
17 BY MS. RAMIREZ:
18    Q    Did you ask her whether that harassment
19 was based on race?
20    **A  I do not recall expressly asking asking**
21 **Kathleen Lewis if her allegation in that e-mail of**
22 **harassment was based on race, no.**

**62**

1    Q    Would that have -- wouldn't that be an
2 important question to ask, though?
3    **A    That would've been ascertained in a --**
4 **in a complaint, an investigation, quite possibly.**
5    Q    And did that investigation take place?
6    **A    I -- not under my leadership there.**
7    Q    Now, you've reviewed a couple of
8 documents, and you described a softer approach --
9    **A    Yes.**
10    Q    -- in terms of issuing a counseling and
11 a letter of expectations?
12    **A    Yes.**
13    Q    However, there was an e-mail there that
14 talked about next -- next actions; right?
15    **A    Uh-huh.**
16    Q    So how did we go from doing a softer
17 approach to that being immediately followed by
18 possible termination and skipping a PIP?  I -- can
19 you explain the thought process there?
20       MS. KIRKLAND:  I'm just going to object
21 to the form of the question, but you can answer,
22 Ms. Harding.

**63**

1       THE WITNESS:  I'd have to see where that
2 -- where that was documented.  It appears that,
3 you know, the memo of expectations was a softer
4 approach than a performance improvement plan.
5 Typically, when a leader at Inova Health System
6 was not successful with a performance improvement
7 plan, the next step was separation, demotion,
8 reassignment.
9       So I'd have to -- to see where I had --
10 where it was documented that separation would
11 occur.  I believe I saw it at the tail end of Ms.
12 North-Giles' memo to Kathleen Lewis, that it said
13 that.  And seeing that now, you know, somewhat
14 alarms me that that was included there.
15 BY MS. RAMIREZ:
16    Q    What alarms you?
17    **A    To see that in the -- in the memo of**
18 **expectations that Ms. North-Giles gave to Kathleen**
19 **Lewis.  I see it there.  So I am -- I, you know,**
20 **normally, at the conclusion of her performance**
21 **improvement plan that wasn't successful, yes,**
22 **separation would occur.  However, I saw it in that**

**64**

1 **memo of expectations.**
2    Q    What did you see?
3    **A    That in the final -- if -- if you pull**
4 **it up, in the final sentence, I think it says**
5 **something about a termination.**
6    Q    Okay.
7    **A    And maybe she, you know, under purview,**
8 **was just covering her bases, but -- but I'm -- I'm**
9 **speculating.**
10    Q    Okay.  Let's look at --
11    **A    Including result in action up to and**
12 **including termination of employment without**
13 **further coaching or notice.  So is that the**
14 **language you all are both referring to?**
15    Q    Yes.  Can you talk about that?  Why is
16 this alarming in a counseling?
17    **A    It just seems that, you know, this --**
18 **this is a sentence there to say that, you know,**
19 **she could terminate.  It just -- with this softer**
20 **approach, it -- it seems that that sentence**
21 **appearing there is, you know, I'm just giving**
22 **opinion right now.  So --**

65

1      Q    We'd like to hear that opinion.  Right.
2  So it's a softer approach, which is not really a
3  soft approach.
4      **A    Yeah.  It's -- it's -- it -- it doesn't**
5  **-- it doesn't kind of match the intent of the**
6  **memorandum.**
7          MS. RAMIREZ:  I have no further --
8          THE WITNESS:  But it does -- but it --
9  but it does indicate that, you know, they could
10 terminate her as a result.
11         MS. RAMIREZ:  All right.  Thank you so
12 much for your time, and that ends my questioning.
13         MS. KIRKLAND:  Okay.  Thank you, Ms.
14 Harding.
15         Jesse, do you need help with any
16 spellings before we let her go?
17         THE REPORTER:  Yes, I do.  So let me go
18 ahead and get orders on the record, and then I can
19 turn the record off.  Then I'll get spellings.
20 Will anyone like to order at this time?
21         MS. RAMIREZ:  At a later time for us.
22 Thank you.

66

1          THE REPORTER:  Okay.
2          MS. KIRKLAND:  I'll order.  Electronic
3  only, and regular is fine.  If I need to expedite
4  it, I'll reach back out.
5          THE REPORTER:  Very good.  Thank you.
6          (OFF THE RECORD AT 4:43 PM)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

67

1      CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2      I, Jesse Lyell, AAERT CER, the officer
3  before whom the foregoing proceedings were
4  taken, do hereby certify that any witness(es) in
5  the foregoing proceedings were fully sworn;
6  that the proceedings were recorded by me and
7  thereafter reduced to typewriting by a
8  qualified transcriptionist; that said digital
9  audio recording of said proceedings are a
10 true and accurate record to the best of my
11 knowledge, skills, and ability; and that I am
12 neither counsel for, related to, nor employed
13 by any of the parties to this case and have
14 no interest, financial or otherwise, in its
15 outcome.
16
17 Notary Registration No.: 7950530
18 My Commission Expires: 2/28/2025
19
20
21 JESSE LYELL, AAERT CER,
22 NOTARY PUBLIC FOR THE COMMONWEALTH OF VIRGINIA

68

1      CERTIFICATE OF TRANSCRIBER
2      I, Brandi McLean, do hereby certify
3  that this transcript was prepared from the digital
4  audio recording of the foregoing proceeding; that
5  said proceedings were reduced to typewriting under
6  my supervision; that said transcript is a true and
7  accurate record of the proceedings to the best of
8  my knowledge, skills, and ability; and that I am
9  neither counsel for, related to, nor employed by
10 any of the parties to the case and have no
11 interest, financial or otherwise, in its outcome.
12
13
14
15 BRANDI MCLEAN
16 PLANET DEPOS, LLC
17 6/28/2024
18
19
20
21
22

**kramirez@kramirezlaw.com**

| | |
|---|---|
| **From:** | Kathleen Lewis <katy18624@gmail.com> |
| **Sent:** | Wednesday, February 23, 2022 11:04 AM |
| **To:** | Kathlynne Ramirez |
| **Subject:** | Fwd: Need Your Assistance |
| **Attachments:** | image001.jpg |

---------- Forwarded message ---------
From: **Lewis, Kathleen T.** <Kathleen.Lewis@inova.org>
Date: Mon, Jul 1, 2019, 6:14 AM
Subject: Need Your Assistance
To: Walden, Robyn A. <Robyn.Walden@inova.org>
Cc: North-Giles, Shannon M. <Shannon.North-giles@inova.org>, Jackson, Lanai <Lanai.Jackson@inova.org>

Good Morning Robyn,

Before I left for vacation, I had a scheduled 1:1 meeting with my boss. She told me that I was a great leader, had engaged staff, and did good job at hitting my financial targets. Subsequently, I had a meeting with Lanai regarding the immunization status of my team member. I asked Lanai if she needed anything else from me and she began to question me about my boss. She asked me an interesting question, which was "do I like my boss"? I was uncomfortable with the conversation and stated that working with my boss was fine. She continued the line of questions. She shared that many of my colleagues did not like my boss and considered her a micromanager. I asked her was she ok? Lanai said to keep her in prayer. The meeting dispersed. I told her I supply my boss with all that she asks. I tried to end the session discreetly.

I left for a scheduled vacation for June 12-19, 2019. While I was on PTO, Shannon reached out to me to schedule a meeting to discuss updates while I was out of the office. Upon my arrival at the meeting on June 6, 2019, I felt surprised and ambushed because Lanai was already in the office. Lanai started the meeting by saying this is a discussion to provide feedback to you. Shannon stated that I done a great job while working alongside her up until two weeks ago (one of the weeks was PTO). Here is the feedback that was given:

▪ Shannon said she was basing her opinion on historical perception.

▪ Shannon requested that I communicate effectively with her.

▪ Shannon requested follow-up on tasks to be received quicker.

▪ She received complaints from a source where I said "no" to something lab related.

I requested examples related to the concerns listed to above. She was unable to provide specific examples and articulate specific names and events related to her complaints or e-mails. Since we were having a discussion, I expressed the following concerns:

1

**KL0123**

▪ Shannon does not allow team members to do their job because she micromanages them. She incessantly calls, texts, and e-mails throughout the day. She also does not forward any aforementioned concerns or refer the requestor to me.

▪ I requested that good communication has to be bidirectional. For example, the ABG instruments were purchased without my knowledge while I was on PTO. Shannon wants less e-mails, but she communicates via e-mail a majority of the time.

▪ I expressed to Shannon that she makes promises to other departments without checking to see if the lab can even accommodate the request.

▪ I expressed that Shannon has exuded unprofessional behavior while working with her. I requested that she remain respectful during any interactions. Here are two examples that were provided:

> I was chastised and embarrassed in a meeting in front of a colleague (Debbie Berg) and a Supervisor (Nicolas Centeno) when trying to solve a problem. Ultimately, it turned out that the Lab Services and Radiology teams understood the issue and had no qualms. Unfortunately, Shannon did not understand the crux of the issue nor the solution, which was explained after the outburst. Twenty-four hours later Shannon apologized to me for her actions.

> Shannon told me that the Lab needed to review the hybrid model for the ABG project. I started giving the history and the "why" behind the decision to transition the ABGs to the lab when Shannon threw up her hands and said "I'm done" and left me standing in the hallway by myself.

▪ I requested that Shannon give me appropriate time to figure out a problem (ex. Lab Coag concern, Epic issue).

Shannon/Lanai summarized that this was discussion to provide feedback to me. I expressed my appreciation for the feedback and the meeting dispersed and the discussion was complete. The next week, I was met with many voices mails, e-mails, and texts by Shannon. I immediately shared these e-mails with HR as an example of what I've had to deal with. I was told that I would have follow-up to my concern on Friday. I reached out to HR on Friday since I didn't hear from them.

After the discussion from the previous week I had further concerns. It wasn't until I expressed those concerns when I received a call from Lanai and she mysteriously wanted to document the previous meeting with a verbal counselling.

I am requesting assistance from with this matter because I have never heard of a retroactive documented counselling. I am also requesting a copy of my complete personnel file and the most updated version of the employee handbook.

Kind Regards,

**Kathleen T. T. Lewis , MPH, MT (ASCP)**
Director, Laboratory Services



2

Inova Alexandria Hospital
4320 Seminary Road
Alexandria,Virginia 22304
**IAH T** 703-504-3866  / **HealthPlex T**  703-797-6867

Kathleen.Lewis@inova.org



This communication may contain confidential and/or privileged information. Additionally, this communication may contain protected health information (PHI) that is legally protected from inappropriate disclosure by the Privacy Standards of the Health Insurance Portability and Accountability Act (HIPAA) and relevant Virginia Laws. If you are not the intended recipient, please note that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this message in error, you should notify the sender immediately by telephone or by return e-mail and delete this message from your computer.

