IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| KATHLEEN LEWIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:23-cv-1716 (LMB/LRV) |
| ) | |
| INOVA HEALTH CARE SERVICES, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff Kathleen Lewis ("Lewis" or "plaintiff") has filed a four-count Complaint against defendant Inova Health Care Services ("Inova" or "defendant"), alleging in Counts I and II that she was subjected to racial discrimination and in Counts III and IV that she was subjected to retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), et seq., and 42 U.S.C. § 1981. Before the Court is defendant's Motion for Summary Judgment ("Motion"), [Dkt. No. 26], which has been fully briefed and argued. For the reasons that follow, defendant's Motion will be granted and judgment will be entered in favor of defendant.

### I. BACKGROUND

#### A. Statement of Undisputed Facts

The following facts are not in dispute. From July 2016 through July 2020, plaintiff, an African American woman, was employed by Inova as the Director of Laboratory Services at its Alexandria facility. Motion ¶ 1; [Dkt. No. 1] ¶ 13. In early 2018, plaintiff's supervisor, Katherine Slattery ("Slattery"),[1] concluded in an evaluation that plaintiff was not meeting

---

[1] The record is silent as to Slattery's race.

expectations in two categories: "Lives our 'Stronger Together' Cultural Belief" and "Lives our 'Tell Me' Cultural Belief." Motion ¶ 3. According to the evaluation, "[t]he belief shared was that [plaintiff] was not a role model for collaboration and often suggestions for compromise were met with defensiveness or negativity," and that plaintiff "needs to better demonstrate that she absorbs the feedback that she received from others by acting on it . . . ." Id. ¶ 4. On February 15, 2018, Slattery placed plaintiff on a performance improvement plan ("PIP") designed to address concerns about plaintiff's perceived "unwillingness to partner or compromise," her "defensive manner" and "negative tone" when responding to leaders, and concerns that plaintiff was not "proactively escalating" concerns involving the lab.[2] Id. ¶ 5. The PIP stated that plaintiff "must show immediate improvement and sustain improved performance on an on-going basis beyond the assessment period of this Plan. Recurring or additional performance issues will result in action up to and including termination of employment without further coaching or notice." Id. ¶ 6. Although plaintiff completed the PIP in April 2018, "[t]here remain[ed] outstanding concerns regarding the relationship with the perioperative leadership team." Id. ¶ 7.

In 2019, plaintiff's new supervisor, Shannon North-Giles ("North-Giles"), who is Caucasian, observed that plaintiff had begun exhibiting behaviors similar to those referenced in the 2018 PIP. Id. ¶¶ 10, 12; Def. Ex. 15 at 2. North-Giles and human resources ("HR") staff discussed issuing a Memorandum of Expectations, which would require plaintiff to change "the recurring pattern of behaviors observed by Inova" to "continue in Inova's work environment." Motion ¶ 12. On June 20, 2019, North-Giles and HR Business Partner Lanai Jackson ("Jackson"), who is African American, met with plaintiff to provide counseling "regarding her

---

[2] Plaintiff argues that the "PIP was dishonest, unfair and unjustified," [Dkt. No. 29] at 2, but she does not dispute that the PIP recited the deficiencies with which she disagrees.

communications and how they failed to embody Inova's values." Id. ¶¶ 15–16. On July 2, 2019, Inova issued plaintiff a Memorandum of Expectations, requiring that she "make herself available to her colleagues for collaboration and partnership," "halt reflexive email push back," "participate in cross-functional projects as requested," and act such that her "colleagues will no longer need to escalate to senior leadership for [plaintiff's] non-participation in operational changes and improvements." Id. ¶¶ 17, 19; Def. Ex. 16. As with the 2018 PIP, the 2019 Memorandum of Expectations warned that "[r]ecurring or additional performance issues may result in action up to and including termination . . . ." Motion ¶ 20.