**KL0125**

Transcript of Renauldo Hawkins
Conducted on June 5, 2024

37

1  document can still be transferrable to a
2  performance improvement plan or to a progressive
3  discipline if the behaviors continue.
4      Q  Would you be surprised if, after July 2,
5  2019, no further documentation followed this?
6      A  Can you clarify that question?
7      Q  So you just testified that the information
8  on a document such as this could be transferrable
9  to a PIP or a progressive discipline, correct?
10     A  It can, yes.  The general performance
11 issues of a document like this can be transferred
12 to a performance improvement plan or progressive
13 discipline.
14     Q  Okay.  And if there was no PIP or
15 progressive discipline that followed this document
16 and the employee was met with termination, would
17 that surprise you?
18     A  I guess I'm not understanding the question
19 the way it's being -- the way it's being asked to
20 me, sorry.
21     Q  What would be the natural progression
22 after a document like this if the observed

38

1  behaviors were to continue?
2      A  Well, it depends.  There's no -- there's
3  -- I can't tell you how every leader is going to
4  manage their team members.  I can't tell you every
5  circumstance that happened from July 2nd, 2019,
6  until I got there.
7          And there was also a different HR leader
8  there at the time who was managing this process,
9  so I can't tell you the guidance that was given
10 during -- from this period to the point where I
11 got to Alexandria.  I can only speak to how it was
12 handled from the point of when I got there in 2020
13 until I left Inova.
14     Q  Okay.  Let's talk about that then.
15         So from the time you came to Inova
16 Alexandria in January 2020, what, if any,
17 documents were issued to the plaintiff as a
18 follow-up to this letter?
19     A  I would need document refreshers.  I
20 cannot specifically remember every document.  I
21 can remember events.  I can remember, you know,
22 kind of the major events that happened from when I

39

1  got there, but I can't remember the specific
2  documents or guidance.
3      Q  Are you familiar with the discrimination
4  complaint process at Inova?
5      A  Yes.  I'm familiar with it, not -- at this
6  point, not every single detail, but I have a
7  general memory -- remembering of it.
8      Q  In general terms, then, what was that
9  process?
10     A  A team member could bring up a case of
11 discrimination against someone, which Inova -- the
12 HR team would investigate, and it would use --
13 they would ask for character witnesses, in
14 general, people that can kind of testify to the
15 discrimination.
16         We would use documentation, any evidence
17 that is presented, as a source of their truth, and
18 we would use that to investigate discrimination.
19 And then from there, we would determine if it was
20 accurate or if it was -- if it was substantiated
21 or if it was not substantiated.
22     Q  Who specifically in HR would be involved

40

1  with the investigation?
2      A  It would depend on who is the --
3  supporting the department, and, in general, it
4  would start with whoever their HR representative
5  was; and then from there, based on the level of
6  complexity, it could involve the HR leader and
7  even higher if necessary.
8      Q  Who is higher than the HR leader?
9      A  It could be Wendy Jolly, the VP; or even
10 as high as Terri Feely, the chief human resources
11 officer.
12     Q  Are all discrimination complaints
13 investigated?
14     A  Yes.
15     Q  How long does an investigation usually
16 last?
17     A  It depends on the -- I guess, the claim.
18     Q  Can you give us a ballpark?
19     A  No.
20     Q  What happens if the allegation involves
21 someone in HR, specifically, the designated HR
22 representative?

49

1    A  I do not recall, no, ma'am.

2    Q  What is a climate or cultural assessment?

3    A  A climate/cultural assessment is an
4 opportunity for the HR department to speak with
5 some of the team members and leaders within a
6 department to get a general feel for the culture
7 within a department.

8    Q  Can it be used as a basis for a
9 termination?

10   A  Yes.

11   Q  How so?

12   A  If within the cultural assessment, it is
13 determined that the leader is leading in a way
14 that is not within the mission, vision, and
15 values, then it can be used as a basis.  And it
16 depends on the severity, but, yes, it can be used
17 as a basis.

18   Q  Can you give an example of a leader not
19 leading within that mission, vision, and values
20 that would call for termination?

21   A  If a leader is creating a culture where
22 there is retaliation, if a leader is creating an

50

1 environment where team members are not able to
2 speak up, if a leader has the team members,
3 overwhelmingly, saying that they fear this leader,
4 then it can be used.  It can also be used in
5 consort with other behaviors demonstrated.

6    Q  Okay.  When you say overwhelmingly, in
7 terms of number, what are you referring to?

8    A  I don't have a specific number.

9    Q  So if a minority -- let's say, less than
10 50 percent -- complained about the leader, would
11 that be grounds for termination?

12   A  It would depend.  So I can't say whether
13 -- I can't say whether yes or no, because, again,
14 it depends on the severity of the claims that are
15 being made, and so things that -- these things
16 have to be taken on a case-by-case basis in terms
17 of the severity.

18   Q  How many cultural assessments were
19 conducted at Inova during your employment there?

20   A  Several.

21   Q  Can you put a number on it?

22   A  I can't remember a specific number.

51

1    Q  Do you know why Shannon referred to the
2 cultural assessment done on the lab department as
3 a pilot?

4       MS. KIRKLAND:  Object to the form of the
5 question.

6       But you can answer.

7    A  No, I don't know why.

8    Q  Do you recall her calling it a pilot?

9    A  I do not recall her calling it a pilot.  I
10 do recall Kathleen saying that that was -- that's
11 how it was presented to her.

12   Q  Who conducts the cultural assessment?

13   A  Cultural assessments are conducted by HR
14 representatives.

15   Q  Is the cultural assessment aimed at the
16 leadership, or can they be aimed at the general --
17 like, team members environment --

18   A  Cultures -- sorry.

19   Q  Go ahead.

20   A  Cultural assessments -- the culture is
21 created by leaders, so cultural assessments are
22 always aimed at understanding the leadership style

52

1 and the culture the leader is creating.

2    Q  Who determines whether to conduct a
3 cultural assessment?

4    A  The leader.

5    Q  In this case, who decided?

6    A  My belief was Karen Wastler requested it.

7    Q  Do you know if that was due to any
8 suggestions by Shannon?

9    A  No.  Shannon wasn't involved at this
10 point.  The reason why the cultural assessment was
11 requested was because of a conflict Kathleen was
12 having with her PA director -- I can't remember --
13 Dr. Liu.

14       And so -- and there was a document
15 presented, speaking to some of the fears that the
16 team members had in -- within that department; and
17 therefore, Karen Wastler felt it was important to
18 do a cultural assessment to see, you know, what
19 was going on and if there was any validity to the
20 claims that was in this document.

21   Q  You refer to a document with fear of team
22 members.  Where is that document located?

53

1    A  I don't know.  It was something that was
2  -- it was sent via e-mail by Dr. Liu, and it had
3  information in it that spoke to behaviors that
4  Dr. Liu was seeing from Kathleen that she was not
5  pleased with and some other statements -- it was
6  some other, I guess, statements or comments that
7  team members had been mentioning about how they
8  feel in the department.
9    Q  Was Kathleen given an opportunity to
10 respond to the feedback collected by the cultural
11 assessment?
12   A  No.
13   Q  Why not?
14   A  So the cultural assessment -- sorry -- the
15 cultural assessment team and -- so to -- I guess
16 the best thing I can say is, I don't know why.  At
17 the time, I can't remember exactly how this came
18 about.
19      What I remember is that there were issues
20 with Dr. Liu and Kathleen that had been happening
21 on top of the issues that were happening in the
22 department, and it was determined by the

54

1  leadership team that Kathleen was not living by
2  the mission, vision, and values.
3      Why she wasn't given a chance to respond
4  to that, I don't recall.
5    Q  Based on the cultural assessment, who made
6  the determination that she was not living up to
7  the mission, vision, and values?
8    A  That was the leadership team, so that
9  would have been Sean McCleary; that would have
10 been Karen Wastler; that would have been myself.
11 Those three would have came together and discussed
12 it.
13   Q  Is there a set of criteria used to decide
14 whether to conduct a cultural assessment?
15   A  No.
16   Q  So can you describe the process for a
17 cultural assessment?  What does -- for example,
18 HR.
19      How does HR approach individuals for
20 feedback?
21   A  So a list of questions are developed,
22 based on the feedback that is given to HR, based

55

1  on feedback given to leaders, and then those
2  questions are developed.  They are shared with the
3  leadership team to make sure that is --
4  essentially, that the questions are in the right
5  vein and that they're being open-ended enough so
6  that it's not leading.
7      And then, from there, HR would work with
8  the leadership -- the leader of the department to
9  set up individual interviews to have conversations
10 with them and ask the questions.
11      In this particular cultural assessment,
12 every person was interviewed individually, and if
13 -- and then had them -- each team member sign and
14 date the conversations to -- just to put a
15 signature to the validity of the information and
16 content that was being collected.
17   Q  And then you've already testified that
18 Kathleen was not given an opportunity to provide a
19 response.  Let's talk about the other cultural
20 assessments that you did observe.
21      Was the leadership given an opportunity to
22 respond to their feedback?