On October 2, 2019, plaintiff emailed HR with concerns about North-Giles, stating "I feel as though I am being harassed . . . and treated badly." Id. ¶ 23. In response, HR coordinated a meeting with plaintiff, North-Giles, and Karen Wastler ("Wastler")[3]—North-Giles's supervisor—to "determine what needs to happen to ensure [plaintiff] feel[s] [she is] being treated fairly and respected as a leader, and, [North-Giles] is able to obtain information from [plaintiff] to be effective and accountable in her role." Id. ¶ 24. There is no indication in the record that plaintiff alleged in that meeting that the purported harassment or bad treatment about which she complained was due to her race. See id. ¶ 25; see also [Dkt. No. 29] at 5.

In the spring of 2020, Inova received a complaint in an exit interview that plaintiff was "extremely difficult to work with . . . and . . . made it a hostile environment." Motion ¶ 29. As a result of this report, HR tasked Jackson with conducting a Cultural Assessment of plaintiff's department. Id. ¶ 35. North-Giles was not involved in the decision to conduct a Cultural Assessment and did not conduct it. Id. ¶ 31.

---

[3] According to the Complaint, Wastler is Caucasian. [Dkt. No. 1] ¶ 6.

3

On June 29, 2020, while the Cultural Assessment was still pending, plaintiff submitted a grievance against North-Giles to HR members Terri Feely (Caucasian), Kelly Armstrong (Caucasian), MaryBeth Ireland (Caucasian), and Renauldo Hawkins (African American). Id. ¶ 37. In the grievance, plaintiff posed a series of rhetorical questions regarding her perception that North-Giles treated her differently without making any express claim of racial discrimination. Id. ¶ 38. The grievance stated on the second page:

> I have no clue why my Senior Director [North-Giles] targets and treats me differently. Is it because I am younger than her? Is it because I look different than her? Is it because I have a different skin hue than her? Is it because I am taller than her? Is it because my knowledge base and experiences are different from hers?

Def. Ex. 25 at 2. Renauldo Hawkins ("Hawkins")[4] shared the grievance with Wastler and their supervisors, but not with Sean McCleary ("McCleary"), as he was not in North-Giles's chain of supervision. Motion ¶ 39. McCleary, a Caucasian, was Vice President of the laboratory services line and a member of Inova Alexandria's executive team. Id. ¶ 46.

In response to plaintiff's grievance, Hawkins interviewed all the directors who, like plaintiff, reported to North-Giles to determine whether, among other things, North-Giles treated plaintiff differently from others. Id. ¶ 41. None of them substantiated plaintiff's claim that she was treated differently; rather, they described North-Giles's intense management style as consistent across the directors under her supervision and showed that some appreciated that style while others did not. Id. ¶ 43. For example, two directors—an Asian female and a Caucasian female—perceived North-Giles's behavior as disruptive and micromanaging, whereas two other directors—an African American male and a Caucasian female—viewed North-Giles's high level of involvement with the team as positive. Id. ¶ 42; Def. Ex. 26. In light of these findings,

---

[4] Hawkins was the Interim HR Director beginning in 2019. See [Dkt. No. 1] at 2.

4

defendant decided to honor plaintiff's request and allowed her to report to McCleary, a member of the executive team, rather than to North-Giles.[5] Motion ¶¶ 44, 46; Def. Ex. 27.

On July 7, 2020, McCleary, Wastler, and Hawkins met to review the results of the Cultural Assessment. They determined that plaintiff had "always had challenges with her behavior and aligning with Inova's cultural values." Def. Ex. 29. Based on plaintiff's behavioral issues and on recent complaints about her creating a hostile culture involving fear of retaliation and a lack of collaboration—complaints that were substantiated by the Cultural Assessment—McCleary decided to terminate plaintiff's employment with Inova. Motion ¶ 46. The Cultural Assessment was not the sole reason for McCleary's decision to terminate plaintiff's employment. Id. ¶ 48. He also considered exit interview feedback and his own interactions with plaintiff, which had indicated to him that she did not prioritize how the lab fit into the larger structure of the organization and that she did not work collaboratively with leaders in other departments. Id. ¶ 49.