56

1    A  It depends -- so I will say, yes.  In
2  those cultural assessments, they were given a
3  chance to respond because -- I will say, the
4  reason why, in those situations, it wasn't a --
5  there wasn't a history of performance, and, I
6  guess, not living within the mission, vision, and
7  values, in which that they were out of the bubble,
8  in terms of if they are the right fit for the
9  role.
10      There was a cultural assessment that was
11 done for another senior-level leader in which they
12 were not given the chance to respond.  They were
13 provided the information, as was Kathleen was
14 provided the information, but the decision to
15 terminate was based on the -- based on the
16 information given.
17      So I will say that, in the case, Kathleen
18 is not the only leader that has had a cultural
19 assessment done and has been terminated after that
20 without having a chance to respond to the actual
21 cultural assessment.
22   Q  You say that Kathleen was given a copy of

69

1 the team members were deeming unprofessional in
2 the way that Kathleen was responding. Again,
3 so --
4     Q I get it. I get it now. Okay.
5       So the examples were sent to you directly?
6     A Yes.
7     Q Do you recall the time frame? Was it
8 within this time frame of the cultural assessment?
9     A I don't -- I do not know exactly when I
10 received those e-mails. I can only believe that
11 it was sometime between when I started and the
12 cultural assessment, but I don't know exactly when
13 I received these e-mails.
14       There -- in this -- in the -- when working
15 with Kathleen and her team, there was a lot of
16 e-mails that were being forwarded to me by not
17 only Kathleen, but by team members, by leaders.
18 There was a lot of documentation that was being
19 sent to me in this role, so I can't really
20 pinpoint exactly when I were getting these
21 e-mails.
22     Q Was a cultural assessment aimed at Shannon

70

1 North-Giles?
2     A Can you clarify that question, please?
3     Q Sure.
4       Do you agree that this cultural assessment
5 was aimed at Kathleen Lewis?
6       MS. KIRKLAND: Object to the form of the
7 question.
8       But you can answer.
9     A The cultural assessment was done to
10 understand the culture in which Kathleen has
11 created in her department -- had created in her
12 department.
13     Q Okay. Was a similar cultural assessment
14 conducted to discover the culture that Shannon
15 North-Giles had created in her -- in her team?
16     A So I will say that when Kathleen brought
17 up her grievance against Shannon North-Giles, that
18 we used similar questions with Shannon
19 North-Giles's leaders to get a general sense of
20 Shannon's leadership style and if, indeed, Shannon
21 was treating Kathleen differently than her other
22 leaders, but I wouldn't call that a cultural

71

1 assessment. That was -- because that was done
2 more in a sense of a grievance.
3     Q Okay. So what would you call that
4 inquiry?
5     A Responding to a grievance.
6     Q Where is that file located?
7     A It would probably be within the same
8 documents that were also sent to my legal team,
9 E-services, HRIS. And if they haven't moved any
10 of the folders, it would still be in the folders
11 at Inova Alexandria.
12     Q Let's move on to KL180. Okay.
13       There's a challenge listed here regarding
14 staffing being a challenge due to COVID-19.
15       Does this have anything to do with -- is
16 this the plaintiff's fault in any way?
17     A I don't know. So I don't know the level
18 of degree to which Kathleen was responsible for
19 the staffing.
20       The lab department is very complex in
21 terms of the leadership structure, so I wouldn't
22 know if this would be a Kathleen responsibility or

72

1 someone else's.
2     Q Moving on to KL178 -- okay -- bullet point
3 4 -- bullet point -- yeah, the fourth bullet
4 point.
5       Team members who have had negative
6 encounters with the lab director, there is fear of
7 retaliation or that there will be harsh
8 consequences for questioning decisions made by
9 leadership.
10       Let's break this up.
11       The fear of retaliation. Has that been
12 substantiated? What is a clear example of that?
13     A Has it been substantiated? I cannot say
14 yes or no, because, again, the -- when you have
15 multiple people saying this is a fear of somebody,
16 you can say it's a theme.
17       Would you be able to give a -- can I give
18 you a specific example today? No.
19       At the time -- at the time there may have
20 been documentation from prior employees talking
21 about this, but, today, I cannot tell you yes or
22 no.

97

1     She was saying that she needs to be able
2 to (inaudible) the reflective e-mails, that she
3 needs to be able to work with her peers, and she
4 needs to, essentially, create a culture where, you
5 know, she's living within the values.
6     And based on her previous history, based
7 on the current situation that was going with a --
8 somebody escalating something above her head, and
9 based on some of the factors of the cultural
10 assessment -- that being substantiated -- it was
11 determined that Kathleen was not a great fit for
12 the role and that they wanted to move in a
13 different direction with a different leader.
14    Q  Okay.  So the second paragraph on KL2
15 talks about a complaint was filed against Kathleen
16 on June 4, 2020.
17     Was that the complaint filed by Dr. Liu?
18    A  Yes.
19    Q  And, as a result, the cultural assessment
20 was conducted, correct -- yes?
21    A  It would make sense, yes, but I can't tell
22 you exactly yes or no.

98

1     I don't know if that was the -- June 4th
2 we had a complaint, and then the next day we did a
3 cultural assessment, but it would make sense that
4 that would be the case.
5    Q  And, again, Dr Liu's June 4th, 2020,
6 complaint, was that shared with plaintiff?
7    A  I don't know.
8    Q  Did anyone from Inova reach out to
9 plaintiff regarding Dr. Liu's complaint?
10    A  I don't know.
11    Q  Who would be in the best position to know
12 that?
13    A  This letter went directly to Karen
14 Wastler -- well, actually, I believe it went to
15 Dr. Graf first, and then it was moved over to
16 Karen Wastler.
17     So I'm not sure if Karen Wastler, from
18 that point, spoke to Kathleen or shared anything
19 with Kathleen.  I just know that it was brought to
20 my attention, and we were asked to do a cultural
21 assessment.
22    Q  Who is Dr. Graf?

99

1    A  Dr. Graf is the CMO.
2    Q  And Karen Wastler?
3    A  She was the AVP of ambulatory services,
4 surgical services, some other things.
5    Q  Was an investigation conducted into
6 Dr. Liu's allegations?
7    A  No.
8    Q  Why not?
9    A  Because it was just a complaint.  So this
10 was the second complaint that Dr. Liu brought up,
11 so where -- this is what I will say, from my
12 memory.
13     Dr. Liu brought up complaints in regards
14 to Kathleen's collaboration when it came to a
15 former team member.  So the first time, there was
16 a mediation session between Dr. Liu and Kathleen
17 to talk about being collaborative and working
18 together and being, you know -- generally, working
19 as a team.
20     So the first time that Dr. Liu brought a
21 complaint against Kathleen, there was a -- it was
22 a mediation session, and then after that, you

100

1 know, they continued to work together.
2     This was the second time that a complaint
3 was brought up against her from Dr. Liu after the
4 mediation session, so that's why it was not --
5 that's why this -- that specific letter was not
6 necessarily investigated for that, but instead,
7 the leader, Karen Wastler, felt that, between the
8 situations that were happening with Dr. Liu and
9 the other things that were being brought up by
10 other team members at the time, that it was time
11 to do a cultural assessment and figure out if
12 Kathleen was the right leader for the role.
13    Q  Were you involved with that first
14 complaint and that mediation session?
15    A  Yes.
16    Q  And, after that, did you find that
17 plaintiff was at fault?
18    A  There was no fault, and that meeting was a
19 -- I think it was more of an alignment type of
20 conversation, you know, just to --
21    Q  What type?
22    A  It was more of an alignment conversation.

101

1  Because, at the time, it was all involved around a
2  team member getting a -- trying to save a team
3  member from leaving, because they felt they were
4  short-staffed, and that Kathleen was not willing
5  to submit the proper documentation to at least try
6  to get this team member a raise to keep this team
7  member on the team.
8      And so Dr. Liu was not familiar with the
9  process. She was just reaching out to Kathleen
10 for help in this situation and felt that Kathleen
11 wasn't being responsive or helpful. So then she
12 escalated it above Kathleen's head, which -- I
13 believe, to Shannon North-Giles, at the time.
14     So that meeting was -- that meeting ended
15 up being more of a discussion about the alignment
16 of the PAs, and that's when Dr. Liu requested to
17 have the PAs moved under her leadership, at which
18 point, Kathleen, I believe, was amenable to it if
19 it was possible.
20     And then from there, we continued with --
21 we just continued with trying to, I guess, get
22 them on the same page.

102

1      I can't remember, you know, everything
2  that was said. I do know that, in that meeting,
3  it was challenging to understand Dr. Liu exactly,
4  so there was a lot of -- I felt there was a lot
5  of, kind of, translation being done by Shannon in
6  that meeting to help her kind of get her thoughts
7  out.
8      So was there a firm conclusion from that
9  mediation?
10     It didn't feel like it was a firm
11 conclusion, but the takeaway was to try to get the
12 PAs underneath Dr. Liu.
13 Q  Who was that PA that was requesting an
14 increase in her salary?
15 A  Emily Loter.
16 Q  And how did that -- how did that conclude?
17 A  I believe she got -- I believe she got a
18 little bit more money.
19 Q  Was that a CARF?
20 A  It would have been a CARF, yeah.
21 Q  Is it true that CARFs cannot be issued
22 prior to a performance evaluation?

103

1  A  No.
2  Q  It's not true?
3  A  No.
4  Q  When can they be --
5      Can they be issued at any time?
6  A  They can be issued at any time.
7  Q  Did you tell plaintiff that her CARF would
8  not be approved until after performance
9  evaluations?
10 A  No.
11 Q  You deny that?
12 A  I don't believe I said that, no.
13 Q  To your understanding, why did the
14 plaintiff -- why was her CARF denied?
15 A  Her CARF was submitted prior to me, so I
16 don't know why her CARF was denied.
17     When it was brought back to my attention
18 later on after the Emily Loter situation, it was
19 right at the peak of COVID when we were doing
20 layoffs; and therefore, I was -- it was told by my
21 compensation team -- my leadership team -- that
22 there were going to be no raises given until after

104

1  a certain period. So that's why I wasn't able to
2  help her; but the original CARF, I had nothing to
3  do with.
4  Q  I'm going to direct you to KL38. Okay.
5  This is an e-mail from Kathleen to you, regarding
6  revisiting a submission of her justification
7  letter for her compensation, right?
8      Do you recall seeing this?
9  A  Okay.
10 Q  Okay. Based on your review of the CARF
11 application --
12     Or did you review her CARF application?
13 A  I was -- I can't recall. I feel like I
14 may have reviewed it. I may have reviewed it
15 directly with the leadership team, because,
16 typically, a CARF is not a -- I'm the final
17 approval on a CARF, so the CARFs have to be
18 approved by leadership, right?
19     It's initiated by leadership; it's
20 approved by leadership, so they need to review it,
21 and they need to agree that the raise is
22 necessary. So even though Kathleen might bring a

109

1 2020, right?

2     A Yes.

3     Q All right. So did she complain about

4 harassment based on skin color in this document?

5     A What I remember from this was her not

6 making a direct complaint, but making more of an

7 inquiry. Like, the way she phrased it was, I

8 don't know why I'm treated differently. It could

9 be because of my age; it could be because of my --

10 like, her skin, but she didn't make a direct

11 complaint to --

12     From my recall, it says that -- she says,

13 I am being discriminated against because of my --

14 because I'm African American.

15     It was more -- it was more of a suggestion

16 or kind of -- it was asking -- almost like if she

17 was questioning, like, do I know why -- or not

18 me -- but asking us, do we know why she is being

19 treated differently.

20     So it wasn't a direct statement saying, I

21 am being discriminated against, or I am being

22 treated differently because of my race.

110

1     Q All right. Being younger than somebody

2 who is mistreating you, that's not something that

3 is illegal. Do you understand that?

4     A I understand that age discrimination is

5 after you're 40, yes.

6     Q Okay. And being taller, that's not a

7 protected category, correct?

8     A Yes.

9     Q Okay. But when somebody says, it's my

10 skin hue, my skin color, does that raise a flag

11 for you?

12     MS. KIRKLAND: Object to the form of the

13 question.

14     But you can answer.

15     A Yes. I mean, it's implying that she

16 believes that there may be a treatment because

17 their skin hue, yes.