There is no evidence in the record that, in making the decision to terminate plaintiff's employment, McCleary considered plaintiff's race or plaintiff having filed the grievance against North-Giles, and there is no evidence in the record showing that McCleary was aware of plaintiff raising the hypothetical question about race discrimination in the grievance or at any other time.[6] Id. ¶ 52–53; Def. Ex. 24 ¶¶ 13–15.

---

[5] In response to the investigation into plaintiff's grievance, defendant also provided coaching to North-Giles on her management style. Def. Ex. 27.

[6] In March of 2019, plaintiff had requested that her compensation be reviewed because she would soon be undertaking additional duties. Def. Ex. 33 at 2; Motion ¶ 56. Plaintiff updated the request in July 2019 and followed up with Hawkins on June 22, 2020. Def. Ex. 33 at 2. Hawkins replied the same day, updated her request, and sent it to McCleary. Id. From June 23, 2020 through at least June 25, 2020, McCleary compared plaintiff's position to lab directors at other Inova locations, determined that plaintiff was being equitably compensated in line with her scope of duties and tenure at Inova, and denied her request. See Def. Ex. 34; Motion ¶¶ 61–64.

5

On July 27, 2020, McCleary provided plaintiff a Notice of Termination that outlined the reasons for his decision, including references to plaintiff's "multiple violations of Inova's 'Standards of Behavior' and demonstrating acts and behaviors that reflect unfavorably upon the reputation of Inova, and failing to meet Inova's expectations for a Director." Motion ¶ 54; Def. Ex. 30.

Because the rhetorical question in plaintiff's 2020 grievance was the only hint in the summary judgment record of plaintiff claiming that her race was the reason for North-Giles's negative treatment, during oral argument, plaintiff's counsel was asked to identify any other evidence of defendant being put on notice of plaintiff being treated in a racially discriminatory manner. Plaintiff's counsel responded by presenting a copy of an email that plaintiff sent to Wendy Jolly, an Inova HR employee, on July 3, 2019. There was no reference to this email in either plaintiff's Complaint or her opposition to defendant's motion for summary judgment. In the email, plaintiff complained about North-Giles and then-HR Director Robyn Waldron:

> I am not sure if it is due to my boss not liking me, me being a minority (African American), gender (female), a young leader, etc. I feel like I am being treated differently than my colleagues that do not look like me in this type of role.
> Would you have time to talk to me?

KL1072. Plaintiff's counsel discussed this document without citing to where in the record it came from. Counsel went on to allege—without providing supporting evidence—that defendant never responded to this email. Because that email was not included in the summary judgment record, the Court is free to disregard it; however, even if it were considered, it would not change the outcome. Fed. R. Civ. P. 56(c)(3).

---

There is no evidence in the record indicating that, in denying her request for a raise, McCleary considered plaintiff's race or was aware at that time that plaintiff had complained of any discrimination based on her race. Motion ¶ 65; Def. Ex. 24 ¶¶ 20–21.

6

## B. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." Variety Stores v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018). Once the moving party has met its burden to show that it is entitled to judgment as a matter of law, the nonmoving party "must show that there is a genuine dispute of material fact for trial . . . by offering sufficient proof in the form of admissible evidence." Id. (quoting Guessous v. Fairview Prop. Inv'rs., LLC, 828 F.3d 208, 216 (4th Cir. 2016)). In evaluating a motion for summary judgment, a district court must consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from those facts in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

## II. ANALYSIS

### A. Discriminatory Employment Practices (Counts I and II)

To establish a prima facie case for discrimination based on race, a plaintiff may use direct or circumstantial evidence. In the absence of direct evidence, the burden-shifting framework of McDonnell Douglas Corp. v. Green governs the allocation of proof. 411 U.S. 792 (1973). Because plaintiff has not provided any direct evidence that any of defendant's actions were based on her race, she must support her claims with circumstantial evidence under the McDonnell-Douglas framework, which provides that: (1) plaintiff must first establish a prima facie case of discrimination; (2) if she does, then the employer must articulate a legitimate, nondiscriminatory reason for its actions; and (3) in order to prevail, plaintiff must establish that the employer's

7

articulated legitimate, nondiscriminatory reason or reasons were a pretext to mask unlawful discrimination. See id. at 802–04; see also Pearson v. Prince William Cnty. Sch. Bd., No. 1:19cv1543, 2021 WL 1150068, at *11 (E.D. Va. Mar. 25, 2021), aff'd, 858 F. App'x 650 (4th Cir. 2021).