18     Q Okay. Did you do anything to inquire

19 about what she meant by this?

20     A I did sit down with Kathleen and have a

21 meeting with her, where I asked her about this

22 discrimination that she was feeling; and I asked

111

1 her to provide specific examples, in which she was

2 not able to give me examples of any treatment that

3 would have been direct to her skin color.

4     The complainant -- or the plaintiff's

5 biggest challenge that I was ascertaining from our

6 conversation wasn't to do with her skin color or

7 height or age, but with Shannon being disruptive

8 to her ability to do her job.

9     And so from here, we did do a -- as I told

10 you, a grievance, a meeting, where I met with

11 every single one of, you know, Shannon's leaders,

12 spoke with them directly using very similar

13 questions, but it was the same question for each

14 leader and getting an assessment of how Shannon

15 leads.

16     And with that, what we found is that

17 Shannon was being -- some people perceived her as

18 being a micro-manager, being disruptive, and that

19 came from more of the more tenured leaders, the

20 ones who were kind of more fixed in the role;

21 however, the leaders that were kind of newer in

22 the roles felt it was a value in terms of how she

112

1 was leading, that that extra touch and being more

2 involved in e-mailing and asking questions -- they

3 felt that that was actually being a good leader.

4     So what we found is that there wasn't

5 anything specific to Shannon's leadership style

6 that was direct to an ethnicity, but more of that

7 her leadership style, whether it's effective or

8 not, was consistent across every single leader.

9     Q Why did you go to Shannon's leadership if

10 a subordinate was complaining against her, rather

11 than go to other subordinates?

12     A So can you -- can you clarify that

13 question, please?

14     Q Right.

15     It sounds like your inquiry was limited to

16 leadership above Shannon, in response to a

17 complaint raised by plaintiff.

18     A Thank you for that clarity.

19     So when I say leadership, I meant the --

20 her leadership team, her subordinates that she

21 leads, or the peers of Kathleen Lewis.

22     Q Okay. Thank you.

117

1      But a lot of times, you know, when it
2  comes to a discrimination case, we do -- we talk
3  to the leaders.  We look at the behaviors that
4  they are displaying and if they're displaying
5  these behaviors solely to this person or if
6  they're demonstrating them across the board.
7      So that's, to the best of my knowledge, of
8  how we look at discrimination.
9      Q  Are you, as an EEO investigator -- so as
10 the HR department, handling these discrimination
11 cases, are you familiar with the burden shifting
12 analysis?
13     A  No.  I've never heard of that, no.
14     Q  You -- have you received EEO training?
15     A  In my career, I have; and in my studies, I
16 have.  I don't recall the burden analysis, no.
17     Q  Okay.  But did you receive EEO training
18 while at Inova?
19     A  I don't remember at this point.
20     Q  Do you know whether employees were given
21 EEO training?
22     A  I believe that there was -- I do believe

118

1  there was training that went through our yearly
2  training, but, again, I can't remember
3  specifically, so I don't want to -- I don't want
4  to say, for a fact, because I can't remember.
5      Q  If an employee did receive EEO training,
6  is that something that would be included in a
7  personnel file?
8      A  Every -- so everything was -- everything
9  goes through the system-level training.  So the
10 system-level training is going to be a recorded --
11 it would be recorded and be available to see that
12 they have gone through these different trainings.
13     And during certain events, like, we can
14 print out -- meaning, we, Inova -- can print out
15 the different trainings that people go through,
16 yes.
17     Q  You said there's a document where you and
18 the plaintiff sat down after she filed her
19 grievance.
20     Where is that document now?
21     A  I would have given everything to Jenny.
22     Q  Your legal department?

119

1      A  Yes.  Legal department, yes.
2      Q  Okay.  Prior to giving it to Jenny, where
3  was it stored?
4      A  I had -- there was a file for Kathleen
5  Lewis that I had, in terms -- that I -- my
6  conversations with her, and so that would be at
7  the Alexandria office.
8      Q  An electronic folder?
9      A  I had a physical folder, and then I
10 scanned everything into the system and then
11 provided it all to Jenny.
12     Q  Okay.  So the file that you were keeping
13 for Kathleen Lewis, it was a physical file.
14     And where did you put it when you left
15 Inova?
16     A  I left it in the cabinet where we keep our
17 employee files in the AVP office.
18     Q  Is that separate from their personnel
19 file?
20     A  It can be inclusive of the personnel file
21 or separate of the personnel file, because HR
22 notes and conversations that we had -- we don't

120

1  have to upload everything into their E-services
2  file.  Some things, we will keep in their separate
3  file.
4      And departments can have their own
5  personnel files on team members as well, so not
6  everything will necessarily go into the E-services
7  file.
8      Q  Okay.  After you met with the plaintiff
9  regarding her grievance, you then met with four
10 other individuals, leadership reporting to
11 Ms. Giles, correct?
12     A  Yes.
13     Q  Did you then go back to meet with the
14 plaintiff again to explain your findings?
15     A  I do not know.
16     Q  As part of the cultural assessment, did
17 you speak with Samuel Awate?
18     A  I have no idea.  And for -- sorry, is that
19 for --
20     Q  Samuel Awate provided feedback to
21 Ms. Lewis after her termination, and it was in
22 direct response to the reason she was terminated.

INOVA®
Join the future of health.

*EMAIL*

*Scared of receiving an email about not taking lunch. pay will

* Transcription Office - Jeremy Graf
* continuation from same group
* no example of retaliation
* Culture is great. Seen team members go to HR.

# IAH Lab Services  Cultural Value/ Climate Assessment Results

* Free reign of retaliation + feedback

Lanai Jackson, HRBP
June/July 2020

1

HUMAN RESOURCES SENSITIVE – DO NOT FORWARD



**INOVA**
*Join the future of health.*

- Team members from all 3 shifts were interviewed (see spreadsheet)
  - 39/55 team members interviewed
  - 6 reporting to M. Bond
  - 18 reporting to K. Lewis
  - 9 reporting to P. Parker-Clemons
  - 5 reporting to B. Rivales
  - 1 reporting to S. Villagomez
- Interviews were conducted between June 22nd – July 1st
- Interviews were conducted in person and by phone
- Interviews were conducted by Lanai Jackson (HR BP), Lalah Masood (HR Coordinator) and Renauldo Hawkins (Interim HR Director)
- Team members reviewed and signed off on notes when available
  - Team members who were interviewed via phone were unable to sign; responses were read back to team member for confirmation of accuracy

2



- Histology Assistants* (3)
- Interim Lab Leader (1)
- Lab Central Processing Specialist (1)
- Lab Section Specialist (1)
- Lab Supervisor (3)
- Lab Tech Assistant* (4)
- Laboratory Technical Specialist (1)
- Med Lab Scientist Med Tech* (18)
- Medical Lab Technician* (5)
- Pathologists Assistant (1)
- Prog Edu Coord Histology (1)

*all levels for position

3

KL0176


- Questions
  - How would you describe the climate of your current work environment? What works well within the department? What are the challenges within your department?

  - What feedback have you received from your manager leader(s)?

  - What feedback have you provided to your leader regarding any of the following: 1. The work environment itself 2. Communication 3. Suggestions/Recommendations

  - When issues occur, do you feel comfortable raising your concerns to your leader? If not, why not?

  - Based upon feedback received during interviewing, an additional question was asked of team members regarding meal breaks.

4


- Most of the team members interviewed had positive feedback to provide. These team members often stated they shared their concerns with the leaders as issues arise.

- There is a mix of responses regarding team members providing feedback to Lab leadership team as some team members said they are comfortable, some are not comfortable and some do not provide feedback at all.

- Team members feel supported by the leadership within the Lab Department however, there are opportunities to improve the consistency of communication of positive feedback among leaders to team members and across the areas within the Lab Department

- For the team members who have had negative encounters with the Lab Director there is a fear of retaliation or that there will be harsh consequences for questioning decisions made by leadership

- Some team members are uncomfortable speaking with leadership regarding schedule changes for fear they will be told "No" or that they will be treated negatively because of the request

- Sometimes the Lab Director will make decisions or take actions without seeking the input of the team members who will be impacted by the decision (ex. Cleaning out the office where the Transcriptionist was located)

5



Team Member Responses: Question 1(A)


INOVA®
Join the future of health.

How would describe the climate of your current work environment? **A. What works well within the department?**

- Feels like a family
- There is a collaborative process for resolving workflow issues
- Team members work well together and help each other with tasks
- Leadership is supportive
- Leadership communicates information about changes which impact the lab
- Leadership provides positive and constructive (some team members may call negative) feedback
- Team members are engaged in making decisions

6



How would describe the climate of your current work environment? **B. What are challenges within the department?**

- ✓ Staffing has become a challenge due to COVID-19 (ex. The Transcriptionist position was eliminated which has led to additional work for the remaining team members in department)
  - ♪ Staffing challenges within Central Processing specifically during the weekends as there is sometimes only one person to do blood draws in Outpatient
  - ♪ More responsibilities due to lab owning testing of blood gases
- – Workload can be overwhelming particularly during the night shifts and on the weekends
- – Lack of pay increases for PRN team members, specifically those who have longer tenure within the organization
- – Departments outside of lab do not understand certain processes which impact lab results (ex. Specimen collection/samples being sent to lab and handled appropriately to maintain integrity for appropriate testing)



160773 - BL

7

ən

10

8


**INOVA**
Join the future of health.

What feedback have you received from your leader(s)?

– Many team members state they have received feedback from their leaders via email (ex. Emails recognizing teams and/or team members specifically; showing appreciation by saying thank you)

– Lab Director is encouraging with respect to professional development and personal growth

– Yearly check-in (evaluation) meetings are held with leaders; competency assessments held

✱ – Nicolas Centeno does not show appreciation by way of recognition emails like the other supervisors within the laboratory department

✱ – Some team members who work hours when leaders are less visible (weekends and nights) do not receive feedback or receive less feedback; If there is negative feedback they hear from the leader via phone call or email

✱ – Much of the feedback received is through emails. There are some instances where the Lab Director has sent email responses that team members believe to be unprofessional (examples sent to interim HR Director)

8


What feedback have you provided to your leader regarding any of the following: 1. The work environment itself 2. Communication 3. Suggestions/Recommendations What was his/her response? Has your leader acted upon the feedback you have provided?

— Team members are encouraged and able to contact leaders via email and phone in order to communicate workflow issues, equipment and supply concerns (ex. Analyzer issues)

— Some team members have provided feedback to leaders by providing recommendations or suggestions during huddles

— Team members have shared their ideas regarding professional and personal growth and development (ex. Wanting to be trained in a different area within the lab)

— Some team members have provided feedback to Tess Bond regarding the schedule; based upon the interviews her response to their requests and/or feedback is a mix of positive and negative

— Some team members have not shared any feedback with the leadership team

— Some team members do not feel comfortable providing feedback to the leaders within the Lab Department for fear they will be treated differently, retaliated against or their feedback will not be acted upon

## Team Member Responses: Question 4 

INOVA
*Join the future of health.*

When issues, occur, do you feel comfortable raising your concerns to your leader? If no, why not?