To establish a prima facie case of discriminatory employment practices under Title VII or 42 U.S.C. § 1981, plaintiff must show (1) her membership in a protected class; (2) an adverse employment action; (3) that at the time of the adverse employment action, she was meeting her employer's legitimate expectations; and (4) that the adverse employment action "occurred under circumstances giving rise to an inference of unlawful discrimination." Swaso v. Onslow Cnty. Bd. of Educ., 698 F. App'x 745, 748 (4th Cir. 2017) (quoting Adams v. Tr. of Univ. of N.C.-Wilmington, 640 F.3d 550, 558 (4th Cir. 2011)). The fourth element is met if "similarly-situated employees outside the protected class received more favorable treatment." White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004).

Plaintiff satisfies the first two elements because she is a member of a protected class (African American) and suffered an adverse employment action—termination. What is disputed is whether plaintiff "was performing at a level that met [her] employer's legitimate expectations," Guessous, 828 F.3d at 219, and whether she has presented evidence of disparate treatment that gives rise to a reasonable inference of unlawful discrimination.

1. Inova's Legitimate Expectations

In her opposition to defendant's Motion, plaintiff argues that it "is simply not true" that she "was performing below Inova's legitimate expectations at the time of her termination." [Dkt. No. 29] at 10. In support of this conclusory statement, plaintiff observes that she "received an overall rating of Meets Expectations in her Performance Assessment in 2018 and a rating of

8

Successful in her Yearly Performance Check-In for 2019," and that she was not placed on a PIP in 2019 or 2020. Id. at 10–11.

Evidence of satisfactory job performance can rebut an employer's claim of unsatisfactory performance, but only if the employee's evidence raises a genuine dispute about her performance during the timeframe relevant to the adverse employment action. In Haynes v. Waste Connections, Inc., 922 F.3d 219, 225 (4th Cir. 2019), the court found that an employee who was told "mere weeks before his termination[] that 'everything looks good' and there was 'nothing to worry about' regarding his upcoming performance review," and who "received bonuses for the period in question," raised a genuine dispute of material fact as to whether he was meeting his employer's legitimate expectations at the time of termination. By contrast, Lewis was terminated in 2020, which renders her 2018 and 2019 performance appraisals irrelevant. Plaintiff has not cited any caselaw, nor is the Court aware of any, suggesting that evidence of satisfactory performance one and two years before termination is sufficient to create a material dispute of fact in the face of evidence of unsatisfactory performance during the year leading up to termination. Moreover, plaintiff has not offered any evidence disputing that defendant placed her on a PIP in 2018 designed to address concerns about her perceived "unwillingness to partner or compromise," "defensive manner," and "negative tone." Motion ¶ 5. Although plaintiff argues that the "PIP was dishonest, unfair and unjustified," [Dkt. No. 29] at 2, she has not produced any evidence supporting those allegations.[7] Furthermore, plaintiff does not dispute that

---

[7] In her opposition to defendant's Motion, plaintiff cites to her own deposition when arguing that the PIP was "extended several times for no reason." [Dkt. No. 29] at 2. Plaintiff also cites to a sentence in her own "Rebuttal to Position Statement" from the EEOC proceeding in which she claimed that "[t]he parties underwent mediation and the mediator even stated he didn't understand why Ms. Lewis was on a PIP to begin with." [Dkt. No. 30] at 1. There is no report from a mediator in this record. Other than her opinion, plaintiff has not cited to any evidence suggesting that the PIP was unfair, dishonest, or unjustified.