— 31 out of the 39 team members interviewed feel comfortable speaking with the laboratory leadership team (supervisors and/or director)

— Of those who reported they do not feel comfortable raising concerns to leadership, the following feedback was shared

- Does not feel that Kathleen will listen to suggestions and will proceed with doing what she wants to do
- Believes there will be retaliation from Kathleen or that the issues that are brought to her attention will be ignored
- Nick (Nicolas Centeno) does not listen; gets upset with team members for "little things." He sometimes gets upset about mistakes team members have made. His leadership is poor.
- Sometimes frustrating to tell leaders your concerns because you don't know if they are going to answer or if you challenge them you will lose your job
- Does not feel comfortable asking Tess (Maria Bond) for schedule changes. Has been told by Tess they should not complain about the schedule.
- Does not always feel comfortable speaking up right away about concerns.
- Team member rather try to fix problems on their own instead of escalating to leadership

10

Results F
CHEMIST

©2017 A

## AFFIDAVIT OF WITNESS

1. Please provide your full name, address, telephone number and e-mail address.
   Deborah Sexton, 884 Mitchell Road, Airville PA
   mommasexton@aol.com

2. Please provide your race.
   Asian American

3. Have you ever opposed or complained about discrimination?  No

4. When did you work for Inova? I can't remember the start date but worked there for 10+
   years.  I left in Sept or Oct 2021.

5. Provide your job titles and the dates you held the positions. Laboratory QA/POC
   Coordinator and Springfield Healthplex Supervisor

6. Do you still work for Inova? If not, did you resign or were you terminated? Why?

   I resigned to work for a better company.  I felt like Inova Alexandria was becoming
   unethical and the HR department was corrupt.

7. What was your position for the period October 2019 to July 2020?  Laboratory QA/POC
   Coordinator

8. Did you work with Kathleen Lewis? Yes

9. Provide estimated dates and in what capacity.  She was my director ever since she started
   at Inova until she left.  I don't remember the dates.

10. Did you participate in a Climate Assessment for the Lab Department in 2020? Yes

11. Did you understand the Climate Assessment to be directed against Kathleen Lewis?
    Please explain.  We weren't told that, but it was obvious.

12. Provide the date, who and how you were approached about the Climate Assessment.
    I don't remember the date.  HR just showed up and said they were doing a Climate
    Assessment.

13. What were you told about the reason, purpose and procedure of the Climate Assessment?

No reason was given that I was made aware of. HR did a last minute Climate Assessment, which if I remember correctly, was shortly after Kathleen filed a formal complaint against Shannon.

14. Who interviewed you for the Climate Assessment? Lanai, I think her last name is Jackson

15. Did you find that person to be fair, neutral and objective while conducting the Climate Assessment? Please explain.
No it wasn't fair, neutral and objective. It was aimed at Kathleen.

16. Did you receive a copy of the Climate Assessment? No

17. Was all of your input included in the Climate Assessment?

No, I don't believe so. When I brought up my concern that ever since Shannon started, Kathleen had a target on her back and it seemed Shannon was doing everything to try to fire Kathleen. I also mentioned that this "climate assessment" looked like a witch hunt against Kathleen. I also mentioned that it appeared Shannon was harassing Kathleen and HR was letting it happen. Lanai told me I didn't know the whole story and that this assessment wasn't about Shannon and she (Shannon) would get her own assessment. This comment, that Shannon would get her own assessment, confirmed my suspicion that the assessment was directed specifically against Kathleen. Lanai wrote something down on the back of the interview form, so I felt like she was hiding my comments and probably did not share them.

18. Did you find that the Climate Assessment resulted in a fair result?
No, they fired Kathleen shortly after. This looked to me like retaliation for filing a complaint against Shannon.


I solemnly affirm under the penalties of perjury and upon personal knowledge, that the contents of the foregoing paper are true.

_Debbie Sexton 7/28/2024__
Name                              Date

## AFFIDAVIT OF WITNESS

1. Please provide your full name, address, telephone number and e-mail address.
   Bixbie Gail Baliang Rivales
   14 English Saddle Ct, Parkton, MD 21120
   714-270-9064
   BBALIANG@yahoo.com

2. Please provide your race.
   Asian

3. Have you ever opposed or complained about discrimination?
   No

4. When did you work for Inova?
   Oct 2019 – July 2022

5. Provide your job titles and the dates you held the positions.
   Lab Supervisor Oct 2019 – July 2022

6. Do you still work for Inova? If not, did you resign or were you terminated? Why?
   No. I resigned because after Kathleen Lewis left, the workplace became toxic and the new director was unethical.

7. What was your position for the period October 2019 to July 2020?
   Lab Supervisor

8. Did you work with Kathleen Lewis?
   Yes

9. Provide estimated dates and in what capacity.
   I worked for Kathleen Lewis from October 2019 until July 2020 as a Chemistry Laboratory Supervisor.

10. Did you participate in a Climate Assessment for the Lab Department in 2020?
    Yes

11. Did you understand the Climate Assessment to be directed against Kathleen Lewis? Please explain.

1

I did not understand what the Climate Assessment was for because there was no explanation what the 1:1 interview was about.

12. Provide the date, who and how you were approached about the Climate Assessment.
I don't remember the exact date, but it was a few weeks before KL's termination. The HR specialist who interviewed me did not introduce herself. I was just called into the conference room right next to the laboratory with no explanation of what it was about.

13. What were you told about the reason, purpose and procedure of the Climate Assessment?
No reason, purpose or procedure was provided. The climate assessment was unclear and confusing because the questions were about KL's leadership and not about the employee experience as a whole.

14. Who interviewed you for the Climate Assessment?
She did not give me her name.

15. Did you find that person to be fair, neutral and objective while conducting the Climate Assessment? Please explain.
I did not get the feeling of fairness, neutrality nor objectivity in the line of questioning. I was just pulled into the room with no explanation of what it was for. I was being asked a lot of questions about KL's leadership. I was giving positive responses, and the meeting was short. It lasted maybe only 10 minutes or less but others were interviewed for longer periods of time.

16. Did you receive a copy of the Climate Assessment?
No.

17. Was all of your input included in the Climate Assessment?
I do not know.

18. Did you find that the Climate Assessment resulted in a fair result?
I do not know the result.

I solemnly affirm under the penalties of perjury and upon personal knowledge, that the contents of the foregoing paper are true.

07/28/24

Bixbie Gail B. Rivales  July 28, 2024
Name                              Date

2

Transcript of Shannon North-Giles
Conducted on June 17, 2024

65

1   Q    Is it common within Inova to conduct
2 a cultural assessment in response to a
3 discrimination complaint?
4   **A    I don't know.**
5   Q    Do you know whether
6 discrimination-complaint investigations are
7 conducted?
8   **A    I -- I -- I don't know.**
9   Q    Have you ever experienced being --
10 participating in a discrimination investigation?
11  **A    No.**
12  Q    To your knowledge, what other action
13 did Inova take to address Plaintiff's allegation of
14 discrimination in this letter?
15       MS. KIRKLAND:  Object to the form of
16 the question, but you can answer.
17       THE WITNESS:  I don't know.
18       MS. RAMIREZ:  Okay.  Let's turn to
19 Exhibit 7.  This is KL 174.
20       (Exhibit 7 was marked.)
21 BY MS. RAMIREZ:
22  Q    Have you seen this before?

66

1   **A    I don't remember.**
2   Q    I'm going to turn to KL 178, which
3 is Page 4 -- okay, Bullet Number 4 or Bullet 4.  The
4 assessment states, There is a fear of retaliation or
5 that there will be harsh consequences for
6 questioning decisions made by leadership.
7       Do -- do you have any context for this,
8 and do you know what it's referring to?
9   **A    The -- I don't know what this is**
10 **specifically referring to, but I do remember that**
11 **Dr. Liu was the medical director, pathologist, for**
12 **the lab, and I believe that she had expressed some**
13 **concerns about retaliation from Kathleen.**
14  Q    Did she report to Plaintiff?
15  **A    No.**
16  Q    What forms of retaliation did the
17 Plaintiff subject Dr. Liu to?
18  **A    I don't -- I don't know that she --**
19 **the concern was that there would be retaliation.  I**
20 **don't know that -- if there was actual alleged**
21 **retaliation.**
22  Q    Did you ever observe the Plaintiff

67

1 retaliate against anyone?
2   **A    Not that I remember.**
3   Q    If there were allegations of
4 retaliation by the Plaintiff, is that something that
5 HR would have investigated?
6   **A    Yes.**
7   Q    Did they?
8   **A    Again, I don't know.  This was fear**
9 **of retaliation, not a specific event.**
10  Q    Is there any documentary support to
11 substantiate a fear of retaliation?
12       MS. KIRKLAND:  Object to the form of
13 the question, but you can answer.
14       THE WITNESS:  I -- I don't know the
15 answer to that.  I -- I -- I -- I don't know.
16 BY MS. RAMIREZ:
17  Q    So in your experience at Inova, if
18 somebody were to fear retaliation from, let's say,
19 you, should that be grounds for termination for you?
20       MS. KIRKLAND:  Object to the form of
21 the question, but you can answer.
22       THE WITNESS:  Not based just on

68

1 fear, no.
2 BY MS. RAMIREZ:
3   Q    Why not?
4   **A    Because, you know, a -- it depends**
5 **on who is involved, how many people are involved.**
6 **This bullet point is -- references multiples, and I**
7 **don't know where this document came from but it is**
8 **talking more about a culture of fear of retaliation.**
9 **If there is a culture of fear of retaliation, there**
10 **can be some significant patient safety concerns that**
11 **come up because people are afraid to speak up.  And**
12 **while it may not be grounds for termination, if it**
13 **is pervasive and found to be impactful in the**
14 **department's culture, then that would be grounds for**
15 **a performance improvement plan.**
16  Q    You talked about how many are
17 involved and that this references multiples.  I'm
18 going to go back up to the second page of this
19 cultural assessment.
20       Do you agree that 39 team members were
21 interviewed?
22  **A    I don't know.  I wasn't involved in**