9

the July 2, 2019 Memorandum of Expectations addressed many of the same concerns defendant had about plaintiff's behavior that were addressed in the 2018 PIP.

Additional evidence of plaintiff's unsatisfactory job performance came from complaints defendant received about plaintiff from her colleagues, including two complaints from Dr. Yan Liu, an Asian female. Def. Ex. 11 at 30–31. In February and March of 2020, Dr. Liu expressed concerns to Wastler about being "extremely nervous" interacting with plaintiff and her belief that other team members may be unwilling to speak candidly about their similar concerns regarding working in plaintiff's work environment. Motion ¶ 26; Def. Ex. 19. Plaintiff argues that the complaints against her were unfounded, citing Hawkins's deposition testimony in which he said that an HR mediation meeting between plaintiff and Dr. Liu to discuss any concerns resulted in no finding of fault. [Dkt. No. 29] at 5; Def. Ex. 11 at 30–31. Even though plaintiff was not found to be at fault, that a fellow supervisor made two complaints about plaintiff that resulted in the need to conduct a mediation is evidence of plaintiff presenting a continued problem for the defendant.

Defendant also considered an exit interview from Emily L., a Caucasian pathology assistant who complained that plaintiff was "extremely difficult to work with" and that the resulting "hostile environment" was one of her reasons for resigning. Motion ¶ 29; Def. Ex. 22 at 3–4. Plaintiff has not offered any evidence to create a dispute as to these statements having been made by Emily L. and considered by McCleary when he assessed plaintiff's performance leading up to termination of her employment.

Another data point regarding plaintiff's job performance was the July 6, 2020 Cultural Assessment in which Hawkins, Wastler, and McCleary—not North-Giles—determined that plaintiff had "always had challenges with her behavior and aligning with Inova's cultural

values." Def. Ex. 29; Motion ¶ 46. Of the 39 responses to the assessment, eight members of plaintiff's lab team expressed that they did not feel comfortable speaking with the lab leadership team for fear of retaliation. Motion ¶ 45; Def. Ex. 28 at 7. Team members also reported that they did not feel plaintiff would listen to suggestions. Def. Ex. 28 at 7.

Plaintiff argues that the Cultural Assessment targeted her unfairly and the results from it did not justify disciplinary action because they were "overwhelmingly positive." See [Dkt. No. 29] at 5–8. In support of her assertions, plaintiff cites to two responses to the Cultural Assessment by plaintiff's then-supervisees. Deborah Sexton, an Asian American female, wrote that "this 'climate assessment' looked like a witch hunt against [plaintiff]" and was "aimed at [plaintiff]." [Dkt. No. 30] at 28. Bixbie Rivales, an Asian female, wrote that she "did not get the feeling of fairness, neutrality nor objectivity in the line of questioning," which was "about [plaintiff's] leadership and not about the employee experience as a whole." Id. at 30.

The responses of these two team members do not contradict those of the other respondents who expressed concerns with plaintiff's leadership of the department. McCleary testified that the Cultural Assessment was considered in the context of similar concerns raised in the 2018 PIP, the 2019 Memorandum of Expectations, the feedback in Emily L.'s exit interview, and his own observations, and it "led [him] to conclude that the culture of the lab, including the expression of fear of retaliation . . . would not change if [plaintiff] remained in her position . . . ." Def. Ex. 24 at 2. The material fact raised by the negative feedback in the Cultural Assessment is not whether a majority of the team felt the same way or whether the assessment was conducted with an emphasis on the plaintiff as the leader of the department, but whether the results supported McCleary's determination that plaintiff was not meeting Inova's legitimate

11

expectations. Plaintiff has not produced any evidence to dispute that the Cultural Assessment supported McCleary's decision.