## AFFIDAVIT OF KATHLEEN LEWIS

1. Please provide your full name, address, telephone number and e-mail address.
   **Kathleen Lewis**
   **9050 Iron Horse Lane, Apt 309**
   **Pikesville, MD 21208**
   **(269) 876-2851**
   **Katy18624@gmail.com**
2. Please provide your race.
   **African American**
3. Have you ever opposed or complained about discrimination?
   **Yes**
4. When did you work for Inova?
   **July 2016 – Aug 2020**
5. Provide your job titles and the dates you held the positions.
   **Administrative Director of Laboratory Services & Pathology**
   **Inova Alexandria Hospital (IAH)**
   **Springfield HealthPlex**
6. Did you work with Sean McCleary?
   **No, not very closely. He seemed to only meet with Houshang Falahatpour, who was the AVP over the Laboratory Service line when Sean onboarded. We had laboratory service line meetings that were virtual. We talked about system directives for the lab, each of which I/ my team abided by (for example, quick implementation of Abbott covid instrumentation with the entire system).**

   **Sean never got to know me for the short time he was working while I was there. He never asked how he could support me, if I had concerns, or how he could better assist me/my team. He was very hands off.**

7. Did you ever meet Sean McCleary in your role? Please explain.

   **I do not remember the exact date, but Sean came to my office at IAH. He seemed nervous and did not seem to know how to drive the session. He shared his vision. I shared the pulse of the IAH and SHP labs as well as plans and accomplishments for my team. I spoke with him about my concerns regarding Shannon North-Giles and Karen Wastler for safety and compliance concerns (ABG/Blood Gas project, ED issue – drawing arterial blood and sending as venous, Respiratory Therapy compliance issue – cease and desist letter, water issue that cost IAH thousands of dollars, and other items).**

1

One thing I made sure to bring up was that I was promised a raise after having the blood gases (analytes) transition to the Core Lab. I shared my CARF and the data that showed I along with the leaders of the lab ABG department had never received our due compensation. I also shared that a pathologist assistant had a CARF approved in a matter of days after I had submitted mine several times with no follow up by Shannon North-Giles, Karen Wastler, nor Renauldo Hawkins. At this time, there was no initiative to move other ABGs in the system to the lab teams. Inova Mount Vernon Hospital had to move years ago to run ABGs in the lab because of similar non-compliance issues by their respiratory leadership. Fairfax always had varying workflow processes from the rest of the sister sites. Inova Fair Oaks did not run blood gases but worked as a team with their Respiratory team to meet the needs of the patients. Inova Louden was under construction and was not even on the radar for ABGs. I worked closely with Houshang Falahatpour and Frank Beylo in doing the project phased planning (from shutting down respiratory therapy for non-compliance for ABGs, devising a partnership with IMVH and IFH to run body fluids until IAH's ABGs were fully validated and "live".

Sean did share that he spoke to Shannon North-Giles and Karen Wastler about me. He did not share what they stated nor of any concerns. He just said that he had heard about me. I am not sure what that meant. However, it was reminiscent of when Renauldo Hawkins shared, he had heard about me from Shannon North-Giles and Karen Wastler. Sean did not say that the CARF would be denied.

8. Was there any follow-up from Sean McCleary after the meeting?
   **There was no follow-up from Sean after my 1:1 in my office at IAH.**

9. When did you meet in person with Sean McCleary after your only face-to-face meeting at IAH?

   **After my only face-to-face meeting with Sean, the next time I saw him was at the system office edifice for the surprise termination.**

10. At your date of termination, who walked you out? Please explain that conversation.

    **Sean McCleary walked me out of a new system edifice in Fairfax, VA. He told me that he was sorry to have to release me that way. At that point, I told him "You are too new to know what just occurred and how toxic Karen Waster, Shannon North-Giles (my IAH leadership) and Renauldo Hawkins (HR) are at IAH" and I do not accept your apology. I requested that he stop walking beside me to my car. I left him on the curb as he watched me walk to my car.**

2

11. Do you feel that your compensation was comparable with that of your colleagues at Inova Health System?

**My compensation was not comparable to my colleagues. When I onboarded at IAH, I was making $107k until Houshang Falahatpour realized the deficit in my salary. During an equity I received a ~12-13% increase because that is how much my salary lagged in comparison to my colleagues, who were all white females with 1 white male. Houshang Falahatpour pointed out during my 1:1 discussion that had my salary on the agenda, that I had a master's degree, which many of my colleagues did not have.**

**Inova Fairfax Hospital (IFH) is the flagship hospital, over ~900 beds. I learned that their director was on a higher pay scale than the other sites. IAH (~350) and the Springfield HealthPlex (over 20 bays) was the second largest hospital and ambulatory site (volumes, testing, complexity of testing) next to IFH. Inova Louden Hospital had ~137 beds and that Director had auspice of the Ashton and Cornwall HP. IFOH (no HP attached – had ~174 beds) and Inova Mount Vernon Hospital (~237) with Lorton HP were the tiniest of the system. It is ludicrous to compare IAH with the smaller institutions that paled in comparison to the sheer volumes of testing that IFH and IAH/SHP completed. My salary should have mirrored the level of knowledge and work that was completed at my site in comparison to the other sites. That should solidify the capacity of work that was completed at IAH. IFH also reached out to IAH to "team up" when they had an issue or concern that they needed insight on. We partnered with them as well as the smaller Inova Health System sites.**

12. Did Shannon North-Giles call/text you after hours and on weekends whenever she felt like it?

**Shannon North-Giles called me at any time (late nights, weekends) whenever she felt like it. She called both of my office phones (IAH & SHP) while I was at work as well as my personal cell phone. She insinuated that she did not know where I was. See attached document for reference.**

13. Was the climate assessment data ever reviewed with you by Renauldo Hawkins, Karen Wastler, or Sean McCleary prior to your termination?

**The climate assessment data was never reviewed with me by Renauldo Hawkins, Karen Wastler, or Sean McCleary prior to my termination. I was told during the**

**initial conversation with Shannon North-Giles regarding the climate assessment that Karen Wastler and Renauldo Hawkins would schedule time to review the data after the climate assessment window had closed for interviews. Shannon North-Giles presented the climate assessment as being a "pilot" process being done only for the laboratory at IAH.**

I solemnly affirm under the penalties of perjury and upon personal knowledge, that the contents of the foregoing paper are true.

7/29/24

Name Kathleen T. T. Lewis      Date 7/29/24

# T Mobile

## Calls/Texts in Response to Shannon North-Giles

**Sprint CDR Request - Call Detail by MDN Target - 2698762851 Start Dt = 1/1/2018 12:00:00 AM End Dt = 8/31/2020 11:59:00 PM**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2698762851 | 7039739038 | | Outgoing | 01-26-2019 08:32:23 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 01-26-2019 08:32:24 | | 0 | Text | 551 | 2698762851 | Saturday |
| 2698762851 | 7039739038 | | Outgoing | 01-26-2019 08:38:31 | | 0 | Text | 551 | 2698762851 | Weekday |
| 2698762851 | 7039739038 | | Outgoing | 01-26-2019 08:40:27 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 01-26-2019 08:40:43 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | 17039739038 | Outgoing | 01-28-2019 19:30:07 | 01-28-2019 19:32:37 | 150 | VoLTE | 161 | 2698762851 | |
| 2698762851 | 7039739038 | 7039739038 | Undetermined | 01-28-2019 20:30:06 | 01-28-2019 20:32:37 | 151 | Voice | 161 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 03-30-2019 15:43:47 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 03-30-2019 15:43:48 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 03-30-2019 15:54:24 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 03-30-2019 16:41:24 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 03-30-2019 16:41:25 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-13-2019 22:14:10 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-13-2019 22:14:28 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-13-2019 22:16:09 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-13-2019 22:18:59 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-13-2019 22:22:17 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-13-2019 22:24:14 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-13-2019 22:24:41 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-13-2019 22:26:00 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-13-2019 22:26:58 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-13-2019 22:47:46 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-13-2019 22:51:03 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-13-2019 22:54:07 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-26-2019 17:08:32 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-26-2019 17:09:12 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 04-26-2019 17:10:24 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 06-25-2019 16:34:05 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 06-25-2019 16:42:08 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 08-23-2019 16:22:35 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 08-23-2019 16:22:36 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 08-23-2019 16:26:29 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 08-23-2019 16:27:11 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 09-12-2019 16:47:44 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 10-18-2019 17:31:48 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 10-18-2019 17:59:10 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 10-18-2019 18:00:28 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 10-18-2019 18:04:01 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 10-18-2019 18:05:17 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 10-18-2019 21:43:33 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | 7039739038 | Undetermined | 12-05-2019 16:27:31 | 12-05-2019 16:30:51 | 200 | Voice | 90 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 01-04-2020 23:18:40 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 01-04-2020 23:19:02 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 01-04-2020 23:19:41 | | 0 | Text | 551 | 2698762851 | |
| 2698762851 | 7039739038 | | Outgoing | 01-05-2020 07:32:46 | | 0 | Text | 551 | 2698762851 | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2698762851 | 7039739038 | | Outgoing | 01-05-2020 07:32:49 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 01-05-2020 07:32:50 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 01-05-2020 07:32:53 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 01-05-2020 07:32:54 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 01-05-2020 10:21:28 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 01-05-2020 10:33:02 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 01-10-2020 17:14:18 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 01-10-2020 18:04:34 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | 17039739038 | Undetermined | 01-14-2020 16:27:10 | 01-14-2020 16:27:10 | 0 | VoLTE | 161 | 2698762851 |
| 2698762851 | 7039739038 | 17039739038 | Outgoing | 01-14-2020 16:27:14 | 01-14-2020 16:28:48 | 94 | VoLTE | 161 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 01-14-2020 16:35:38 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | 7039739038 | Undetermined | 01-14-2020 17:26:53 | 01-14-2020 17:27:09 | 16 | Voice | 161 | 2698762851 |
| 2698762851 | 7039739038 | 7039739038 | Undetermined | 01-14-2020 17:27:13 | 01-14-2020 17:28:47 | 94 | Voice | 161 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 01-15-2020 16:29:34 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 01-15-2020 16:30:00 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 01-15-2020 16:41:08 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 02-15-2020 19:55:39 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 02-15-2020 19:55:40 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 02-15-2020 19:56:06 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 02-15-2020 19:57:58 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | | Outgoing | 02-16-2020 08:04:08 | | 0 | Text | 551 | 2698762851 |
| 2698762851 | 7039739038 | 17039739038 | Outgoing | 03-16-2020 16:10:56 | 03-16-2020 16:11:18 | 22 | VoLTE | 161 | 2698762851 |
| 2698762851 | 7039739038 | 7039739038 | Undetermined | 03-16-2020 17:10:55 | 03-16-2020 17:11:17 | 22 | Voice | 161 | 2698762851 |