Finally, plaintiff does not offer evidence contradicting that three different supervisors found that her conduct (in at least some respects) fell below Inova's standards.[8]

2. Inference of Discrimination

Even if plaintiff's arguments and evidence established a material dispute that she was meeting defendant's legitimate expectations, plaintiff still must show that the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination. Such an inference may be established by producing evidence that similarly situated employees outside plaintiff's protected class were treated differently. "The similarity between comparators . . . must be clearly established in order to be meaningful." Lightner v. City of Wilmington, N.C., 545 F.3d 260, 265 (4th Cir. 2008) (rejecting a comparison between a higher-ranking plaintiff and a lower-ranking comparator in a different division).

In her Complaint, plaintiff points to various comparators outside her protected class to support this element of the prima facie case. Frist, the Complaint alleges that a Caucasian "Histology Technician" "was not terminated despite egregious violations of Standards of Behavior, to include throwing things at people, threatening, screaming at and calling people 'bitches' and 'hoes' from 2016 through 2022. Instead, HR placed him on extended [PIPs]." [Dkt. No. 1] ¶ 79. Plaintiff did not offer any evidence substantiating this allegation. Even if evidence in the record did support this allegation, the Histology Technician is not a suitable

---

[8] The 2018 PIP was implemented by Slattery, the 2019 Memorandum of Expectations was issued by North-Giles, and the 2020 Cultural Assessment and termination decision were made by McCleary.

12

comparator. Based solely on their respective titles, "[t]he difference in their positions within [Inova] makes the purported comparison in this case too loose." Lightner, 545 F.3d at 265.

The Complaint also alleges that the two Caucasian directors (i.e., plaintiff's peers also under North-Giles's supervision) were "not subjected to the same conduct" as plaintiff, such as being denied a raise, having North-Giles tell colleagues not to work with her, North-Giles dropping in unannounced at meetings, and lowering performance evaluation scores due to "historic bias" [sic—the phrase was "historic perceptions," used in reference to perceptions in the lab]. [Dkt. No. 1] ¶¶ 43, 45, 47, 49.

There is evidence in the record that two directors who were not African American were not terminated after receiving negative feedback on a Cultural Assessment. Hawkins testified that these directors were given "documented coaching conversations," and no other disciplinary action was taken; however, he explained that, contrary to plaintiff's circumstances, "[t]his feedback was the first time hearing this about either one of those leaders." Def. Ex. 11 at 20. Thus, unlike plaintiff, these two directors had no "history of performance [issues]," "written expectations [they] previously had been given which did not result in sustained improvement of [their] performance, [or] recent complaints"—all reasons given by McCleary for his determination that plaintiff failed to meet defendant's expectations and supporting his decision to terminate her employment. Def. Ex. 24 at 2.

The results of defendant's investigation into plaintiff's grievance provide additional uncontradicted evidence that plaintiff was not treated differently on account of her race. Of the four other directors surveyed, one Caucasian director and one Asian director reported negative treatment by North-Giles, and an African American director had no problem with North-Giles's conduct. See Motion ¶ 42; Def. Ex. 26. This evidence undercuts plaintiff's claim that she was

treated differently due to her race. For all these reasons, the evidence in the record does not create a reasonable inference of unlawful discrimination. Given the lack of evidence supporting the third and fourth elements of a prima facie claim of race discrimination, plaintiff has failed to satisfy the first step of the McDonnell Douglas framework.

### 3. Steps Two and Three of the McDonnell Douglas Framework

Even if the plaintiff had established a prima facie case of racial discrimination, defendant has satisfied step two of the McDonnell Douglas framework by providing legitimate, nondiscriminatory reasons for its actions as described in detail above. McCleary's stated reasons for terminating plaintiff's employment were plaintiff's "multiple violations of Inova's 'Standards of Behavior' and demonstrating acts and behaviors that reflect unfavorably upon the reputation of Inova, and failing to meet Inova's expectations for a Director." Motion ¶ 54; Def. Ex. 30. There is ample evidence that plaintiff, who was an at-will employee, persisted in behaviors that did not meet defendant's expectations as documented in the 2018 PIP, the 2019 Memorandum of Expectations, Emily L.'s exit interview, results from the 2020 Cultural Assessment, and McCleary's personal observations. Accordingly, defendant has met its burden of producing legitimate, non-discriminatory reasons for the decision to terminate plaintiff's employment.