# Calls/Texts From Shannon North-Giles

# **T Mobile**

**Sprint CDR Request - Call Detail by MDN Target - 2698762851 Start Dt = 1/1/2018 12:00:00 AM End Dt = 8/31/2020 11:59:00 PM**

| CALLING_NBR | CALLED_NBR | DIALED_DIGITS | M_R_NUMBER | START_DATE | END_DATE | DURATION(SEC) | CALL_TYPE | NEID | MDN |
|---|---|---|---|---|---|---|---|---|---|
| 7039739038 | 2698762851 | | Incoming | 11-30-2018 11:03:45 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 11-30-2018 11:06:08 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 12-19-2018 14:27:34 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 12-19-2018 14:33:51 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 12-19-2018 14:34:31 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | 2698762851 | Undetermined | 12-27-2018 13:02:05 | 12-27-2018 13:02:58 | 53 | VoLTE | 178 | 2698762851 |
| 7039739038 | 62450000000122 | 62450000000122 | Routed | 12-27-2018 13:02:26 | 12-27-2018 13:02:58 | 32 | VoLTE | 450 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-15-2019 12:22:02 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-15-2019 12:59:35 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-15-2019 13:06:47 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-15-2019 13:18:30 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-15-2019 13:20:09 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-15-2019 15:21:20 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-26-2019 08:11:25 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-26-2019 08:19:47 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-26-2019 08:35:29 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-26-2019 08:35:59 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-26-2019 08:42:20 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-26-2019 08:43:23 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-31-2019 10:06:17 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 02-28-2019 07:31:23 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 02-28-2019 07:31:50 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 03-11-2019 07:39:03 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 03-29-2019 09:37:46 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 03-29-2019 09:48:52 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 03-29-2019 09:51:14 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 03-30-2019 15:57:01 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 03-30-2019 16:39:21 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-02-2019 11:31:29 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-09-2019 08:11:22 | | 0 | Text | 550 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-12-2019 07:40:35 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:21:37 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:21:49 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:22:33 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:22:37 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:23:39 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:24:25 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:24:47 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:25:18 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:26:11 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:26:22 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:26:37 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:49:33 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:53:23 | | 0 | Text | 540 | 2698762851 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7039739038 | 2698762851 | | Incoming | 04-13-2019 22:54:34 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-15-2019 09:35:13 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-17-2019 08:13:01 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-17-2019 08:13:26 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 04-26-2019 17:09:53 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-02-2019 08:57:38 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-02-2019 08:59:59 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-03-2019 12:01:59 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | 2698762851 | Undetermined | 05-03-2019 12:03:17 | 05-03-2019 12:16:07 | 770 | VoLTE | 90 | 2698762851 |
| 7039739038 | 2698762851 | 2698762851 | Incoming | 05-03-2019 13:03:21 | 05-03-2019 13:16:08 | 767 | Voice | 90 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-03-2019 14:08:28 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-03-2019 14:08:46 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-03-2019 15:26:17 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-03-2019 15:28:09 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-03-2019 15:29:38 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | 2698762851 | Undetermined | 05-07-2019 11:24:42 | 05-07-2019 11:40:00 | 918 | VoLTE | 178 | 2698762851 |
| 7039739038 | 2698762851 | 2698762851 | Undetermined | 05-07-2019 11:44:25 | 05-07-2019 11:55:56 | 691 | VoLTE | 178 | 2698762851 |
| 7039739038 | 2698762851 | 2698762851 | Incoming | 05-07-2019 12:24:44 | 05-07-2019 12:39:59 | 915 | Voice | 178 | 2698762851 |
| 7039739038 | 2698762851 | 2698762851 | Incoming | 05-07-2019 12:44:27 | 05-07-2019 12:55:55 | 688 | Voice | 178 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-08-2019 08:52:21 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-08-2019 08:57:54 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-08-2019 09:31:25 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-08-2019 09:39:07 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-08-2019 12:27:04 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-14-2019 14:11:46 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-15-2019 15:33:16 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-23-2019 12:02:25 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-28-2019 09:31:30 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 06-07-2019 10:06:35 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 06-07-2019 10:09:05 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 06-07-2019 10:09:44 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 06-11-2019 07:35:10 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 06-20-2019 10:55:33 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 06-25-2019 10:38:29 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | 12698762851 | Undetermined | 06-25-2019 15:03:11 | 06-25-2019 15:03:37 | 26 | VoLTE | 161 | 2698762851 |
| 7039739038 | 62450000000122 | 62450000000122 | Routed | 06-25-2019 15:03:32 | 06-25-2019 15:03:37 | 5 | VoLTE | 454 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 06-25-2019 15:04:01 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 06-25-2019 15:04:28 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 06-25-2019 16:41:05 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 08-22-2019 05:07:31 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 08-22-2019 05:16:21 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 08-22-2019 05:16:43 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 08-22-2019 05:18:07 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | 12698762851 | Undetermined | 08-22-2019 05:25:54 | 08-22-2019 05:26:56 | 62 | VoLTE | 178 | 2698762851 |
| 7039739038 | 62450000000122 | 62450000000122 | Routed | 08-22-2019 05:26:06 | 08-22-2019 05:26:56 | 50 | VoLTE | 454 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 08-22-2019 05:27:19 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 08-22-2019 06:10:11 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | 2698762851 | Incoming | 08-22-2019 06:25:57 | 08-22-2019 06:26:04 | 7 | Voice | 178 | 2698762851 |
| 7039739038 | 2698762851 | 12698762851 | Undetermined | 08-22-2019 15:14:32 | 08-22-2019 15:14:32 | 0 | VoLTE | 178 | 2698762851 |
| 7039739038 | 2698762851 | 2698762851 | Incoming | 08-22-2019 16:14:29 | 08-22-2019 16:14:32 | 3 | Voice | 178 | 2698762851 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7039739038 | 2698762851 | | Incoming | 08-23-2019 05:02:04 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 08-23-2019 06:46:29 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 08-23-2019 16:25:09 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 08-23-2019 16:25:30 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 08-23-2019 16:26:47 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | 2698762851 | Undetermined | 09-11-2019 11:46:19 | 09-11-2019 11:47:58 | 99 | VoLTE | 178 | 2698762851 |
| 7039739038 | 2698762851 | 2698762851 | Incoming | 09-11-2019 12:46:22 | 09-11-2019 12:47:58 | 96 | Voice | 178 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 09-12-2019 15:38:52 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | 12698762851 | Undetermined | 10-01-2019 08:43:38 | 10-01-2019 08:44:02 | 24 | VoLTE | 90 | 2698762851 |
| 7039739038 | 62450000000122 | 62450000000122 | Routed | 10-01-2019 08:43:59 | 10-01-2019 08:44:02 | 3 | VoLTE | 454 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 10-01-2019 08:44:34 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 10-01-2019 08:45:19 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 10-01-2019 08:45:46 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 10-01-2019 08:46:15 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 10-01-2019 08:46:31 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 10-01-2019 08:48:58 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | 2698762851 | Incoming | 10-01-2019 09:43:41 | 10-01-2019 09:43:57 | 16 | Voice | 90 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 10-02-2019 12:02:47 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 10-02-2019 12:27:17 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 10-02-2019 14:37:03 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 10-18-2019 17:58:51 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 10-18-2019 17:59:53 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 11-21-2019 12:31:06 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 12-04-2019 08:14:55 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 12-04-2019 08:19:30 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 12-04-2019 08:19:41 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 12-12-2019 09:59:39 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 12-12-2019 10:02:54 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 12-19-2019 12:28:38 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 12-19-2019 12:28:46 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-04-2020 23:17:05 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-04-2020 23:19:19 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-05-2020 07:32:55 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-05-2020 10:29:44 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-05-2020 10:29:50 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-10-2020 15:05:46 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-10-2020 15:05:47 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-10-2020 15:09:45 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-10-2020 15:10:29 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-10-2020 15:10:30 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-10-2020 15:26:47 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-10-2020 15:36:46 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-10-2020 15:36:47 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-10-2020 15:39:20 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-10-2020 15:57:04 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-10-2020 17:32:34 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-10-2020 17:32:40 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-13-2020 07:01:45 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-14-2020 16:15:48 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-14-2020 16:17:34 | | 0 | Text | 540 | 2698762851 |

| 7039739038 | 2698762851 | | Incoming | 01-14-2020 16:35:53 | | 0 | Text | 540 | 2698762851 |
|---|---|---|---|---|---|---|---|---|---|
| 7039739038 | 2698762851 | | Incoming | 01-14-2020 16:35:55 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-15-2020 09:40:32 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-15-2020 09:40:35 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-15-2020 09:54:14 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-15-2020 16:40:20 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-17-2020 08:59:10 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-17-2020 08:59:38 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-17-2020 09:18:43 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-17-2020 09:26:09 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-17-2020 09:31:57 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-17-2020 09:32:27 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 01-17-2020 09:33:38 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 02-11-2020 12:09:58 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 02-11-2020 12:10:00 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 02-11-2020 12:10:14 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 02-15-2020 19:56:17 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 02-15-2020 19:56:24 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 02-16-2020 09:25:33 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 02-16-2020 09:25:34 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 02-17-2020 10:00:15 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 03-10-2020 19:04:36 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 03-11-2020 12:57:17 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 03-11-2020 13:00:42 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 03-17-2020 11:04:39 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | 12698762851 | Undetermined | 03-17-2020 11:06:50 | 03-17-2020 11:07:17 | 27 | VoLTE | 178 | 2698762851 |
| 7039739038 | 62450000000122 | 62450000000122 | Routed | 03-17-2020 11:07:16 | 03-17-2020 11:07:17 | 1 | VoLTE | 454 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 03-17-2020 11:29:38 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | 2698762851 | Incoming | 03-17-2020 12:06:58 | 03-17-2020 12:07:16 | 18 | Voice | 178 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-29-2020 08:51:14 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-29-2020 08:57:25 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 05-29-2020 09:05:59 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 06-12-2020 14:56:02 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 06-12-2020 14:56:03 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 06-12-2020 15:06:48 | | 0 | Text | 540 | 2698762851 |
| 7039739038 | 2698762851 | | Incoming | 06-12-2020 15:06:54 | | 0 | Text | 540 | 2698762851 |



July 2, 2019

Kathleen T. T. Lewis, MPH, MT (ASCP)

Director, Laboratory Services

Inova Alexandria Hospital

4320 Seminary Road

Alexandria, VA 22304

Inova Health System

HR Benefits/Compensation

8110 Gatehouse Road, Suite 100W

Falls Church, VA 22042

**Re: Compensation Action Request (CAR) Form**

To Whom It May Concern:

Historically, IAH Respiratory Services Department (RT – Life Support) has analyzed Blood Gasses (ABGs) for the entire house. On July 2, 2019 IAH Laboratory Services began the process to transition ABG testing from RT to the lab for patient safety, compliance, and accreditation. This transition will prove to be beneficial regarding the standardization of care throughout the system. The implementation "kick-off" took place on July 2, 2019.