The same is true of defendant's decision to deny plaintiff's request for a pay raise. McCleary gathered data of other lab directors' profiles and salaries to determine that plaintiff was being equitably compensated. Indeed, she was making more than one other director who actually had several more years of experience than plaintiff.

Plaintiff has not shown that these explanations were pretext for discrimination. The Fourth Circuit "has held that to establish that an employer's 'proffered reason for the challenged action is pretext for discrimination, the plaintiff must prove both that the reason was false, and that discrimination was the real reason for the challenged conduct.'" DeJarnette v. Corning Inc.,

14

133 F.3d 293, 298 (4th Cir. 1998) (quoting Jiminez v. Mary Wash. Coll., 57 F.3d 369, 377–78 (4th Cir. 1995)). Plaintiff argues that defendant's reasons for terminating her employment were false, but she has not produced any evidence to support this assertion. "The Court must 'generally consider self-serving opinions without objective corroboration not significantly probative,' such that a plaintiff's uncorroborated opinions and statements may be struck and disregarded as irrelevant." Pearson, 2021 WL 1150068, at *1 (quoting Evans v. Tech. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996)). To the extent that plaintiff's arguments rely on her beliefs, for which she has not submitted a factual foundation, they do not create a genuine dispute of material fact.

Plaintiff asks the Court to infer pretext because "North-Giles was not subject to a Climate Assessment after Plaintiff's numerous complaints against her," "Hawkins determined that Plaintiff was not at fault after Dr. Liu complained in the first instance," and "[t]he Climate Assessment was overwhelmingly positive and yet[] used to terminate Plaintiff." [Dkt. No. 29] at 11. As explained above, plaintiff has not shown that defendant's reasons for terminating her employment were false. Undisputed evidence in the record shows that plaintiff was placed on a PIP in 2018 for behaviors that then recurred, as observed contemporaneously and later testified to by multiple supervisors and HR employees. The record further shows that plaintiff was given a Memorandum of Expectations addressing these concerns, followed by an exit interview with another employee, and the results from the Cultural Assessment that showed plaintiff continued to exhibit behaviors that did not meet defendant's legitimate expectations. Likewise, nothing in the record suggests that defendant—through McCleary, North-Giles, Slattery, Hawkins, or anyone else—were motivated by racially discriminatory intent. Accordingly, plaintiff has failed to provide any evidence creating a factual dispute as to whether defendant's proffered reasons for

its actions towards plaintiff were pretextual. For all these reasons, defendant will be granted summary judgment on Counts I and II.

### B. Retaliation (Counts III and IV)

To establish a prima facie case of retaliation, plaintiff must show "(1) that she engaged in protected activity, (2) that her employer took adverse action against her, and (3) that a causal relationship existed between the protected activity and the adverse employment activity." Guessous, 828 F.3d at 217 (cleaned up). "Protected activity under § 1981 includes opposing policies or practices that discriminated against any person on the basis of race." Cepada v. Bd. of Educ. of Balt. Cnty., 974 F.Supp.2d 772, 788 (D. Md. 2013) (internal quotation and citation omitted); see also 42 U.S.C. § 2000e-3(a).

The Complaint alleges that plaintiff engaged in protected activity on two occasions: (1) "when she complained to Wastler in the Spring of 2020" and (2) "on June 29, 2020 when she complained to Feely, Ireland, Armstrong and Hawkins [i.e., the Grievance]." [Dkt. No. 1] ¶¶ 96–97, 101–02. In her opposition to defendant's Motion, plaintiff also argues that the first times she engaged in protected activity were when she complained to HR on July 1, 2019 and October 2, 2019. See [Dkt. No. 29] at 11; see also [Dkt. No. 1] ¶¶ 14–15.