The current Lab Services Director role needs to be evaluated for equitable compensation that is comparable to the Director Role at IFMC Lab Services and the DMV vicinity. Transitioning RT

KL0031

to IAH Lab Services has added the following entities to the lab Director's current role (not limited to the below):

- Change in Scope of Services Provided by IAH Laboratory Services
- Change in Responsibilities for the Laboratory Director
    - ✓ Current oversight of:
        - IAH Laboratory Services
        - SHP Laboratory Services
        - Mark Center – POCT Testing
    - ✓ Additional oversight of:
        - RT POCT Areas (NICU, ICUs)
        - Additional proposed satellite labs for IAH
- Transition of entire Line of Service offered with IAH Laboratory Services
    - ✓ Implement the following tests:
        - Cooximetry
        - Arterial Blood Gas
        - Venous Blood Gas
        - Electrolytes – Potassium, Sodium, Chloride, Ionized Calcium
        - Lactic Acid (Sepsis Protocol)
        - Creatinine
    - ✓ Must re-onboard pH pleural fluids for Interventional Radiology. Testing ceased in the fall of 2018 due to CAP compliance concerns.
- Long-term compliance oversight for the IAH Lab Services Director and Chief Medical Director (not a one-time affair – extended period of time) for the Blood Gas service line
- Department Reorganization – Lab Services
    - ✓ Create physical space for Critical Care Lab/Inventory (consumables)
    - ✓ Standardize inventory orders for new service line in the lab.
    - ✓ Create new workflow for ABGs at IAH for all units in partnership with RT.
    - ✓ Additional collaboration with service line medical directors and nursing leadership to meet their inherent departmental needs.
    - ✓ Testing & Validation - RFS Submission for IT SOFT Build, Data Drops, IT Equipment
    - ✓ Add new service line to current CAP accreditation (compliance, testing)
    - ✓ Cross-Train current staff in ABGs for effective workflow.
    - ✓ Vendor relationship with Radiometer to standardize processes with Laboratory services System-wide
    - ✓ Implement a new Quality Assurance program (AQURE) with Radiometer.
- Onboard additional 1.0 FTE in Laboratory Services Leadership (Chemistry Section Specialist) role to accommodate ABG service line (must be trained and on-boarded before "go live").

KL0032

- ▪ Onboard/Oversight of additional staff
  - ✓ 3.0 newly hired lab FTEs for centralized ABGs in the laboratory
  - ✓ Additional lab FTEs to be added as the transition continues for the ancillary labs in the NICU and MSICU to cover the ABG service line 24/7. The transition is due to be completed by 2nd or 3rd quarter of 2020. POCT & the Lab Leadership team would need approval for the additional roles to support the POCT teams (future request):
    - • 1.0 FT QA/QC Coordinator or Specialist
    - • 1.0 FT Laboratory Services Manager
    - • 1.0 FT ON Shift Supervisor
  - ✓ Oversight of the entire RT Point of Care Testing operation (POCT) for currently 33 RT staff approved for NICU/ICUs.
  - ✓ Oversight of additional POCT site's team members if warranted (ex. CVIR, ED) by Lab Leadership.

It is essential that this role is reviewed for equitable compensation dating from when the project began (July 2, 2019). Please reach out to me directly if you have any further questions.

Kind Regards,

**Kathleen T. T. Lewis , MPH, MT (ASCP)**
Director, Laboratory Services
Inova Alexandria Hospital
4320 Seminary Road
Alexandria, Virginia 22304
**IAH T** 703-504-3866   / **HealthPlex T**  703-797-6867

Kathleen.Lewis@inova.org

KL0033


**INOVA HEALTH SYSTEM**

# Compensation Action Request (CAR) Form

## Operating Unit (OU) Information

| Process Level **Number**: | 160 | **Department Number**: | 761 | **Location**: | IAH & SHP |
|---|---|---|---|---|---|

## Job Information

| | |
|---|---|
| **Job Title\***:   Kathleen Lewis | **Current Pay Grade**:   M07 |

\* Please attach a current job description in Inova's competency based job description format. All requests should have a job description set up in the Management Portal. profile portal.

**Job Code**:   565160

## Supervisor Information

| **Name\*\***: | Shannon North-Giles | **Employee Number**: | | **Job Title**: | Sen Dir, Ambulatory Servs |
|---|---|---|---|---|---|
| **Process Level Number**: | | **Department Number**: | | **Location**: | IAH & SHP |

## Employee Information *(Required if action requested affects individual employee(s))*

| **Name\*\***: | Kathleen Lewis | **Employee Number**: | 73654 |
|---|---|---|---|

\*\* For multiple employees, attach spreadsheet with employee information

## Request Information

**(Check one)**

**Activity Requested** *(Required Signatures)*

**Job Evaluation**

- ☐ Create a new position
- ☐ Activate existing Inova position at new O.U.
- ☒ Re-Evaluate Position
- ☐ Set up Shift Differential Pay /On-Call Pay / Charge Pay *(Circle One)*
- ☐ Edit position content
- ☐ Deactivate position (1, 2)

**Market/ Equity Evaluation**

- ☐ Market Review
- ☒ Internal Equity Review

**Other**

- ☒ Please Specify    <u>Transition ABGs from IAH</u> Respiratory Services to IAH Lab Services.

**Reason for Request** *(Please attach supporting documentation)*

- ☒ Change in Scope
- ☒ Change in Responsibilities
- ☒ Changed Line of Service
- ☒ Department Reorganization
- ☐ Recruitment/ Retention Issue
- ☐ Equity Concerns
- ☐ Other

**Note:**

Please attach a Business Case Memo that explains/supports this request.  Be sure to describe how this position impacts the rest of the department and/or operating unit, and what other positions, if any, you consider to be comparable to this position.

## Authorization and Approvals

Kathleen      Lewis

| | | |
|---|---|---|
| 1. Department Director's Name (Printed) | 1. Department Director's Signature of Approval | Date |
| 2. Department Senior Leader's Name (Printed) | 2. Department Senior Leader's Signature of Approval | Date |
| 3. SVP Leader's Name (Printed) | 3. SVP Leader's Signature of Approval | Date |

## For Compensation Use Only

| | |
|---|---|
| Date Form Received: | CAR Number Assigned: |
| Consultant Name: | Date Completed: |

Revised as of 5/05

# KL0034

As an exercise in this two assignment are defined:
1. Develop an ABG presentation that allows for several options to ensure compliance, efficiency, safety, and cost. One of these options should include respiratory therapy to continue to run ABG's while lab runs the rest of the needed tests. Due April 12th.
2. Work with CVIR to facilitate a plan to begin plavix resistant testing at IAH. Due May 3rd.

## Goal Details

| Goal Description* | Continue development around thinking creatively about solutions that meet cross functional needs. | Development Action | As an exercise in this two assignment are defined:
1. Develop an ABG presentation that allows for several options to ensure compliance, efficiency, safety, and cost. One of these options should include respiratory therapy to continue to run ABG's while lab runs the rest of the needed tests. Due April 12th.
2. Work with CVIR to facilitate a plan to begin plavix resistant testing at IAH. Due May 3rd. |
|---|---|---|---|
| Start Date | 01/01/2019 | Due Date | 12/31/2019 |
| Status | Not Started | | |

## Overall Summary of Performance

This section provides an overall summary of the employee's performance. All goals, associated ratings, and weights can be reviewed before submission and edited for revision before manager approval.

**Overall Form Rating:**                                    **Adjusted Calculated Form Rating:**
Meets Expectations                                          Meets Expectations

| | Rating | Weight |
|---|---|---|
| **Cultural Belief Competencies** | | 60.0% of total score |
| Lives our "Patient Always" Cultural Belief | Meets Expectations | |
| Lives our "Value People" Cultural Belief | Meets Expectations | |
| Lives our "Stronger Together" Cultural Belief | Meets Expectations | |
| Lives our "Focus" Cultural Belief | Meets Expectations | |
| Lives our "Engage and Decide" Cultural Belief | Exceeds Expectations | |
| Lives our "Tell Me" Cultural Belief | Meets Expectations | |
| **Leadership Competencies** | | 40.0% of total score |
| Demonstrates Critical Thinking and Sound Decision Making | Exceeds Expectations | |
| Demonstrates Leadership Courage | Meets Expectations | |
| Takes Accountability | Meets Expectations | |
| Pursues New Ideas and Leads Change | Meets Expectations | |
| Attracts, Retains and Develops High Performers | Meets Expectations | |
| Achieves Desired Results and Outcomes | Meets Expectations | |
| **Professional Development Plan** | | 0.0% of total score |
| Increase 'tell me' feedback evidenced by self-development log at mid-point check in and reaching the benchmark or 71.3% in "manager open and responsive to feedback" scores. | | |
| Continue development around thinking creatively about solutions that meet cross functional needs. | | |

## Signatures

In signing this performance assessment form, I am acknowledging that I have seen and discussed my performance with my manager or, (if the manager) with my direct report. My signature indicates receipt of, but not necessarily concurrence with, the content of the assessment.

Please be advised that any comments provided in this acknowledgment section are visible to both manager and employee after signing.

**Employee:**   KATHLEEN T LEWIS has not signed yet

**Manager:**   SHANNON M NORTH-GILES has not signed yet

KL1035



# LEWIS, KATHLEEN

**2019 Yearly Performance Check-In**
Document Status Assessment Shared with Team Member
Evaluated By NORTH-GILES, SHANNON

## Employment Details

|  |  |
|---|---|
| **Person Number** | 73654 |
| **Job** | DIR LAB SVCS |
| **Department** | 160761 - LABORATORY ADMIN |
| **People Leader** | NORTH-GILES, SHANNON |

## 2019 Final Rating

|  | **Team Member** | **People Leader** |
|---|---|---|
| **2019 Final Rating** | Exceptional | Successful |
| **Comments** | There have been a lot of excellent things that have occurred for the IAH/SHP Lab Services team in 2019. This occurred of the tremendous efforts by all team members and our partnerships throughout the house. Interactions from some parties have improved since the spring of 2019 (ex communication, feedback, etc). I truly hope that it is sustainable. My goal is to uphold Inova's cultural beliefs, make my team even stronger, exude our mission/vision/values in an effort to provide quality patient care. We have worked hard and our efforts show not just internally but even at the system level | Kathleen has made progress in both areas outlined last year as goals. Her ability to engage cross functional parties has objectively been enhanced in the last several months. She has been working closely with her leadership, nursing departments, and respiratory therapy. This last year has been one of significant leadership changes both at the system and the local level. Objectives for continued successful performance over the next year will be as follows:<br><br>1.   Operational (My |

**KL1037**