It is questionable whether any of these communications qualify as protected activity. Although the Complaint alleges that plaintiff "complained to Wastler in the Spring of 2020," there is no description of what that complaint alleged, other than a general claim that "Plaintiff then reported Giles' conduct to Wastler." [Dkt. No. 1] ¶ 17. When asked about this allegation in her deposition, plaintiff testified that she complained "about the time and attendance issues, about feeling isolated; about how I was spoken to, how I was treated; how I was subjected to anonymous complaints, . . . about feeling like I was discriminated against." Def. Ex. 1 at 89:13–18. Nothing in that complaint raised the issue of racial discrimination. This evidence is not

16

sufficient to support a reasonable inference that she was engaged in protected activity when she made her report to HR in the Spring of 2020.

Plaintiff's June 29, 2020 grievance fares no better. In the grievance, plaintiff states that she "has no idea why" North-Giles "targets and treats me differently," and then posits a series of rhetorical questions, the third of which was—"Is it because I have a different skin hue than her?" Def. Ex. 25 at 2. At no other point in the five-page, single-spaced grievance does plaintiff state that North-Giles treated her differently due to plaintiff's race. The rhetorical question about "skin hue" was the closest plaintiff came to questioning rather than alleging racial discrimination. Given that it was one of several questions posited rhetorically and not repeated in any other part of the grievance, it is not sufficient to constitute engaging in protected activity under Title VII or § 1981. Plaintiff's counsel did not offer any caselaw—nor did the Court find any—supporting the proposition that the types of rhetorical questions plaintiff posed to her employer put the employer on sufficient notice that she was complaining about racial discrimination.

The Complaint's allegations that plaintiff complained to HR in 2019 are similarly vague and do not mention race. The Complaint alleges that plaintiff "started working with HR through [Director] Walden [(who is Caucasian)] regarding her concerns," and that "she complained to Walden of Giles' worsening harassment." [Dkt. No. 1] ¶¶ 14–15. Specifically, plaintiff emailed HR that "I feel as though I am being harassed . . . and treated badly." See Def. Ex. 18 at 2. Plaintiff argues that "[i]t was Mr. Hawkins and Ms. Wastler's responsibility to ensure that Plaintiff was not retaliated against based on her complaints of discrimination," [Dkt. No. 29] at 11, but she offers no evidence that her complaints reported racial discrimination or that she was being retaliated against because of her complaints.

Again, plaintiff does not provide evidence showing that she was engaged in protected activity because none of her communications with HR mentioned race, and there is no evidence in the record that anyone from HR would have understood plaintiff's communications as claiming differential treatment based on race. By failing to show that she was engaged in protected activity, plaintiff cannot establish a prima facie case that defendant engaged in retaliation under Title VII or § 1981. Similarly, by failing to show that McCleary was even aware of plaintiff's complaints—much less that they were complaints based on racial discrimination—plaintiff fails to show a causal connection between the adverse employment action and any protected activity. Accordingly, Counts III and IV fail as a matter of law.

## III. CONCLUSION

Although the facts in the record support an inference that North-Giles was a difficult supervisor, they do not support an inference that any employee at Inova—including North-Giles—discriminated against plaintiff due to her race or retaliated against her due to her protected activity. Courts do "not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." DeJarnette, 133 F.3d at 299 (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997)). Although plaintiff may have been (justifiably) upset by her former supervisor's management style and treatment, the evidence in the record does not establish any legally cognizable harm under Title VII or § 1981. Just being subjected to harassment by a difficult supervisor or being terminated from employment does not establish an employer's liability under Title VII or § 1981. A plaintiff must produce evidence, not

conjecture, that the harassment or termination was the result of illegal discrimination or done to retaliate for engaging in protected activity. Plaintiff has failed to make this showing.

For all the reasons stated above, defendant's Motion for Summary Judgment, [Dkt. No. 26], will be granted by an Order that will accompany this Memorandum Opinion and judgment will be entered in favor of defendant.

Entered this 7th day of October, 2024.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge